IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

GREGORY JACK ALMOND and )
TERESA ROBERTS ALMOND, )
       )
     Plaintiffs, )
       )
v. ) Case No. 3:19-cv-175-RAH
       )
RANDOLPH COUNTY, ALABAMA; )
et al., )
       )
     Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Gregory Jack Almond and Teresa Roberts Almond (Plaintiffs or Almonds) are two adult residents of Randolph County, Alabama. They allege unlawful actions by Randolph County deputy sheriffs that violated their federal constitutional rights and constituted state-law torts. They seek both legal and equitable relief. Jurisdiction is proper pursuant to 18 U.S.C. §§ 1331 and 1343, and under pendant jurisdiction under 28 U.S.C. § 1367.

The case comes now before the Court pursuant to the motions to dismiss, both filed pursuant to Fed. R. Civ. P. 12(b)(6), filed by (1) Randolph County, Alabama (County) and the Randolph County Commission (County Commission) and (2) the sheriffs and deputy sheriffs. The Court considers these motions in turn. For the reasons that follow, each motion will be granted in part and denied in part.

1

## I.   Motion-to-Dismiss Standard

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  When evaluating a motion to dismiss pursuant to Rule 12(b)(6), the Court must "take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff."  *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 663 (alteration in original) (citation omitted).[1]

───────────────

1. Beyond cursory references and general citations regarding pleading standards, the Defendants' motions to dismiss do not present arguments that the Plaintiffs have *generally* failed to state a claim under Fed. R. Civ. P. 12(b)(6). Rather, they present a number of specific arguments against liability, primarily relating to County control over sheriffs and sheriffs' qualified immunity.  For instance, the sheriffs' brief summarizes that they "move for dismissal of the state

Finally, a motion to dismiss may be granted as to only part of a complaint. *See, e.g.*, *Chepstow Ltd. v. Hunt*, 381 F.3d 1077 (11th Cir. 2004).

## II. Factual Background

The relevant facts, as alleged by Plaintiffs, are as follows.

On January 31, 2018, Randolph County Deputy Sheriff Nathaniel Morrow attempted to serve civil papers on Greg Almond at the Almond residence in Randolph County, Alabama. (Doc. 67 at 8.) Teresa Almond answered the door and stated that Greg Almond was not present but that he would return approximately two hours later. (*Id.*) Morrow claimed to smell marijuana coming from the residence and left the premises. (*Id.*) Based on Morrow's alleged smell of marijuana, a search warrant was obtained. (*Id.*)

With the search warrant in hand, the Randolph County Narcotics Unit[2] (Unit) returned to the Almond residence later that day. (*Id.*) The Unit kicked in the door

---

law claims on the basis of State law immunity granted to Alabama sheriffs and their deputies under Article I, Section 14 of the Alabama Constitution and dismissal of the federal claims on the basis of qualified immunity." (Doc. 70 at 1; *see also* Doc. 78 at 4 (noting that "[d]efendants' motion does not allege that the Second Amended Complaint[] fails to contain sufficient factual mater, accepted as true, to state a claim to relief that is plausible on its face")).) Accordingly, the Court, at this time, considers only those substantive arguments that are discussed in the Defendants' motions and analyzed in their briefs.

2. The Narcotics Unit is made up of law enforcement officers from cities, municipalities, and the Randolph County Sheriff's Department. According to

and used a "shock" explosive device.  (*Id*. at 8-9.)  The Almonds were forcibly thrown to the floor by members of the Unit.  (*Id*. at 9.)

While executing the search, officers from the Unit searched through the Almonds' personal property.  (*Id*.)  They located a partially smoked marijuana cigarette, a marijuana plant, a small baggy with a leafy substance inside, and a single Lunesta pill.  (*Id*. at 9-10.)  Various property of the Almonds was seized, including numerous guns, $8,000 in cash, and jewelry.  (*Id*. at 9.)

The Almonds were arrested on charges of manufacturing a controlled substance and taken to jail.  (*Id*. at 10.)  They were released on bond the following day.  (*Id*.)  Subsequently, the charges were amended to possession of marijuana and a controlled substance.  (*Id*.)

The Almonds' son later admitted to the Randolph County Sherriff's Department that the marijuana belonged to him.  (*Id*.)  Despite the son's admission, the Sherriff's Department continued its prosecution, which ultimately led to multiple indictments against the Almonds.  (*Id.* at 10-11.)

On April 15, 2019, the criminal charges against the Almonds were dismissed and an order was entered requiring that the Almonds' property be returned to them.  (*Id*. at 12.)

---

Plaintiffs, the Narcotics Unit coordinates with Randolph County and the Randolph County Commission.

Although an order was issued requiring that their property be returned, the Almonds allege that some of their property was not returned, including cash, jewelry, guns, power equipment, coins and a guitar collection. (*Id.*)  Some of the cash was deposited into an account labeled "Randolph County Commission DBA Randolph County Narcotics Unit." (*Id.*)

## III.  Discussion

### A. Claims Against the County and County Commission

Plaintiffs raise eight claims against the County and the County Commission. (Hereinafter, for purposes of simplicity, both entities will be referred to as "the County".)  All eight of these claims ultimately allege that the County either (1) was responsible for the actions of the sheriffs, or (2) was itself the *actor* responsible for the actions alleged.

The County offers two primary arguments in support of its motion to dismiss: (1) the Alabama Legislature has not delegated any authority over law enforcement to counties; and (2) Alabama sheriffs and deputy sheriffs are state officials, not county employees.  The County argues, in essence, that the Plaintiffs' claims rely on "the erroneous presumption that Alabama counties have supervisory capacity or control over law enforcement personnel." (Doc. 72 at 4.)

This premise supports the dismissal of some, but not all, of Plaintiffs' claims. More specifically, the Court will grant the County's motion to dismiss as relates to

Count 1 and Counts 3-8 of the Second Amended Complaint. But the Court denies the County's motion as to Count 2.

### 1. Claims Under 42 U.S.C. § 1983

Three of the Plaintiffs' claims against the County are brought via 42 U.S.C. § 1983: Counts 1, 3 and 4. These three claims are due to be dismissed.

County liability under § 1983 is limited: "local governments can never be liable under § 1983 for the acts of those whom the local government has no authority to control." *Turquitt v. Jefferson Cty., Ala*., 137 F.3d 1285, 1292 (11th Cir. 1998). Put another way, "[a] sheriff's policy or act cannot be said to speak for the county if the county has no say in what policy or action the sheriff takes." *Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1331 (11th Cir. 2003).

For the County to be liable for the acts of the sheriff and deputy sheriffs, then, Plaintiffs must show that the County had authority to control those individuals. Plaintiffs have not done so.

First, sheriffs and deputy sheriffs acting in their law enforcement capacity, as here, are understood to be employees of the *State*, not the county. To determine whether an officer acts for the state or the county, courts look to state law to understand whether, "on a particular issue," the individual in question "represent[ed] the State or the County." *McMillian v. Monroe Cty., Ala.*, 520 U.S. 781, 785-86 (1997). In other words, the Court must ask "which government body, under state

6

law, had direct control over how the sheriff fulfilled his law enforcement duty." *Turquitt*, 137 F.3d at 1292.

Plaintiffs have not alleged facts sufficient to show that, contrary to state law, the sheriff and deputy sheriffs acted on behalf or under the control of the County. As discussed thoroughly in *McMillian,* "the county commission . . . has no direct control over how the sheriff fulfills his law enforcement duty," and as such, the sheriff acts for the *state*.  *Id.* at 791.  "[U]nder Alabama law, sheriffs are not county employees or agents, much less policymakers."  *McClure v. Houston Cty., Ala.*, 306 F. Supp. 2d 1160, 1163 (M.D. Ala. 2003) (Thompson, J.).  While Plaintiffs refer to "instructions" from the County, the allegations do not amount to a clear relationship of actual control.  And while the sheriffs did allegedly deposit seized funds into the county coffers, courts considering comparable arrangements have not found this financial arrangement alone to indicate county control.  *See, e.g.*, *McMillian*, 520 U.S. at 790 (finding the sheriff to be under state control even though, under Alabama law, "the sheriff must give to the county treasurer a sworn written statement detailing the funds he has received for the county since his last statement, and must pay these funds to the treasurer").

More broadly, "the federal judiciary must respect state and local law's allocation of policymaking authority, and not assume that final policymaking authority lies in some entity other than that in which state law places it."  *Turquitt*,

137 F.3d at 1288 (internal quotation marks and citations omitted).   Perhaps unsurprisingly, then, recent cases at the district court level have reaffirmed clear state-law findings of state control.  *See, e.g.*, *Arnold v. Escambia Cty.*, No. CV 06-0471-CG-M, 2007 WL 9718174, at *5 (S.D. Ala. Aug. 10, 2007) (Granade, J.) ("[P]laintiff has failed to demonstrate that Escambia possessed supervisory or administrative control over Sheriff Smith's law enforcement activities; thus, the court's analysis ends here."); *see also Bowden v. Cook*, No. 2:15-CV-620-KOB, 2015 WL 9311965, at *3 (N.D. Ala. Dec. 23, 2015) (Bowdre, J.) ("Case law establishes that the necessary causal link between counties and sheriffs does not exist in Alabama."); *Forehand v. Elmore Cty.*, No. 2:14-CV-207-WHA, 2014 WL 2535190, at *3-5 (M.D. Ala. June 5, 2014) (Albritton, J.).

Moreover, even if the Plaintiffs' § 1983 claims against the County were proper, they have failed to allege a policy, custom, or practice that justifies county liability.  "[A] county is liable only when the county's 'official policy' causes a constitutional violation." *Grech*, 335 F.3d at 1329.  Such a policy may be established through "(1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Id.*  "To establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice." *Depew v. City of St. Marys, Ga.*, 787 F.2d

1496, 1499 (11th Cir. 1986).  Plaintiffs here have not alleged facts sufficient for the Court to identify a widespread custom or practice, even at this early stage.

### 2. Claims Under State Law

Plaintiffs also allege a variety of state-law claims.  Defendants correctly note that the bulk of the Plaintiffs' allegations under state law rely upon a relationship of control between the County and the sheriff.  As discussed above, the Court cannot identify such a relationship; accordingly, any legal claim that relies upon such a premise is due to be dismissed.

Plaintiffs' allegations of Negligent Hiring, Malicious Prosecution, Slander, and Outrage/Intentional Infliction of Emotional Distress all require that the County have control over (or, at minimum, a way to control) the sheriff.  For instance, Plaintiffs allege that the members of the Narcotics Unit violated the Plaintiffs' constitutional due process rights, and that the Defendants were therefore negligent in their hiring, training, and supervision.  But there is no evidence that the County hired, trained, or supervised the officers into their positions as sheriffs or deputies. Indeed, as described above, it appears to be the State of Alabama that can exert such control.  *See generally King v. Colbert Cty.*, 620 So. 2d 623, 625 (Ala. 1993) (describing sheriffs' constitutional status).

Similarly, claims of malicious prosecution, slander, and outrage against the County all flow through actions of the members of the Narcotics Unit.[3]  (*See, e.g.*, Doc. 67 at 22 (alleging malicious prosecution based on criminal charges brought "by the members of the Narcotics Unit")).  Without control over those members, the County cannot be held liable.

As to the claim for conversion, however, the Defendants have not demonstrated that the Plaintiffs' claims require County control.  Rather, the conversion claim against the County alleges behavior *by the County and County Commission*, arguing that they "converted the money seized from the Plaintiffs for the use and possession of Randolph County and/or the Randolph County Commission for over a year."  (Doc. 67 at 16.)  The County's motion and accompanying briefs address *only* the County's lack of control, and as such, they do not provide any sufficient rationale for dismissal of the conversion claim.  The conversion claim alleges unlawful behavior that occurred after the County had received the money in question, an allegation that does not necessarily depend on

---

3. It is also not clear that a County or County Commission can, in fact, be guilty of malicious prosecution.  *See generally Franklin v. City of Huntsville*, 670 So. 2d 848, 850 (Ala. 1995), *as modified on denial of reh'g* (Nov. 1995) (noting that "a malicious prosecution action cannot lie against a municipality, because a municipality cannot be deemed to act with malice").  Because this argument was not raised in Defendants' briefing, and because the Court has otherwise found the claim due to be dismissed, this analysis is unnecessary here.

county control over the sheriff and deputies.  Accordingly, this claim will not be dismissed at this stage.  *Cf. Stout v. Cumse*, 3 So. 3d 878, 883 (Ala. Civ. App. 2008) (reversing a dismissal of claims against Colbert County for negligent entrustment based on the County's own alleged actions).

### b. Claims Against the Sheriff and Deputies

Defendants raise a number of arguments to urge that, under Fed. R. Civ. P. 12(b)(6), the claims against them should be dismissed.  In their motion, they specifically raise three arguments:

(1) All state law claims are due to be dismissed on the basis of State immunity under the Alabama Constitution;

(2) All federal claims should be dismissed on the basis of qualified immunity because the alleged actions were not a violation of clearly established law; and,

(3) The Fifth Amendment Takings Clause is not implicated for law-enforcement-related forfeitures.

(Doc. 69.)  The Court finds these arguments persuasive with respect to some, but not all, of Plaintiffs' claims.  As is detailed below, the Court will dismiss Counts 12 and 15.

### 1. Claims Under State Law: State Immunity

Defendants argue, first, that Plaintiffs' "state law claims are due to be

dismissed on the basis of State immunity" pursuant to Article I, § 14 of the Alabama Constitution.[4]  (Doc. 69 at 1.)

The burden to establish an immunity defense rests with the Defendants. "Immunity is an affirmative defense that the defendant must plead and prove." *Matthews v. Ala. Agric. & Mech. Univ.*, 787 So. 2d 691, 695 (Ala. 2000).  For the reasons described below, the Court finds that the Defendants have not met their burden at this early stage as to the state-law claims.

The Alabama Constitution, Article I, § 14, erects a "wall of immunity" that is "nearly impregnable." *Patterson v. Gladwin Corp.*, 835 So. 2d 137, 142 (Ala. 2002). As interpreted by the Alabama courts, such immunity extends to sheriffs and their deputies.  *See, e.g.*, *Ex parte Davis*, 930 So. 2d 497, 501 (Ala. 2005).  A sheriff or deputy sheriff acting *within the line and scope of his or her employment* is generally entitled to state sovereign immunity.  *See, e.g.*, *Ex parte Fielding*, 86 So. 3d 354, 357 (Ala. 2011).

Defendants essentially suggest that, because the alleged tortious acts occurred while they were "investigating crimes, applying for search warrants, conducting searches, and effecting arrests," the acts fall "within the scope of sheriffs and deputy

---

4. Defendants allege State immunity, which applies to constitutional officers of the state, including sheriffs and their deputies.  Defendants (and, thus, the Court) do not discuss "state-agent" immunity, which applies to other state employees.  *See Ex parte Cranman,* 792 So. 2d 392 (Ala. 2000).

sheriffs' employment." (Doc. 81 at 1.)  And indeed, the broadly defined contexts in which the Defendants' unlawful actions allegedly occurred (effecting arrests, conducting searches) typically arise "within the statutory duties of a sheriff and his deputies," *Shuler v. Duke*, 792 F. App'x 697, 704 (11th Cir. 2019) (unpublished).

But in light of the Plaintiffs' allegations to the contrary (here, assumed true), the Court cannot simply accept that the sheriffs and deputy sheriffs were acting within the scope of their employment.  *See Ex parte Haralson*, 853 So. 2d 928, 933 (Ala. 2003) ("We cannot conclude, at this early stage of the proceedings, without evidence showing that at the time of the accident he was acting within the line and scope of his employment, that Deputy Haralson is entitled to immunity.").  The mere fact that a tort occurs while a sheriff is on duty, or even while that sheriff is effecting an arrest, does not automatically raise immunity's shield.  *See, e.g.*, *Cooper v. Smith*, No. 1:12-CV-889-WKW, 2013 WL 252382, at *2 (M.D. Ala. Jan. 23, 2013) (Watkins, J.) ("Defendants have cited no authority for the proposition that deputies who savagely beat a man for no reason other than a personal grudge are acting within the line and scope of their employment, and the court is aware of none.").  Put simply, "[n]o State officer, such as a deputy sheriff, can avoid tort liability simply by claiming that his mere status as a [S]tate official cloaks him with the [S]tate's constitutional immunity." *Ex parte Haralson*, 853 So. 2d at 933 (internal citations and quotation marks omitted) (alterations in original).

13

In a recent (albeit unpublished) discussion of State immunity in Alabama, the

Eleventh Circuit agreed:

> According to the defendants, even if their activities were ill-intended, the actions occurred during the course of police investigations, evidence seizures, and the like, such that absolute immunity still applies.  This view requires an extraordinarily broad view of absolute immunity that would effectively immunize any conduct when the sheriff flashes his or her badge.  The district court correctly rejected this view because Alabama law does not provide such infinite immunity. The allegations in the complaint extend well beyond the negligent mishandling of an investigation or sloppiness in executing a search warrant, or any other number of activities that could fairly advance the objectives of the sheriff, even if the sheriff's actions suffered from procedural defects.

*Bradley v. Franklin*, 786 F. App'x 918, 923 (11th Cir. 2019) (unpublished).  Indeed,

the Eleventh Circuit has explicitly rejected "conclusory assertion[s]" that alleged

misconduct occurred within the scope of duty.  *Lockhart v. Franklin*, 777 F. App'x

387, 391 (11th Cir. 2019) (unpublished); *see also Ass'n of Cty. Commissions of Ala.*

*Liab. Self-Insured Fund v. Robinson*, 777 F. App'x 397, 400 (11th Cir. 2019)

(unpublished) ("The complaint here repeatedly alleges that the defendants acted

beyond their authority by making material misrepresentations to obtain the search

warrant, by searching the plaintiffs' property, by intentionally interfering with the

plaintiffs' contractual relations, and by intercepting the plaintiffs' electronic

communications.  Yet Deputies Wilson and Robinson, in moving to dismiss, simply

made the conclusory assertion that they are entitled to state-law immunity because

14

they are deputies.").  Here, too, the Court cannot accept the Defendants' general statements that conclude, but do not evince, that they acted within the scope of their duties.

Furthermore, a sheriff's immunity is subject to a number of key exceptions. *See Ex parte Moulton*, 116 So. 3d 1119, 1141 (Ala. 2013) (describing and restating exceptions to state sovereign immunity).  More specifically, certain actions are "not considered to be actions against the state for § 14 purposes," *Ex parte Thomas*, 110 So. 3d 363, 369 (Ala. 2012) (internal citations and quotation marks omitted), and thus are not impacted by state immunity.  One of these exceptions may be applicable to the case at bar: § 14 immunity does not cover "actions for damages brought against State officials in their individual capacity where it is alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law, subject to the limitation that the action not be, in effect, one against the State." *Ex parte Moulton*, 116 So. 3d at 1141.[5]

---

5. The Court also notes that one exception to § 14 immunity covers certain "actions brought under the Declaratory Judgments Act . . . ." *Ex parte Moulton*, 116 So. 3d 1119, 1131 (Ala. 2013).  At this stage, none of Defendants' briefs or motions discuss Count 21, which seeks a declaratory judgment regarding the Alabama Civil Forfeiture Statute.  But to the extent that general arguments regarding the application of § 14 immunity were meant to address this count, the Court finds that, at least at this stage, such arguments are unavailing.

As recently clarified by the Supreme Court of Alabama, this exception is not *categorical*; rather, it requires an analysis of the nature of each allegation. *See Barnhart v. Ingalls*, 275 So. 3d 1112, 1126-27 (Ala. 2018) (noting that "any previous decisions of this Court containing language indicating that the State immunity afforded by § 14 cannot apply when monetary damages are being sought from State officers in their individual capacities . . . are overruled to the extent they support that proposition"). But, while Plaintiffs allege behavior that could plausibly fit within this exception, and thus pierce state immunity, Defendants did not address why the exception does not apply.

In sum, given the possibility that the Defendants acted outside the line and scope of their duty, and given the potential applicability of the exception re-stated in *Moulton*, the Defendants have not met their burden. The state-law claims against the sheriffs survive their motion to dismiss, though the Court recognizes that the Defendants are likely to re-allege their state immunity defense at the summary judgment stage. *See generally Ass'n of Cty. Commissions of Alabama Liab. Self-Insured Fund*, 777 F. App'x at 400 ("If Deputies Wilson and Robinson believe, after a period of discovery, that the evidence establishes their entitlement to state-law immunity, they may seek summary judgment on this defense.").

## 2. Claims Under Federal Law: Qualified Immunity

Defendants argue, second, that Plaintiffs' "federal claims are due to be

dismissed on the basis of qualified immunity because Defendants' actions were not a violation of clearly established law."  (Doc. 69 at 1.)

Generally, "[q]ualified immunity protects government actors performing discretionary functions from being sued in their individual capacities."  *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001).  When qualified immunity applies (that is, when a government actor is performing a discretionary function), a motion to dismiss a complaint on the grounds of qualified immunity will be granted if the "complaint fails to allege the violation of a clearly established constitutional right." *St. George v. Pinellas County,* 285 F.3d 1334, 1337 (11th Cir. 2002) (internal quotation marks and citation omitted).  The burden starts on the Defendants but then shifts: "An official asserting that he is entitled to the protection of qualified immunity must initially establish that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.  Once the defendant has made this showing, the burden shifts to the plaintiff."  *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007) (internal citations omitted).

### a) Discretionary Authority

Here, the Court finds that the sheriffs were acting within the scope of their discretionary authority.   To assess whether actions are in an individual's "discretionary authority," courts "assess whether [the acts in question] are of a type that fell within the employee's job responsibilities.  Our inquiry is two-fold.  We ask

whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

The inquiry occurs at a high level and asks only about the action *in general*: "In applying each prong of this test, we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Id.* at 1266. Allegedly-unlawful intent is irrelevant: "In determining whether a defendant performed a discretionary function, our inquiry is not whether the act complained of was done for an improper purpose . . . ." *Plotkin v. United States*, 465 F. App'x 828, 831–32 (11th Cir. 2012) (unpublished). "In other words, a court must ask whether the act complained of, *if done for a proper purpose*, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Mikko v. City of Atlanta, Ga.*, 857 F.3d 1136, 1144 (11th Cir. 2017) (internal quotation marks and citations omitted) (emphasis added).

Under this standard, and for the limited purpose of their motion to dismiss, the Defendants have established that they acted within their discretionary authority. As the Eleventh Circuit has noted in a comparable context, the inquiry "is easy here.

18

Because making an arrest is within the official responsibilities of a sheriff's deputy, [the deputy] was performing a discretionary function when he arrested [the plaintiff]." *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). In the instant case, too, the logic holds. *See generally Carter v. Gore*, 557 F. App'x 904, 907 (11th Cir. 2014) (unpublished) ("This burden is easily met here, as Gore was clearly acting within the scope of his discretionary authority as a police officer by investigating and securing an arrest warrant in response to reported criminal activity.").

### b) Overcoming Qualified Immunity

To overcome a public official's qualified-immunity defense, a plaintiff must make two showings. "First, the plaintiff must establish that the defendant violated a constitutional right. Then, the plaintiff must show that the violation was clearly established." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007) (internal citations omitted).[6] In considering whether a violation is "clearly established," relevant law "consists of holdings of the Supreme Court, the Eleventh

---

6. Courts can consider these prongs in either order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

Circuit, or the highest court of the relevant state." *Sebastian v. Ortiz*, 918 F.3d 1301, 1307 (11th Cir. 2019).

Guided by this two-part analysis, the Court now considers Defendants' claims of qualified immunity in response to alleged violations of federal constitutional rights.

### i.    Excessive Force

Plaintiffs allege that Defendants' actions inside of Plaintiffs' home, including the use of a "shock" explosive device, constituted excessive force that violated a clearly-established constitutional right.   At this early stage, the Court agrees, and Defendants' invocation of qualified immunity therefore fails.

When law enforcement is effecting an arrest, some amount of force, including an amount of force that is arguably unnecessary, may be constitutionally acceptable. *Cf. Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003).  But "[o]fficial action constitutes *excessive* force when it is objectively unreasonable."  *Dukes v. Deaton*, 852 F.3d 1035, 1042 (11th Cir. 2017) (emphasis added).  To determine whether the use of force is objectively unreasonable, courts "measure the quantum of force employed against these factors—the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Salvato*

*v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015) (quotation marks and citation omitted).

Accepting the facts alleged in the Second Amended Complaint as true, the Court concludes that excessive force was employed by the sheriffs.  Plaintiffs' allegations are serious.  Plaintiffs allege that the sheriffs kicked in the door of the family's home; threw a "'shock' explosive device," which injured one of the plaintiffs; "forcibly threw both Greg and Teresa to the floor"; and "ransacked" the home, all because an officer had, hours earlier, smelled marijuana. (Doc. 67 at 9.) In contrast, the underlying suspected unlawful action (at the time, allegedly, possession of marijuana) does not justify such serious force.  *Cf. Dukes*, 852 F.3d at 1043 ("[T]he suspected crime that prompted the search was possession and sale of marijuana.  [The officer] deployed a dangerous device into a dark room for a de minimis return.").

Defendants cite *Dukes*, a recent Eleventh Circuit decision, to suggest that "Plaintiffs' rights as to use of a flashbang device [were] not clearly established." (Doc. 70 at 13.)  And indeed, that case so held; the officer in question had violated the Fourth Amendment, but the "contours of the right were not clearly established . . . ." *Dukes*, 852 F.3d at 1044.

But, while the right was not "clearly established" at that time, it is now—by *Dukes* itself.  "A right may be clearly established for qualified immunity purposes

in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Maddox v. Stephens*, 727 F.3d 1109, 1121 (11th Cir. 2013) (internal quotation marks and citation omitted).  Here, *Dukes* established the right and thereby "g[ave] notice," *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005), of the limitations on the lawful use of explosive devices used in effecting arrests.

Accepting alleged facts as true, *Dukes* "clearly established" that the sheriffs' actions constitute a constitutional violation.  *Dukes* held, in similar factual circumstances, that an officer utilizing a "flashbang," thrown into a room without looking and injuring a bystander, was excessive.[7]  *Dukes*, 852 F.3d at 1043.  There, as here, the detonation was questionably necessary and "posed a significant risk of harm." *Id.* at 1042.  The underlying alleged crime (by the individuals subjected to the force) was nearly identical and similarly non-violent: both cases involved the possible possession of marijuana.  *Id.* at 1039.  Any difference, in fact, indicates that

---

7. The precise nature of the explosive device used against Plaintiffs is not clear, but Defendants themselves acknowledge that *Dukes* is relevant to establishing the contours of "Plaintiffs' rights as to use of a flashbang device."  (Doc. 70 at 13.) The Court agrees with the suggestion that *Dukes* clarifies the constitutional right at issue.

the factual circumstances in *Dukes* posed *more* danger to officers; for instance, the *Dukes* warrant application alleged a risk of weapons, dogs, and barricades, while no such evidence has been presented here.   *Id*.   And, finally, *Dukes* was published approximately one year before the events alleged in the instant case.   *See id.*; *see also Mercado*, 407 F.3d at 1159 (noting that a case must "pre-date the officer's alleged improper conduct" to clearly establish a violation).

Here, like in *Dukes*, the Plaintiffs' Complaint sufficiently alleges that a constitutional right was violated.   *See Dukes*, 852 F.3d at 1043*; see also Boyd v. Benton Cty.,* 374 F.3d 773, 779 (9th Cir. 2004) ("[G]iven the inherently dangerous nature of the flash-bang device, it cannot be a reasonable use of force under the Fourth Amendment to throw it 'blind' into a room occupied by innocent bystanders absent a strong governmental interest, careful consideration of alternatives and appropriate measures to reduce the risk of injury."). But here, unlike in *Dukes*, the violation was clearly established.   Accordingly, with respect to Plaintiffs' claim of excessive force, Defendants are not entitled to qualified immunity at this stage.

### ii.     Search and Seizure; Malicious Prosecution

The sheriffs also allege that they are entitled to qualified immunity on Plaintiffs' Fourth Amendment search and seizure claim.  The Court disagrees.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. Amend. IV.  "Generally, a search is reasonable under the Fourth Amendment when supported by a warrant or when the search fits within an established exception to the warrant requirement." *United States v. Prevo*, 435 F.3d 1343, 1345 (11th Cir. 2006).  Plaintiffs allege that, although a warrant was secured, the officers' search was nonetheless unconstitutional.

In considering whether qualified immunity protects an officer in this context, courts assess whether the officer in question had "arguable probable cause" to seek the warrant.  "In determining whether qualified immunity exists, the issue is not probable cause in fact but 'arguable' probable cause." *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990) (internal quotation marks and citations omitted).  Broadly speaking, the analysis asks "whether a reasonable officer would know that her conduct violated the Constitution—namely whether a reasonable officer in the same circumstances *could* have believed that probable cause existed." *Bloom v. Alvereze*, 498 F. App'x 867, 878 (11th Cir. 2012) (unpublished) (emphasis added); *see also Daniels v. Bango*, 487 F. App'x 532, 539 (11th Cir. 2012) (unpublished) (undertaking analysis of arguable probable cause and finding that deputy sheriff was not entitled to qualified immunity).

24

A warrant generally counsels in favor of probable cause and, in turn, qualified immunity.  *See, e.g.*, *Malley v. Briggs*, 475 U.S. 335, 345 (1986).  Still, despite the reduced standard of arguable probable cause, the Eleventh Circuit has made clear that a warrant does not *guarantee* qualified immunity.  Most importantly, qualified immunity will not apply if the warrant was based upon intentional or reckless misstatements.  "An officer loses qualified immunity if the plaintiff can prove that the officer perjured himself—that is, put forth information he did not believe or accept as true—in order to obtain a search warrant."  *Gore*, 557 F. App'x at 908.  Put another way, "the existence of a warrant will not shield an officer from liability where the warrant was secured based upon an affidavit that contained misstatements made either intentionally or with reckless disregard for the truth."  *Smith v. Sheriff, Clay Cty., Fla.*, 506 F. App'x 894, 898 (11th Cir. 2013) (unpublished).[8]

The sheriffs note, accurately, that "a search warrant was obtained" prior to the search.  (Doc. 70 at 15.)  They argue that Plaintiffs therefore "fail[] [to] allege a plausible unlawful search and seizure action" sufficient to overcome qualified

---

8. In contrast, "good-faith (hence, honest, non-obvious) mistakes contained in, and minor omissions from, arrest/search warrants will not be sufficient to pierce qualified immunity."  *Joseph v. Kimple*, 343 F. Supp. 2d 1196, 1202 (S.D. Ga.) (Edenfield, J.), *aff'd*, 391 F.3d 1276 (11th Cir. 2004).  At this stage, and on the current record, the allegations of falsehoods made by the plaintiffs rise above such minor mistakes.

immunity. (*Id.*) But Plaintiffs allege that the officers in question sought and received a warrant despite a lack of evidence; that is, they allege that there was no smell of marijuana, and thus that the warrant was issued under false pretenses and that probable cause was lacking. (Doc. 67 at 8 (disputing "that the smell of marijuana was inside the residence"); *id.* at 19 (alleging that Mrs. Almond "did not act in any manner to give probable cause" and that "[t]he smell of any drugs was not in the home of the Almonds at the time Deputy Morrow attempted to serve civil papers").) Taking these factual assertions as true, the Court finds that the officers may indeed have lacked even arguable probable cause: a reasonably well-trained officer would have known, without any smell or other suspicious behavior, that there was a lack of probable cause for the warrant in question. On the limited record before the Court, without "independent evidence that supports the existence of at least probable cause," *Alvereze*, 498 F. App'x at 879, Plaintiffs' allegations indicate that the warrant was unfounded.[9]

Accordingly, at this early stage of litigation, the Court cannot find that qualified immunity applies, pending further factual development. *Cf. Hooks v. Brewer*, No. CV 316-023, 2018 WL 10149641, at *16 (S.D. Ga. Jan. 29, 2018)

---

9. As the case proceeds, the sheriffs may present evidence demonstrating that the warrant was supported by arguable probable cause. That is, the Court's finding at this stage does not rule out a subsequent finding of qualified immunity.

(Bowen, J.) ("In conclusion, the disputed issues of fact are material because, if Plaintiff's version of the facts is accepted, the search warrant is unsupported by arguable probable cause.  Accordingly, qualified immunity from suit on this issue is effectively unavailable at summary judgment, even though after a full trial Defendants Brewer or Harrell may yet prevail."); *Gore*, 557 F. App'x at 908.

This finding bears upon both Plaintiffs' search and seizure claim and their malicious prosecution claim.  The Eleventh Circuit "has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983."  *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003) (citations omitted).  A malicious prosecution claim requires an alleged violation of the Fourth Amendment: "To establish a § 1983 malicious prosecution claim, the plaintiff must prove two things: (1) the elements of the common law tort of malicious prosecution; *and* (2) a violation of his Fourth Amendment right to be free from unreasonable seizures."  *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1256 (11th Cir. 2010).  Accordingly, as in the search and seizure context, "the existence of probable cause defeats a § 1983 malicious prosecution claim."  *Id.*  But as the Court found above, at this stage, the sheriffs have not established the arguable probable cause necessary to invoke qualified immunity against plaintiffs' standalone Fourth Amendment claim.  They have, therefore, also failed to do so with respect to malicious prosecution.  *Cf. Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1145 (11th

27

Cir. 2007) (identifying an absence of probable cause with respect to a Fourth Amendment violation, then relying upon it in regards to a related malicious prosecution claim).

### iii.   Takings Clause

Defendants also argue that they are entitled to qualified immunity as it relates to Plaintiffs' Fifth Amendment Takings Clause claim.  The Court agrees.  These claims are due to be dismissed.

Pursuant to the two-prong test above, Defendants argue that the Fifth Amendment is not implicated in the forfeiture of property for the purposes of law enforcement.  The issue is, at best, unsettled.  Although the Eleventh Circuit has not weighed in, a number of circuits have suggested that law enforcement seizures of property do not implicate the Takings Clause of the Fifth Amendment.  *See, e.g.*, *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008) ("Property seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause."); *see also Johnson v. Manitowoc Cty.*, 635 F.3d 331, 336 (7th Cir. 2011) ("[T]he Takings Clause does not apply when property is retained or damaged as the result of the government's exercise of its authority pursuant to some power other than the power of eminent domain.").  *See generally Lech v. Jackson*, 791 F. App'x 711, 715 (10th Cir. 2019) (unpublished)

("[A]t least three of our sibling circuits and the Court of Federal Claims have expressly relied upon the distinction between the state's police power and the power of eminent domain in cases involving the government's direct physical interference with private property.").

As these circuit courts have indicated, the Supreme Court has implied that "so long as the government's exercise of authority was pursuant to some power other than eminent domain, then the plaintiff has failed to state a claim for compensation under the Fifth Amendment." *AmeriSource Corp.*, 525 F.3d at 1154 (citing *Bennis v. Michigan*, 516 U.S. 442, 452 (1996)).  But it is unclear that this logic extends to allegedly *unlawful* forfeitures that occur via the police power: "[t]he government may not be required to compensate an owner for property which it has already *lawfully* acquired under the exercise of governmental authority other than the power of eminent domain." *Bennis v. Michigan*, 516 U.S. 442, 452 (1996) (emphasis added).  Indeed, the Eleventh Circuit has expressly left open the possibility of a lawsuit against individual government officials for common-law trespass claims, including through a Takings Clause suit.  *See Garvie v. City of Ft. Walton Beach, Fla.*, 366 F.3d 1186, 1189 n.2 (11th Cir. 2004).  This Court cannot firmly conclude that no constitutional violation has occurred.

At minimum, however, Defendants have shown that a violation of the Takings Clause, if one did occur, was not "clearly established." *See, e.g.*, *Sebastian*, 918

29

F.3d at 1307.  First, no case of the United States Supreme Court, Eleventh Circuit, or Supreme Court of Alabama has definitively addressed it.  *See id.* at 1311.  Further, given the disagreement among circuit courts and the lack of applicable precedent, Plaintiffs have not shown that a "broader, clearly established principle should control the novel facts in this situation."  *Mercado*, 407 F.3d at 1159.  And, finally, Plaintiffs have not shown that Defendants' conduct "so obviously violates [the United States Constitution] that prior case law is unnecessary."  *Id.*

### iv.    Procedural Due Process

The Plaintiffs' Fifth and Fourteenth Amendment claims also include an allegation that Defendants have violated their right to due process—i.e., "not to have their property taken without due process."  (Doc. 67 at 30.)  They claim, in other words, that the seizure and continued retention of their personal property constitutes a violation of their right to procedural due process.  *Cf. Barker v. Norman*, 651 F.2d 1107, 1131 (5th Cir. 1981) ("Our case law indicates that continued retention by police officers of allegedly stolen property, as distinct from the initial seizure of that property, may in some circumstances be a constitutional deprivation.").[10]

---

10. Pursuant to *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), all decisions of the former Fifth Circuit announced prior to October 1, 1981, are binding precedent in this circuit.

Here, too, Plaintiffs have not alleged a clearly established violation.  "Even assuming the continued retention of plaintiffs' personal property is wrongful, no procedural due process violation has occurred 'if a meaningful postdeprivation remedy for the loss is available.'"  *Lindsey v. Storey*, 936 F.2d 554, 561 (11th Cir. 1991) (quoting *Hudson v. Palmer*, 468 U.S. 517, 533 (1984)); *see also Hoefling v. City of Miami*, 811 F.3d 1271, 1283 (11th Cir. 2016) (discussing the relevance of a post-deprivation remedy).

As a matter of law, therefore, Plaintiffs have failed to demonstrate a clearly established violation.  "We have recognized that a civil cause of action for wrongful conversion of personal property under state law is a sufficient post-deprivation remedy when it extends to unauthorized seizures of personal property by state officers."  *Case v. Eslinger*, 555 F.3d 1317, 1331 (11th Cir. 2009) (internal quotation marks and citation omitted).  And as numerous courts have recently recognized, Alabama does provide civil remedies for those alleging unauthorized seizures of personal property.  *See, e.g.*, *Dawson v. City of Montgomery*, No. 206-CV-1057-WKW, 2008 WL 659800, at *8 (M.D. Ala. Mar. 6, 2008) (Watkins, J.) ("All a state must provide is '*some* adequate post-deprivation remedy,' and a conversion statute provides such.").  Indeed, the tort of conversion is alleged in this action.  Plaintiffs have therefore failed to show a violation of clearly established law.  *See generally Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("Accordingly, we hold that an

31

unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available.   For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable post-deprivation remedy.").

Plaintiffs' claims under the Fifth Amendment (as alleged in Counts 12 and 15 of the Second Amended Complaint) will therefore be dismissed.

## IV.  CONCLUSION

Accordingly, the Defendants' motions to dismiss (Docs. 69, 71) will be granted in part.   To the extent that the motions to dismiss are granted, Plaintiffs' claims are dismissed with prejudice.   The motions are GRANTED only to the following extent:

(1) The Court will grant the County's motion to dismiss (Doc. 71) as to Count 1 and Counts 3-8 of the Second Amended Complaint.

(2) The Court will grant the Sheriffs' and Deputy Sheriffs' motion to dismiss (Doc. 69) as to Counts 12 and 15 of the Second Amended Complaint.

The remainder of the motions to dismiss are DENIED without prejudice to renewal in connection with a summary judgment motion.

DONE, this the 8th day of June, 2020.

R. Austin Huffaker, Jr.
UNITED STATES DISTRICT JUDGE