# EVIDENTIARY SUBMISSION
## EXHIBIT 1

# Deposition of Kevin Walker

October 28, 2021

Almond, et al. v. Randolph County, Alabama, et al.

3:19-cv-175-RAH-JTA



866.993.0207
info@citedepos.com
www.citedepos.com

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    EASTERN DIVISION

4

5    GREGORY JACK ALMOND,
     et al.,

6

     Plaintiffs,

7

     vs.          CASE NO. 3:19-cv-175-WKW

8

     RANDOLPH COUNTY, ALABAMA,

9    et al.,

10   Defendants.

11

12   * * * * * * * * * * * * *

13

14   VIDEOTAPED DEPOSITION OF

15   KEVIN WALKER

16

     October 28, 2021

17   1:21 p.m.

18

19   Location:

20   Alexander City Chamber of Commerce.
     175 Aliant Parkway

21   Alexander City, Alabama  35010

22

23   Tracye Sadler Blackwell, ACCR No. 294

**Page 2**

1    APPEARANCES OF COUNSEL

2

3    ON BEHALF OF THE PLAINTIFFS:

4    Mr. John Michael Segrest, Esq.
     THE SEGREST LAW FIRM

5    Post Office Box 780791
     Tallassee, Alabama  36078

6    Mike.Segrest@Segrestlaw.com

7

8    ON BEHALF OF THE DEFENDANT RANDY MOORE:

9    Mr. Randall C. Morgan, Esq.
     HILL, HILL, CARTER, FRANCO, COLE & BLACK, P.C.

10   425 South Perry Street
     Montgomery, Alabama  36104

11   Rmorgan@hillhillcarter.com

12

13   ON BEHALF OF THE DEFENDANT KEVIN WALKER:

14   Mr. Charles David Stubbs, Esq.
     STUBBS, SILLS & FRYE, P.C.

15   Post Office Box 2023
     Anniston, Alabama  36202

16   David-ssf@cableone.net

17

18   ON BEHALF OF THE DEFENDANT RANDOLPH COUNTY, et al.:

19   Mr. W. Jackson Britton, Esq.
     CAPELL & HOWARD, P.C.

20   150 South Perry Street
     Montgomery, Alabama  36104

21   Jackson.britton@chlaw.com

22

23   (Appearances continued on the next page)

**Page 3**

1    APPEARANCES OF COUNSEL (continued)

2

3    ON BEHALF OF THE DEFENDANT LARRY CLARK:

4    Mr. Robert M. Spence, Esq.
     ROSEN HARWOOD, PA
     Post Office Box 2727

5    Tuscaloosa, Alabama  35403
     rspence@rosenharwood.com

6

7    ALSO PRESENT:

8    Mr. Randy Moore

9    Mr. Tercell Clayborn, Videographer
     Ms. Lindsey Bell, Court Reporting Intern

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**Page 4**

1    EXAMINATION INDEX

2

3    WITNESS:  KEVIN WALKER

4
     BY MR. SEGREST                    8
5

6

7

8

9
     (No exhibits marked to this deposition.)
10

11

12

13

14

15

16

17

18

19

20

21

22

23

STIPULATIONS

1            STIPULATIONS

2      It is hereby stipulated and agreed by and

3 between counsel that the deposition of KEVIN WALKER

4 is taken pursuant to the Federal Rules of Civil

5 Procedure and may be taken before Tracye S.

6 Blackwell, CCR, RPR, and Commissioner for the State

7 of Alabama at Large, without the formality of a

8 commission, that objections to questions other than

9 objections as to the form of the question need not

10 be made at this time but may be reserved for a

11 ruling at such time as the said deposition may be

12 offered in evidence or used for any other purpose

13 by either party provided for by the Statute.

14      It is further stipulated and agreed by and

15 between counsel that the filing of said deposition

16 is hereby waived and may be introduced at the trial

17 of this case or used in any other manner by either

18 party hereto provided for by the Statute regardless

19 of the waiving of the filing of the same.

20      It is further stipulated and agreed by and

21 between the parties hereto and the witness that the

22 signature of the witness to this deposition is

23 hereby waived.

1      THE VIDEOGRAPHER: We are now on

2      record. The time is 1:21 p.m.

3      Today's date is October 28th,

4      2021. We're here for the

5      deposition of Kevin Walker,

6      Case Number 3:19-CV-175-WKW.

7      We're located in Alexander

8      City, Alabama.

9         Would all attorneys

10      please identify themselves for

11      the record and will the court

12      reporter swear in the witness.

13      MR. SEGREST: Mike Segrest for the

14      plaintiffs.

15      MR. STUBBS: David Stubbs for

16      Defendant Kevin Walker.

17      MR. MORGAN: Randall Morgan for

18      Defendant Randy Moore.

19      MR. BRITTON: Jackson Britton for

20      the county, county commission,

21      Billy Lane, Sheriff Cofield,

22      Donnie Strain and Johnson and

23      Nathaniel Morrow. I'm sorry.

1      MR. SPENCE: And Robert Spence for

2      Larry Clark.

3      THE COURT REPORTER: Usual

4      stipulations?

5      MR. SEGREST: Sure, whatever that

6      means.

7      MR. STUBBS: Yes.

8

9

10      (Witness sworn.)

11

12

13      MR. SEGREST: Point of order. The

14      court reporter had asked about

15      if there's an object to

16      form -- if counsel for the

17      witness does that, if that can

18      be applied to, you know,

19      everybody. I have no

20      objection to that, you know,

21      where all of y'all don't have

22      to state an object to form if

23      that's okay with everybody

1      else.

2      MR. MORGAN: Sure.

3      MR. SPENCE: Good. Thank you.

4      MR. SEGREST: Also, another thing.

5      In the previous deposition I

6      had asked about family and

7      stuff, and they had said they

8      would willingly provide just

9      basically immediate family

10      within the Middle District.

11      So if we can take care of

12      that, I will eliminate those

13      questions.

14      MR. STUBBS: We will be glad to

15      provide you a list of Agent

16      Walker's family members within

17      the district.

18      MR. SEGREST: Okay. Thank you.

19

20

21

22

23

Page 9

1           KEVIN WALKER
2     The witness, after having first been duly sworn
3 to speak the truth, the whole truth, and nothing
4 but the truth, testified as follows:
5           EXAMINATION
6 BY MR. SEGREST:
7   Q.  Please state your name for the record.
8   **A.  Kevin Walker.**
9   Q.  And where do you live?
10   **A.  I live in -- Roanoke, Alabama, address, but**
11   **I live about halfway between Roanoke and**
12   **Wedowee.**
13   Q.  Okay. And where are you currently
14 employed?
15   **A.  Alabama Law Enforcement Agency.**
16   Q.  Okay. Have you ever given a deposition
17 before?
18   **A.  No, sir.**
19   Q.  Okay. Have you ever been sued before?
20   **A.  No, sir.**
21   Q.  Okay. Before your current employment where
22 did you work?
23   **A.  Wedowee Police Department.**

Page 10

1   Q.  Okay. And when did you leave Wedowee?
2   **A.  I started with ALEA August the 2nd. I put**
3   **in a two-week notice before that.**
4   Q.  August 2nd of this year?
5   **A.  Yes, sir.**
6   Q.  Okay. And how long had you been with the
7 City of Wedowee Police Department before
8 that?
9   **A.  A little over 16 years.**
10   Q.  Okay. What was your position with the City
11 of Wedowee?
12   **A.  Investigator/assistant chief.**
13   Q.  Okay. And how long had you been in that
14 position?
15   **A.  Ten years maybe.**
16   Q.  And what position did you hold prior to
17 that?
18   **A.  Patrol and then investigations and then**
19   **added the assistant chief title.**
20   Q.  Okay. Who is the current chief of police
21 in --
22   **A.  Current chief now is Robert Taylor.**
23   Q.  And how long has he been the chief of

Page 11

1 police there?
2   **A.  A couple of months now maybe. We just had**
3   **a change. The old chief left right after I**
4   **did.**
5   Q.  Okay. Do you know what the circumstances
6 of him leaving were? New administration or
7 just a different job?
8   **A.  Didn't ask. Didn't concern me.**
9   Q.  Okay. How long had the previous chief been
10 there?
11   **A.  It was around ten years because both of**
12   **us -- when he started, that's when I kind**
13   **of started doing investigations and helping**
14   **him run the department.**
15   Q.  And what was his name?
16   **A.  Jay Stone.**
17   Q.  Jay Stone. And so Chief Stone would have
18 been the police chief during the time in
19 question concerning the Almond case?
20   **A.  Yes.**
21   Q.  Okay. When did you become -- well, let me
22 back up.
23     What specialized training have you had

Page 12

1 just in general over the past 16 years?
2   **A.  I've been to patrol classes, to narcotics**
3   **classes, to self-defense classes, pretty**
4   **much all kind of law enforcement classes.**
5   **Over 25 years it's hard to tell you exactly**
6   **what I've been to.**
7   Q.  Right.
8   **A.  But --**
9   Q.  Okay. Well, you said 25 years. So before
10 you went to work for the City of Wedowee,
11 were you in law enforcement prior to that?
12   **A.  I was.**
13   Q.  Okay. And where were you in law
14 enforcement then?
15   **A.  I worked for the sheriff's office in**
16   **Randolph County and Roanoke Police**
17   **Department.**
18   Q.  Okay. Approximately what time periods
19 were --
20   **A.  I went to the police academy in 1993, and I**
21   **worked for the sheriff's office from '93 to**
22   **'96, I think. Then I got out for a little**
23   **while.**

Page 13

1      Man, don't make me think what I done
2  after that.
3      But I was just going into a law
4  enforcement career, I was out, and then
5  I went back to Roanoke, it seems like, in
6  2000 to 2005.  Then I was out about a year.
7  Then I started with Wedowee.
8  Q.  Was it Sheriff Fuller in there when you
9      were there at the sheriff's department?
10 A.  He was.
11 Q.  Okay.  And who did you work under in
12     Roanoke Police Department?
13 A.  Charlie Harris.
14 Q.  Okay.  When did you first become involved
15     with the Randolph County Narcotics Unit?
16 A.  I'm not good with dates.  Summer of 2017.
17 Q.  Okay.  And what was the occasion for you to
18     become involved with the Randolph County
19     Narcotics Unit?
20 A.  Some of the guys on the unit talked to the
21     chief and kind of come up with a deal that
22     I'd go help them as long as I could keep up
23     with my duties at the police department

Page 14

1  too.
2  Q.  Okay.  So was that the first time that the
3      City of Wedowee was actually involved in
4      the narcotics unit?
5  A.  For the best I can realize, yes -- or that
6      I know.
7  Q.  So you said that was the summer of 2017,
8      somewhere along in there.
9  A.  Don't quote me on that.  I think so.  I'm
10     not -- like I say, I don't --
11 Q.  Right.
12 A.  We talked about everything going fast, and
13     dates just don't ...
14 Q.  Understood.  And to the best of your
15     understanding the City of Wedowee was not
16     involved in the Randolph County Narcotics
17     Unit prior to you being --
18 A.  I know they wasn't.  They hadn't been
19     involved with the narcotics unit since
20     probably the '90s.
21 Q.  All right.  When you came on board with the
22     narcotics unit, what was your understanding
23     of what your role was on that unit?

Page 15

1  A.  That we work narcotics in Randolph County.
2  Q.  And can you be a little bit more specific
3      as far as when -- who was involved in that?
4  A.  It was myself, Randy Moore, and Larry
5      Clark.
6  Q.  Okay.
7  A.  And Aris Murphy was in and out through some
8      of those times.
9  Q.  Okay.  And who was Aris Murphy and who was
10     he with?
11 A.  He was with the Fifth Judicial,
12     investigator, DA's office.
13 Q.  Okay.  Was -- did he pretty much stay
14     involved in this continuously until it was
15     disbanded, or was this something that he
16     was more involved with in the beginning and
17     then --
18 A.  I believe he was more involved when Randy
19     and them were there and kind of towards the
20     end he was in and out a little bit.
21 Q.  Okay.  So when you became involved with the
22     narcotics unit, what was your understanding
23     of your specific role in the narcotics

Page 16

1  unit?
2  A.  I would handle the cases in Wedowee.  Randy
3      would handle Roanoke cases.  And Larry
4      would handle the county cases.  I always
5      done more in the county.  So I told Larry
6      that I would help him take care of the
7      county cases because Roanoke is usually
8      more of your busier spot.  And so I just
9      said I'd help Larry do the county cases
10     since we wasn't doing a whole lot in
11     Wedowee anyway.
12 Q.  Okay.  So there were three separate
13     agencies that were -- the sheriff's
14     department -- Randolph County Sheriff's
15     Department, the Wedowee Police Department,
16     and the Roanoke Police Department; correct?
17 A.  Yes.
18 Q.  Larry Clark represented the Randolph County
19     Narcotics Unit on the task -- on the
20     narcotics unit?
21 A.  Yes.
22 Q.  You represented the town of Wedowee?
23 A.  Yes.

1 Q. And Randy Moore represented the City of
2 Roanoke?
3 A. Yes.
4 Q. Okay. And on any cases that you were
5 working within your jurisdiction, which was
6 the town of Wedowee, you would basically be
7 the lead officer --
8 A. I'd be the case agent.
9 Q. -- you'd be the case agent on that.
10 Did you ever go and work any cases in
11 Roanoke?
12 A. I think so. If we got -- late at night got
13 called out and somebody wasn't -- if Randy
14 wasn't available, I would. Most of the
15 time we would all come out, if possible,
16 but there have some instances that we've
17 went out by ourself. So I'm not going to
18 say I haven't because I probably have.
19 Q. Okay. You were here earlier during
20 Randy's -- Randy Moore's deposition;
21 correct?
22 A. Yes.
23 Q. He talked about that frequently you, Larry

1 Clark, and he would ride together on patrol
2 during the day. Is that correct?
3 A. Yes.
4 Q. Would that be a -- what would be a normal
5 shift for y'all? And did your normal
6 shifts coincide with Larry Clark's shifts
7 and Randy Moore's shifts?
8 A. We pretty much worked all the same. I
9 worked seven-to-four shift when I was
10 strictly at Wedowee, and I kind of cut that
11 seven to four. May have went to eight to
12 five. Just kind of according to what was
13 going on. Then anytime after that if you
14 were called out, then we would come out.
15 Q. Okay. So that's seven in the morning to
16 four in the afternoon?
17 A. Yes.
18 Q. And they worked similar shifts?
19 A. Yes.
20 Q. Okay. And was that a normal Monday through
21 Friday shift, or how did that work?
22 A. We pretty much all between seven and eight
23 o'clock were there.

1 Q. Monday through Friday?
2 A. Monday through Friday.
3 Q. Okay. When you came onto the narcotics
4 unit, what were -- what were you told or
5 instructed as far as the operations of it
6 as far as the bank accounts?
7 A. Wasn't really instructed on anything. Just
8 I've been around a while, so I kind of know
9 what's supposed to be done. But I wasn't
10 informed of any type of procedures or
11 anything.
12 Q. Okay. What instructions were you given
13 about your role on being placed on the bank
14 accounts?
15 A. As far as -- say that one more time.
16 Q. What instructions, if any, were you given
17 about being placed on the bank accounts and
18 what your responsibilities would be?
19 A. There wasn't anything. I was just told we
20 was going to sign me up to be on the
21 account.
22 Q. Okay. Which meant that you would be able
23 to sign checks and use the debit card?

1 A. Yes.
2 Q. Okay. Did you personally have a debit
3 card?
4 A. No.
5 Q. Okay. Where was the debit card kept?
6 A. While Larry was there, it was in a safe in
7 his office with the checkbooks, I believe.
8 Q. Were you told by anyone on or given
9 instructions by anyone on who was supposed
10 to be handling the monthly balancing and
11 reconciliation of the checkbooks?
12 A. Nobody told me, but when I come in, Larry
13 Clark was doing it. And I just assumed
14 that anybody with the sheriff's office,
15 since it was Randolph County, that they
16 would handle that.
17 Q. Okay. Do you know where any records are
18 regarding any ledgers, spreadsheets,
19 electronic or otherwise, reconciling the
20 bank accounts for the narcotics unit,
21 either the seized fund or the buy account?
22 A. Unless they've been moved, they should be
23 in my office in a filing cabinet because

1    that's where I put them after the auditor

2    left.

3    Q.   Okay.  And did anybody do this monthly?

4    Did anybody balance the checking books --

5    the checking accounts monthly?

6    A.   I have no idea until I kind of took over it

7    after Larry was gone.

8    Q.   Okay.  When you took over it, was

9    anything -- was there any accounting to

10   balance the checkbooks at that time?

11   A.   No, sir.  Basically what I did is I knew

12   everything had cleared.  I went to the

13   bank.  I got a balance for the buy money

14   account, a balance for the seized money

15   account, what it was, and I started me a --

16   what do you -- it's not Word -- what's

17   the -- Excel spreadsheet.  And I had talked

18   to Dendinger and the sheriff about that,

19   and we all kind of agreed that I would

20   take -- from that day forward -- and I

21   can't remember -- that I would look after

22   it.

23   Q.   But as far as going back and examining any

1    purchases or anything prior to that while

2    Larry Clark was in charge, you didn't go

3    and try to reconcile any of that?

4    A.   No.

5    Q.   Okay.  You heard the testimony of Randy

6    Moore regarding the purchases that were

7    made, some on Amazon.  What's your

8    knowledge of these purchases to Amazon?

9    A.   We did make some purchases for equipment

10   from Amazon.  I knew we had ordered some

11   stuff from Amazon.  I can't remember what

12   it was, but I know we did.

13   Q.   Randy Moore testified that any purchases

14   that were made by the Randolph County

15   Narcotics Unit was pretty much a collective

16   decision between himself, you, and Larry

17   Clark.  Is that correct?

18   A.   Yes.

19   Q.   Okay.  Y'all didn't have to go and get

20   approval from anyone else --

21   A.   I was never told that we had to.

22   Q.   This was -- these funds was the narcotics

23   unit money to do as they pleased with?

1    A.   Not as you pleased.

2    Q.   Okay.  Well, then --

3    A.   For if we needed equipment or something

4    like that.  It just -- it wasn't like you

5    could just blow it if you wanted to.  It

6    had -- it needed to be for a legitimate --

7    Q.   Okay.  But the three of you collectively

8    decided what was legitimate?

9    A.   It was always discussed between us three.

10   Q.   Okay.  All of these charges and purchases,

11   do you know where the receipts to those

12   purchases would be?

13   A.   They should be in that same filing cabinet.

14   Q.   When you say that same filing cabinet --

15   A.   It's the one in my office.  I don't know

16   what drawer it is.  Well, I don't have

17   access to it anymore.

18   Q.   Okay.

19        MR. STUBBS:  To clarify --

20   Q.   Your office --

21        MR. STUBBS:  Yeah.  Your former

22        office?

23   A.   Yeah, former office.  I'm sorry.

1    Q.   Right.  Your previous office within the

2    Randolph County Narcotics Unit?

3    A.   Yes.

4    Q.   Okay.  When you left, to the best of your

5    knowledge the receipts for any purchases

6    made would have been in that filing cabinet

7    in your previous office?

8    A.   I will say that the ones that -- since I

9    took care of it were.  I don't -- I'm not

10   going to answer for previous, too, because

11   I'm not for sure because I didn't go

12   through them and look to see what was in

13   those.

14   Q.   Are you aware of any spreadsheets, Excel or

15   otherwise, that would show what these

16   purchases were made for --

17   A.   Prior to me?

18   Q.   Yes.

19   A.   I have no idea.

20   Q.   After you took over.

21   A.   I started an Excel spreadsheet for both

22   accounts.  I had one for the buy and one

23   for the seized.

1 Q. As far as any of the property that was
2 purchased and equipment that was purchased,
3 it was -- is there any sort of inventory of
4 that equipment and purchases that would
5 show what has been purchased and what the
6 current status of it is?
7 A. **Small equipment, I don't think so. There's**
8 **a list of like Randy's -- the rifle and the**
9 **two pistols we purchased.**
10 Q. Okay. Were you in possession of any
11 equipment that had been issued to you at
12 the time that you left the narcotics unit?
13 A. **Say that one more time.**
14 Q. Were you in possession of any equipment or
15 firearms belonging to the narcotics unit at
16 the time you left --
17 A. **No. I had already turned all that back in.**
18 Q. Okay. Who did you turn that in to?
19 A. **I didn't really have anything. I left my**
20 **keys with Randy. But as far as -- and I**
21 **think I still got some personal stuff in**
22 **that office. And anything that belonged to**
23 **them I left in that former office.**

1 Q. Okay. I'm going to show you what was
2 marked as Plaintiffs' Exhibit 1. Have you
3 ever seen this document before?
4 A. **No, sir.**
5 Q. Okay. And on this -- this is a document
6 dated September 2nd, 2014, that is from the
7 Randolph County Commission where it is
8 opening up the two accounts for the
9 Randolph County Narcotics Unit under the
10 Federal Employee Identification Number for
11 Randolph County. Were you aware that these
12 two accounts were under the Randolph County
13 Federal Employee ID Number?
14 A. **Not the Federal ID Number. I knew they**
15 **were through like the commission. But as**
16 **far as a Federal ID Number, no.**
17 Q. Okay. On this -- and if -- in the previous
18 deposition we talked about Sheriff Cofield
19 said that Larry Clark worked under his
20 supervision while you would work under the
21 chief of Wedowee's supervision and Randy
22 Moore was under the supervision of the City
23 of Roanoke police chief. Is that a fair

1 description of the arrangement as best you
2 understood it?
3 A. **Yes, sir. I answered to my boss and he**
4 **answered to his boss, yes, sir.**
5 Q. Okay. And then this Randolph County
6 Narcotics Unit operated as its own
7 independent agency?
8 A. **No. I don't --**
9 MR. STUBBS: Object to the form.
10 A. **No, it didn't. We still had to answer to**
11 **somebody.**
12 Q. And who did you have to answer to?
13 A. **I answered to my boss, my chief. Randy**
14 **answered to his chief. And I'm assuming**
15 **the chiefs would discuss whatever. Don't**
16 **know because ...**
17 Q. But you maintained a separate office at a
18 separate location?
19 A. **I did. I had -- I wanted to keep my**
20 **Wedowee and narcotics business separated.**
21 Q. Okay. So the narcotics unit had its own
22 office?
23 A. **Yes.**

1 Q. It had its own case files?
2 A. **Yes.**
3 Q. It had its own bank accounts?
4 A. **Yes. Through the commission.**
5 Q. Through the commission. And --
6 A. **And I don't -- I'll go on and tell you. I**
7 **don't know how all that works. That was**
8 **before my time and ain't got a clue.**
9 Q. Okay. Let's talk about your understanding
10 of how the seized account works and how the
11 buy account works on that -- explain your
12 understanding of those two accounts.
13 A. **My understanding is that if we seized any**
14 **money from somebody, it went -- was**
15 **deposited into the seized account until it**
16 **was -- through plea agreement or a judge**
17 **order that it went to the arresting agency**
18 **narcotics unit. And it stayed there.**
19 **Nothing was purchased. Nothing was --**
20 **whatever -- unless you give money back. If**
21 **the money was still in the seized account**
22 **and I had to, say, give you your money**
23 **back, I would take it -- that would be the**

Page 29

1  only time you would take money from the
2  seized account to do that.
3  Q.  Okay.  Just a second ago I asked you if the
4  Randolph County Narcotics Unit was a
5  separate agency, and you said no.  But then
6  you just said if, you know, the arresting
7  agency -- it would be forfeited to them and
8  that would be the Randolph County Narcotics
9  Unit.  So --
10  A.  I call it the sheriff's office because
11  the -- ultimately the -- to me the sheriff
12  was the one that was over that because it
13  was his -- nobody told me that.  That's
14  just how I feel.  That was my opinion.
15  Q.  Okay.  But you and Randy Moore and Larry
16  Clark collectively made the decisions about
17  what was done with --
18  A.  And there's been instances we've run things
19  by the sheriff just to make sure or his
20  chief or my chief.  It wasn't like we were
21  just out there doing what we wanted.
22  Q.  Are you aware of any of the proceeds from
23  the Randolph County buy account ever being

Page 30

1  distributed back to the sheriff's office,
2  the City of Wedowee, or the City of
3  Roanoke?
4  A.  Not that I'm aware of.
5  Q.  We talked in the previous deposition a good
6  bit about the ATV that was purchased and
7  questions about some checks.  Without
8  having to go back through all of that and
9  ask specifics about it, just tell me your
10  recollection of that and about possible
11  reimbursement from the state and was
12  that -- Randy kind of deferred to you on
13  that.
14  A.  ADECA -- we were -- Strain was actually --
15  he was part of the Alabama Drug Enforcement
16  Task Force.  We get grant money through
17  ADECA each year we send in or whatever.  At
18  the end of each year if there's leftover
19  money, like each department that's in it --
20  like they've been buying vehicles for each
21  department.  Well, that year they had
22  enough left, and we had been asking for a
23  side-by-side.  So basically once they said

Page 31

1  how much money we had through the ADECA
2  grant, the -- they pay for it up front.
3  And this all went through the county.  It
4  didn't go through the commission.  It
5  didn't go through the narcotics unit.  The
6  side-by-side was bought from Speed Zone
7  Motorsports.  The county wrote a check for
8  it.  And then whoever the ADECA moneyholder
9  at the time was that was looking after the
10  account reimbursed the county for that.
11  Q.  Okay.  What was the $2800 check for that --
12  A.  That was --
13  Q.  -- the narcotics unit wrote to Speed Zone?
14  A.  That was going to be for a windshield,
15  winch, a speed pass for the oil change
16  where you didn't have to pay for it for
17  three years if you took it and had it
18  serviced.  I wrote the check.  I turned it
19  in.  The county reimbursed it.  And I
20  deposited the money right back into the
21  account.  It was within -- it was pretty
22  quick.
23  Q.  Okay.  And so there's two separate

Page 32

1  transactions, then.  One transaction was
2  the purchase that the county handled
3  strictly purchasing the side-by-side
4  itself?
5  A.  They -- yes.  Everything went through them.
6  Q.  Okay.  And then basically the Randolph
7  County Narcotics Unit purchased accessories
8  for --
9  A.  This was -- I think it was the next year.
10  But, yes, the -- but you still got
11  reimbursed for that money.
12  Q.  Okay.
13  A.  You just -- you had to pay for it -- like
14  with Wedowee, whatever I purchased, Wedowee
15  has to pay for it, and then I would send in
16  for reimbursement.  And then once I send in
17  the receipts and everything -- like I say,
18  different agencies will hold the ADECA
19  money and keep up with it.
20      I think at that time Randolph County
21  was like Adamsville is now.  The clerk at
22  Adamsville was the one that we were sending
23  the stuff in to get reimbursement for.

1 Q. Okay. So who were you sending in to get

2 reimbursements from the --

3 A. **See, at that time I was on the task force,**

4 **but I hadn't got -- I wasn't eligible for**

5 **grant money till the next year. So we were**

6 **going through the sheriff's office -- their**

7 **part. So it was actually the county's**

8 **money through the task force, if that makes**

9 **sense.**

10 Q. And I'm just trying to understand on it.

11 So who did you actually send the

12 reimbursement form to to get the $2800 back

13 that was spent at Speed Zone?

14 A. **I can't remember if the lady was still**

15 **there or the guy that took her spot.**

16 Q. And that's with the county?

17 A. **Yes. In the commission office.**

18 Q. Okay. So --

19 A. **Because at one time --**

20 Q. -- somebody at the county commission office

21 knew about this expenditure and that it had

22 been spent by the narcotics unit and

23 reimbursed it?

1 A. **Uh-huh (positive response).**

2 Q. So based on that, is it fair to say that

3 the Randolph County Commission knew about

4 the existence of the Randolph County

5 Narcotics Unit?

6 A. **Yes.**

7 MR. BRITTON: Form.

8 Q. And does Randolph County Commission know

9 about these bank accounts?

10 MR. BRITTON: Form.

11 Q. They can object to all of them, whatever.

12 A. **You can object, but I have no idea whether**

13 **they know or not.**

14 Q. Okay. But you talked with somebody at the

15 commission?

16 A. **This was about buying the -- if we're still**

17 **on the side-by-side, yes.**

18 Q. Yes. Okay. So how did they reimburse you?

19 A. **You talking about for the $2800 check?**

20 Q. Yes.

21 A. **I think he cut me a county check.**

22 Q. And who was the county check made to?

23 A. **That I cannot remember.**

1 Q. Well, where was it deposited?

2 A. **Small Town/Southern States Bank.**

3 Q. In what account?

4 A. **Buy money account.**

5 Q. Okay. And about what time frame would that

6 have been?

7 A. **It should have been within a week or so. I**

8 **want to say it was fairly quick.**

9 Q. From the time that check was written?

10 A. **Uh-huh (positive response).**

11 Q. Okay.

12 MR. STUBBS: You have to say

13 "yes."

14 A. **Yes. I'm sorry.**

15 Q. So the check would have had to have been

16 made out to either the narcotics unit or --

17 A. **It was not personally made out to me. I**

18 **just don't remember if it was wrote to the**

19 **narcotics unit. I don't remember how it**

20 **was wrote out.**

21 Q. Okay. In going through the bank records

22 previously, I think you said that there was

23 buy money checks of what -- to you there

1 was one check on 7 -- July 26 of 2017 for

2 $500 and another one in May of two thousand

3 seven -- or May 17th of 2018 for $500. Do

4 you remember receiving those checks?

5 A. **Yes, sir.**

6 Q. Do you remember getting any other checks

7 other than those during the time period you

8 worked for the task force?

9 A. **I think that's all the buy money I got**

10 **except for when myself and Randy split up**

11 **Larry's.**

12 Q. Okay. Tell me about how you kept up with

13 the buy money and how you handled that.

14 A. **When I got the check, I'd make a copy of**

15 **the check. I would cash it. Then I have a**

16 **ledger where I would write in how much I**

17 **had. If I had money prior to, I would add**

18 **that, the check number, and then go from**

19 **there.**

20 Q. And where would you keep this ledger?

21 A. **I always kept it in my bookbag with me. It**

22 **was in a money bag in my bookbag in my**

23 **possession at all times.**

1  Q.   And where was that ledger kept?

2  A.   I always kept it with me.  You had the book

3       and then the money bag would be in there.

4       So they were together.

5  Q.   Was there a form ledger that the three of

6       you all used the same ledger, or how did

7       you keep up with that?  Tell me about the

8       ledger itself.

9  A.   Prior to I don't know.  It's one that they

10      had.  It's nothing that I made up.  It's

11      something that they already had when I come

12      there.

13 Q.   Okay.  And --

14 A.   Now, who started it, I don't know.

15 Q.   Okay.  Was there any oversight as to how

16      you spent this money?

17 A.   What do you mean by that?

18 Q.   Well, once you got this buy money, Randy

19      Moore testified that there would be spot

20      money -- I think is what he -- where you

21      would pay an informant to go do this and

22      then also give the paid informant some

23      money to go make a purchase.  Is that --

1  A.   You would give him the money to buy the

2       dope, and then if he completed the task, if

3       then he was not working off a charge, then

4       you would pay him.

5  Q.   Okay.  And other than just your word for

6       this having taken place in this ledger, was

7       there any other oversight of that?

8  A.   Not that I can think of.

9  Q.   Would your ledger contain the serial

10      numbers of the money that was given to the

11      informant?

12 A.   Not the paid -- where you paid him, but the

13      money that you would give him to actually

14      go buy the dope.

15 Q.   And on all of this thousand dollars that

16      you got and plus maybe another 200 that you

17      and Randy split up when Larry left, did you

18      still have any of that money when you left

19      in August of this year?

20 A.   Yes, sir.

21 Q.   And what did you do with that money?

22 A.   It was locked up in the Wedowee Police

23      Department's evidence room.

1  Q.   Is it still there?

2  A.   Unless they've moved it, it is.  I have no

3       access to that anymore.

4  Q.   Okay.  Why would it have been left in

5       Wedowee's --

6  A.   Because when I left, I didn't have time to

7       get it to them, and I was not going to keep

8       it in my possession because I was no longer

9       employed.  So I -- the chief now, Robbie

10      Taylor, I told him it would be in there and

11      if they were looking for it that a member

12      of the county could come get it from there.

13      I just was not keeping it in my possession.

14 Q.   And how much was in there, if you remember?

15 A.   I have no idea.  It's whatever it was

16      that -- I didn't spend anything after the

17      audit.  So whatever was there from the

18      audit is whatever was in there.  I can't

19      remember how much was in it though.

20 Q.   I mean, do you think it was a couple of

21      hundred dollars or $20, or do you have

22      any --

23 A.   It'd be several hundred dollars.

1  Q.   Okay.  And was your ledger -- did you leave

2       your ledger with them too?

3  A.   Uh-huh (positive response).

4  Q.   Okay.  So that should be in the evidence

5       room in Wedowee?

6  A.   Uh-huh (positive response).

7  Q.   What is your understanding of -- by

8       forming -- tough question.

9            What authority did you have to act

10      outside of the Wedowee police jurisdiction?

11 A.   Before I worked -- before I was on with the

12      ADETF task force, I've been through Jeff

13      Fuller, David Cofield, and I've been

14      deputized.

15 Q.   Okay.

16 A.   That way when I done investigations I could

17      go outside into the county.

18 Q.   And when was that done?

19 A.   Jeff Fuller has been gone for a while.  I

20      want to say at the first -- when David

21      first took office -- I want to say not long

22      after he took office I got deputized.  Then

23      when he was re-elected, I know I did.  And

Page 41

1  as far as time frame there, I want to
2  say -- I was sworn in through the state
3  sometime after that and I didn't worry
4  about the sheriff's office deputizing me.
5  Q.  Okay.  Tell me about -- as far as a
6  swearing in, when was David re-elected?
7  Was that 2018?
8  A.  I don't know dates and times.  I know
9  he's --
10  Q.  You talking about the last election?
11  A.  Yes.
12  Q.  Okay.  When he ran against Donnie Grant?
13  A.  Well, no.  Hold on.  This is, what, third
14  term?
15      I can't -- look, I don't keep up with
16  it either.  I know he swore me in two
17  different times.  I can't remember the
18  last -- if it was this time when.  They run
19  together.
20  Q.  I'm just familiar with in 2018 he and
21  Donnie Grant ran against each other.
22  A.  Uh-huh (positive response).
23  Q.  So you were sworn in again after that?

Page 42

1  A.  I don't -- see, I can't -- I don't think --
2  I think I was -- I don't think so because
3  it wasn't long that I started with that
4  state task force.
5  Q.  Okay.  And tell me about your affiliation
6  with the state task force.
7  A.  Like what do you mean?
8  Q.  Well, what did you do with the state task
9  force?
10  A.  Basically we work narcotics for Region G,
11  which ranges from Randolph, Clay, Cleburne,
12  Calhoun, Talladega, Shelby, St. Clair, and
13  Jefferson County.  We would work narcotics
14  in those general areas.  My responsibility
15  was I pretty much would handle complaints
16  from Calhoun County south back towards
17  Randolph -- like say Calhoun, Cleburne,
18  Clay, Randolph and those general areas and
19  some of Talladega County.  I would handle
20  the complaints.  Most of the work was done
21  in the Homewood/Birmingham area.  So when
22  they would get something together, they
23  would call and I would go assist the other

Page 43

1  guys as -- that was kind of my role with
2  the task force.
3  Q.  And so with the state task force, what kind
4  of cases would they be investigating?
5  A.  High-end meth, heroin, Fentanyl stuff.
6  Q.  Right.  What was the purpose of Randolph
7  County having a separate drug task force
8  outside of the state?
9  A.  I ain't got a clue.  You have to ask the
10  sheriff about that.
11  Q.  So the Randolph County Sheriff's Office and
12  these two other police departments could
13  have been working with the state drug task
14  force --
15  A.  You had -- your department had to --
16      MR. STUBBS:  Object to the form.
17  A.  Your department had to apply to get in, and
18  then I had to do a background packet to get
19  accepted.  Any department was eligible as
20  far as I know.  I don't know how their
21  process was.  But you had to apply to get
22  in.
23  Q.  Okay.  Do you know whether or not the

Page 44

1  area, G -- did it include Chambers County?
2  A.  No.
3  Q.  Did that -- Chambers County is just south
4  of --
5  A.  Randolph County cuts the Region G and
6  it's -- it's the next -- Chambers County
7  starts the new region.  I think it may be C
8  or something like that.
9      No, it's not C.  I don't -- I don't
10  know.
11  Q.  Okay.  Would the state task force and --
12  was the City of Wedowee a -- I'm assuming
13  they would have had to have been an agency
14  that participated with the state drug task
15  force.
16  A.  Yes.
17  Q.  Okay.  So if money was seized by the state
18  drug task force, do you know how it was
19  distributed?
20  A.  What I've been told was whoever the
21  moneyholder is, if there's seized money and
22  it's awarded, they split it between the
23  departments.  There's a -- say if there was

Page 45

1 a thousand dollars and there's five
2 departments. They each get an equal
3 amount.
4 Q. Like the district attorney's office might
5 get a little bit, the state office might
6 get a little bit, and the individual --
7 A. I can tell you about the departments.
8 I don't know about the DA's office or
9 anything like that.
10 Q. Okay. Would that require a forfeiture
11 proceeding being filed in the appropriate
12 circuit court?
13 A. I don't -- I can't answer that. I don't
14 know.
15 Q. Okay.
16 A. I want to say -- I don't know that part of
17 this. I don't know.
18 Q. Okay. How often were you involved in stuff
19 with the state drug task force?
20 A. At least once or twice a month. Sometimes
21 I would go to Birmingham six, seven times a
22 month.
23 Q. If something came up within the city of

Page 46

1 Wedowee involving narcotics, would you
2 involve the state task force or the
3 Randolph County Sheriff's Office or --
4 A. According to what it was, I'd just -- I'd
5 handle it myself. According to the
6 situation though.
7 Q. Okay. Were you ever given any instructions
8 on how to make out checks by anybody
9 involved in the Randolph County Narcotics
10 Unit?
11 A. No.
12 Q. And during the time that Larry Clark was
13 there did you ever check the bank account?
14 A. No.
15 Q. Have you seen the audit that was performed
16 by the office of public examiners?
17 A. Not till earlier. Prior to today, no.
18 Q. Okay. And you're referring to during Randy
19 Moore's deposition?
20 A. Yes.
21 Q. Okay. What role did you play in the audit?
22 A. She contacted me. Like Randy, I would get
23 records. She would say -- would tell me

Page 47

1 what she needed, and I would get that stuff
2 for her and just kind of work alongside
3 her, whatever she needed.
4 Q. In the audit it refers to one officer being
5 about -- $3900 that was unaccounted for.
6 Were you asked anything about that
7 deficiency?
8 A. As far as what?
9 Q. Did she question you about it?
10 A. She asked me if I knew where the money
11 went, and I had no idea.
12 Q. Okay. Then what officer did that involve?
13     MR. BRITTON: Form.
14 A. Larry Clark.
15     MR. SPENCE: Same objection.
16 Q. Do you know how she arrived at the
17 conclusion that it was Larry Clark?
18     MR. BRITTON: Form.
19 A. I have no idea how the audits work and what
20 they do. I just know they come in and
21 audit your stuff and whatever. But the
22 process, I have no idea.
23 Q. Prior to the audit were you aware of Larry

Page 48

1 Clark taking any money from the Randolph
2 County Narcotics Unit?
3 A. No.
4 Q. But you had never looked at the bank
5 accounts?
6 A. No, sir.
7 Q. The audit mentions a property log or lack
8 thereof. How was seized property kept up
9 with when it came into the narcotics unit?
10 A. It would be on an inventory sheet in a case
11 file.
12 Q. Okay. I'm going to show you what's marked
13 as Plaintiffs' Exhibit Number 4. Do you
14 recognize this?
15 A. I do.
16 Q. And what is this document?
17 A. These are the inventory sheets from Greg
18 and Teresa Almond's house.
19 Q. Okay. At the bottom of these inventory
20 sheets it says page "blank" of "blank."
21 Why were these left blank?
22 A. Simple mistake, I'm assuming, sure.
23 Q. Okay. Would you agree that by making this

Page 49

1  mistake it's impossible to tell if a page
2  is missing?
3  **A.  It might be for somebody else.**
4       DEFENSE COUNSEL:  Object to the
5       form.
6  **A.  It wouldn't be for me.**
7  Q.  Just because you remember them?
8  **A.  Uh-huh (positive response).**
9  Q.  Okay.
10       MR. STUBBS:  Is that yes?
11  **A.  Yes.  I'm sorry.  Habits are hard to break**
12  **sometimes.**
13  Q.  Were you ever given any instructions or
14  training on how to fill out an inventory
15  sheet?
16  **A.  I've never had any instruction on how to**
17  **fill out an inventory sheet.  No, I have**
18  **not.**
19  Q.  When you say that this was a mistake by not
20  putting the page number and how many pages
21  at the bottom, do you think that's a
22  one-time mistake or is that something that
23  would have been a regular mistake on --

Page 50

1  **A.  No, it's not a regular mistake.  I**
2  **generally try to put that in there.**
3  Q.  Okay.  And would starting the numbering
4  over on each page -- was that the normal
5  way that you filled out these inventory
6  sheets?
7  **A.  It's not the normal way.  No, it's not the**
8  **normal way.**
9  Q.  Then what would be the normal way?
10  **A.  If we were doing a small house with not so**
11  **much stuff, you would have one sheet and it**
12  **would be consistent 1 through whatever.**
13  Q.  And if it went on to page 2, you would just
14  keep the same numbering?
15  **A.  Yes.**
16  Q.  Okay.  So in that scenario that you just
17  gave, the inventory sheet would have page 1
18  of 2 and might go items 1 through --
19  **A.  35, 36, something like that.**
20  Q.  Okay.  But that wasn't done at the
21  Almonds'?
22  **A.  No.**
23  Q.  All right.  On January 31st, 2018, Randy

Page 51

1  Moore testified that you, he, and Larry
2  Clark were riding around and somebody got a
3  call from Nathaniel Morrow.  To the best of
4  your recollection who received a call?
5  **A.  I believe Larry did because he was the**
6  **sheriff's office and Nathaniel was a**
7  **deputy.**
8  Q.  Okay.  In Nathaniel Morrow's statement he
9  stated that he called Larry Clark, but in
10  your narrative within the Randolph County
11  Narcotics Unit case file you state that you
12  received a call from --
13  **A.  And that's possible.  I'm -- I know we**
14  **talked to him.  He may have called me.  I**
15  **don't know.**
16  Q.  Okay.
17  **A.  I'm not going to say he did or didn't.**
18  **Well, he talked to me or Larry, one.  I**
19  **can't remember.  I know the conversation**
20  **was with Larry.**
21  Q.  Okay.  There's -- within the Randolph
22  County Narcotics Unit Case File Check List
23  there's a telephone number under the

Page 52

1  forensic science request.  It's got Officer
2  Kevin Walker and a listed telephone number
3  on that form.  You see the 863 number?
4  **A.  Where?**
5  **Yes.**
6  Q.  Okay.  Was that your phone number with the
7  City of Wedowee Police Department at that
8  time?
9  **A.  No.  I think that was the number that was**
10  **the narcotics number when they were in**
11  **Roanoke.**
12       MR. MORGAN:  When they what?
13       THE WITNESS:  When they were in
14       the Roanoke office.  When they
15       had an office in Roanoke.
16  Q.  Okay.
17  **A.  I think that's what it is.  That's not**
18  **any of my numbers.**
19  Q.  Okay.  What number would you have been
20  using at the time on the date January 31st,
21  2018?
22  **A.  You want the number?**
23  Q.  Yes.

Page 53

1  A.  (256) 610-4747.
2  Q.  Okay.  Do you know who the carrier was
3      with?
4  A.  Verizon.
5  Q.  All right.  And if you had received a call
6      from Nathaniel Morrow, it would have been
7      on that line?
8  A.  Uh-huh (positive response).
9          MR. SPENCE:  Is that yes?
10 A.  Yes.
11 Q.  And any subsequent call to Judge Amy
12     Newsome would have been on that line as
13     well?
14 A.  Yes.
15 Q.  Okay.  All right.  So either you or Larry,
16     one, got a call.  And tell me what you
17     remember happening next.
18 A.  Nathaniel told us that he had went to serve
19     a civil paper at the residence.  When the
20     female come to the door, he smelled
21     marijuana coming from the residence.  I
22     don't think at that time he knew it was
23     Ms. Almond.

Page 54

1      After that he left and called -- he may
2      have called me.  He may have called Larry.
3      I'm not for sure.  We got that information,
4      met with Nathaniel, made sure that -- face
5      to face that the information was correct.
6      I believe Larry was calling one of the
7      circuit judges, and I called Amy.  Because
8      we usually -- whoever can get one the
9      quickest at the time was kind of the way it
10     went.  And Judge Newsome answered the
11     phone, and I talked to her.
12 Q.  Okay.  Did you call her at the courthouse?
13 A.  I don't know what -- I don't know if I
14     called her on her cell phone or the office
15     number.  I don't remember what number.  I
16     had both cell phones and a office number.
17     So I don't know which one I called her on.
18     More than likely a cell phone.
19 Q.  Tell me to the best of your recollection
20     what was said during that phone call.
21 A.  I told her what Deputy Morrow had told us.
22     And we talked and she said -- she said you
23     have probable cause and from future -- from

Page 55

1      past experiences she said we had a search
2      warrant.
3  Q.  Okay.  She specifically said that I'm
4      issuing you a search warrant
5      telephonically, or did she say -- tell you
6      you had probable cause for a search
7      warrant?
8  A.  It was -- it's been so long.  Can't
9      remember exactly.  She said you got enough
10     for a search warrant basically.
11 Q.  Okay.  But you don't specifically remember
12     her stating I'm hereby issuing you a
13     telephonic search warrant?
14 A.  No.
15 Q.  Okay.  And you did not have any copy,
16     electronic or hard copy, of a search
17     warrant at that time?
18 A.  No.
19 Q.  Randy Moore testified that the Rules of
20     Criminal Procedure were not followed by not
21     having a search warrant -- a physical copy
22     of the search warrant, either electronic or
23     hard copy.  Do you agree with that?

Page 56

1          MR. STUBBS:  Object to the form.
2  A.  Repeat that one more time.
3          MR. SEGREST:  Can you read it
4          back?
5          THE WITNESS:  No.  I asked you.
6          MR. SEGREST:  I can't remember
7          what I had for lunch.  I might
8          object to it when you read it
9          back.
10         (Requested portion of the record
11         was read by the court reporter as
12         follows:  Randy Moore testified
13         that the Rules of Criminal
14         Procedure weren't followed by not
15         having a search warrant -- a
16         physical copy of the search
17         warrant, either electronic or hard
18         copy.  Do you agree with that?)
19         MR. MORGAN:  Object to the form.
20 A.  I'll agree to that because I wasn't
21     familiar with the criminal procedures at
22     that time.
23 Q.  Okay.  And when you say you weren't

Page 57

1   familiar with criminal procedures, can you
2   elaborate on that?
3   **A.  Talking about the warrant purpose?**
4   Q.  Yeah.
5   **A.  It's the way it had been done several**
6   **times.  So I was just kind of following**
7   **suit of how it had been done some in the**
8   **past.**
9   Q.  Okay.  You weren't aware that sworn
10  recorded testimony was required by the
11  Rules of Criminal Procedure --
12  **A.  At that time I did not.**
13       MR. MORGAN:  Object to the form.
14  Q.  When did you learn that?
15  **A.  It was later on.**
16  Q.  Okay.  At any point in time did Judge
17  Newsome swear you in under oath during that
18  conversation?
19  **A.  Not that I can remember.**
20  **I'll add one thing to this.  If I**
21  **didn't think I had a search warrant, we**
22  **would never be sitting here.**
23       MR. MORGAN:  If what, now?

Page 58

1        THE WITNESS:  If we never -- if I
2            hadn't thought we had a search
3            warrant, there wouldn't none
4            of us be sitting in this room
5            today.
6   Q.  Do you understand that there is a
7   difference between being told that you have
8   probable cause for a search warrant and
9   being told that you have a search warrant?
10       DEFENSE COUNSEL:  Object to the
11           form.
12       MR. STUBBS:  Same objection.
13  **A.  I understand.  I just was going off how we**
14  **done it in the past, how it had been done.**
15  Q.  And that's --
16  **A.  I was new to that telephonic search**
17  **warrant, so I was -- had not looked**
18  **everything up.  So at that time I thought**
19  **we were following the procedures.**
20  Q.  Okay.  All right.  Let's talk about the
21  raid and what happened next after the call
22  with Judge Newsome.  Give me your
23  recollection of what happened after that.

Page 59

1   **A.  After we met up and made sure we had enough**
2   **personnel, we went to the residence.  I**
3   **can't remember who the lineup was and what**
4   **order.  I went to the front --**
5   Q.  First of all, where did everybody meet and
6   who is your recollection of who all was
7   involved?
8   **A.  We were at a church probably a couple of**
9   **miles away from the residence.  It was --**
10  **you want me to name them?**
11  Q.  Just by your memory, if you remember.  If
12  you don't --
13  **A.  I remember Greg Johnson, Nathaniel, myself,**
14  **Larry Clark, Randy.  I think Bernard**
15  **Sheppard showed up.  Everybody that's been**
16  **named in the --**
17  Q.  Is there anybody else that you can think of
18  that wasn't named in this lawsuit that was
19  there?
20  **A.  No.**
21  Q.  Okay.  So y'all gathered up on the side of
22  the road and was there any sort of briefing
23  before going into the home?

Page 60

1   **A.  It was a brief briefing, basically like --**
2   **and I don't -- say, Larry, you get you a**
3   **couple of guys to go in and pick who you**
4   **want to be at your team.  We'd say, hey,**
5   **Randy, you go to the back door, I go to the**
6   **side door type deal.  Nothing just an**
7   **in-depth briefing, but just kind of a --**
8   Q.  Were you familiar with the residence?
9   **A.  No.**
10  Q.  Had you ever seen it?
11  **A.  I had seen it from the road.  I had never**
12  **been to it.**
13  Q.  Okay.  When you said you had seen it from
14  the road, did y'all drive by that day prior
15  to it or --
16  **A.  We hadn't been by there that day that I**
17  **remember, but we've -- I've been by it**
18  **before.**
19  Q.  Did you know Greg and Teresa Almond?
20  **A.  Not personally.**
21  Q.  Well, as far as --
22  **A.  Not even -- not even an acquaintance, no.**
23  **I knew their name, but I don't -- I**

Page 61

1   never -- I want to say me and Teresa maybe
2   were in school together or close age at one
3   time, but I haven't had any dealings with
4   them.
5   Q.   In school where did -- where were y'all in
6   school together?
7   A.   I went to Roanoke. I'm assuming that's
8   where I remember her from. I know -- even
9   though I -- I'm pretty sure we were around
10  the same age.
11  Q.   Okay. So just knew them both as -- you
12  being a lifelong resident of Randolph
13  County and them being lifelong residents,
14  you knew of them?
15  A.   Yes, I knew of them.
16  Q.   Were you aware of them having any criminal
17  history?
18  A.   Other than hearsay. I've heard their name
19  pop up, but, no, I didn't know what kind of
20  history they had.
21  Q.   Before seeking to obtain this search
22  warrant, did anyone from the drug -- from
23  the narcotics unit inquire about criminal

Page 62

1   history?
2   A.   No. I didn't.
3   Q.   Okay. Did you know that it was the home of
4   Greg and Teresa Almond that you were going
5   to raid?
6   A.   Yes.
7   Q.   And how did you know that?
8   A.   Because I knew where they lived, if that
9   makes sense. I didn't know their exact
10  address, but I knew that that was their
11  residence.
12  Q.   Okay. And so nobody checked to see if
13  there's any outstanding warrants or
14  previous criminal history before doing the
15  raid?
16  A.   No.
17  Q.   Whose decision was it to enter the home by
18  force?
19  A.   We've always forcefully executed search
20  warrants like that. So I don't know that
21  it was a -- anybody's decision.
22  Q.   Okay. And that's just the way that y'all
23  did it?

Page 63

1   A.   We've always done that type of entry on
2   search warrants.
3   Q.   Whether it's at a family residence or at a
4   known drug house?
5   A.   You're not -- you're talking just -- are
6   you talking strictly drug search warrants,
7   or are you talking -- what kind of search
8   warrant are you talking about?
9   Q.   Well, I'm talking about with the drug --
10  with the Randolph County Narcotics Unit.
11  A.   Our drug search warrants are usually you
12  kick the door in and go in and secure the
13  residence.
14  Q.   Regardless of the situation?
15  A.   I'm not going to answer that because there
16  are so many situations and you hadn't just
17  told me what kind of situation you want an
18  answer for.
19  Q.   Okay. Well, what would be a situation that
20  you would think forced entry wouldn't be
21  necessary?
22  A.   Small kids in the house to elderly.
23  Q.   How do you know that there weren't small

Page 64

1   kids in the Almonds' house?
2   A.   Didn't.
3   Q.   Was it standard operating procedure on a
4   forced entry to throw a detonation device
5   into --
6        DEFENSE COUNSEL: Object to the
7        form.
8   A.   It wasn't a standard -- we didn't -- it was
9   not a standard operating procedure.
10  Q.   But forced entry was?
11       DEFENSE COUNSEL: Object to the
12       form.
13  A.   It's not a standard operating procedure.
14  It was just basically that's always how
15  it's been done.
16  Q.   And what about as far as the use of a
17  detonation device upon entry?
18       DEFENSE COUNSEL: Object to the
19       form.
20  A.   Didn't know it was going to be used.
21  Q.   Okay. You didn't know one was going to be
22  used?
23  A.   No.

1  Q.   Okay.  Who makes the determination as to

2       when a detonation device is used?

3  A.   **I don't know that we had one.  I just -- we**

4       **had access to it.  Randy never used it.**

5       **Myself and Larry would.  But all three of**

6       **us had access to it.  I just didn't know it**

7       **was going to be used at that time.**

8  Q.   Wouldn't you agree it would be good to let

9       everybody on the team know that a

10      detonation device was going to be used?

11         MR. BRITTON:  Form.

12 A.   **That's not really a yes-or-no question, but**

13      **probably.**

14 Q.   Would there be any way of knowing whether

15      or not it was -- a detonation device has

16      been sent in by one of the members of the

17      unit versus a gunshot?

18         MR. BRITTON:  Form.

19 A.   **I know the difference between the sounds.**

20 Q.   So you would know the difference?

21 A.   **I can't answer for anybody else.**

22 Q.   Right.  I'll show you what's marked as

23      People's Exhibit 6.  Do you recognize this

1       exhibit?

2  A.   **I do.**

3          MR. STUBBS:  People's Exhibit 6 or

4             Plaintiffs' Exhibit --

5          MR. SEGREST:  It's Plaintiffs'

6             Exhibit 6, and it's Randolph

7             County Narcotics Unit

8             production that I can't see

9             because it's too dark at the

10            bottom of the page.

11 Q.   Okay.  What do you recognize this document

12      to be?

13 A.   **It's a type of flashbang.**

14 Q.   Is this the kind of flashbang that was used

15      by the narcotics unit?

16 A.   **We had that one.**

17 Q.   Okay.  This one.

18 A.   **I don't know if it was that one.**

19 Q.   That one, but --

20 A.   **It was like that one.**

21 Q.   Okay.  I mean, this appears to be the

22      manual that goes with this type of

23      detonation device.

1  A.   **It looks like the box it come in.**

2  Q.   Okay.  On the back it says, Warning:  The

3       FBC 12-gauge Flash Bang Cartridge are

4       designed for military and law enforcement

5       use in Royal Arms FBG Flash Bang Trainer

6       device only.

7          Okay.  What's your understanding about

8       what's the difference between a training

9       device and a nontraining device?

10 A.   **The training device only uses a blast cap**

11      **instead of the shotgun shell.**

12 Q.   Okay.  What's the difference?

13 A.   **The cap is like the primer in a pistol --**

14      **in a shell, and then you have like the mini**

15      **shotgun shell that's the actual -- what's**

16      **the word I'm looking for -- that you use in**

17      **the actual device for real world stuff.**

18 Q.   All right.  And so what's the difference in

19      the detonation of the two?

20 A.   **Mostly there is no light and it's not quite**

21      **as loud.**

22 Q.   Okay.

23 A.   **The best way I can explain is it's kind of**

1       **set up like a shotgun.  There's nothing in**

2       **it.  It's just -- it makes a lot of noise.**

3       **That's why they're ported right there.**

4       **It's -- and that just makes a loud bang.**

5       **They're nothing like an actual flashbang.**

6  Q.   Was there any discussion in the briefing

7       before going to the Almonds' house that a

8       flashbang device was going to be used upon

9       entry?

10         MR. BRITTON:  Form.

11 A.   **None that I remember.**

12         MR. SEGREST:  What's wrong with

13            the form?

14         MR. BRITTON:  You're calling it a

15            flashbang device and it's not.

16         MR. SEGREST:  Okay.  What is it?

17         MR. BRITTON:  It's a training

18            device.

19         MR. SEGREST:  Okay.

20 Q.   Was there any discussion about a Royal Arms

21      FBG MKII device being used upon entry?

22 A.   **I don't remember discussing it.**

23 Q.   Okay.  Do you know what the FB stands for

1  in this?
2  **A.  No.**
3  Q.  Is it possible it stands for flashbang like
4  what it says right there?
5  **A.  It's possible.**
6  Q.  All right.  In the warning under number 5
7  it says:  Do not throw directly at any
8  person.  The overpressure and flash in
9  direct contact may be lethal.  Ideally to
10  be thrown no closer than 5 feet from an
11  area of desired effect.
12      Were you aware of these warnings?
13  **A.  I didn't throw it.**
14  Q.  I didn't ask you if you --
15  **A.  Yeah.**
16  Q.  Okay.  So you would agree you shouldn't be
17  throwing it directly at any person?
18  **A.  I know the warnings, and I know -- I've**
19  **been trained on how to place flashbangs.**
20  Q.  Okay.  What training specifically have you
21  received --
22  **A.  I've been to the actual flashbang training.**
23  Q.  So you're certified in the use of flashbang

1  devices?
2  **A.  Yes.**
3  Q.  Do you know who detonated this device at
4  the Almonds'?
5  **A.  Do not.**
6  Q.  Okay.  Are you saying you don't know
7  because you weren't there or --
8  **A.  I wasn't there when they went in.  I don't**
9  **know who had it or who threw it.**
10  Q.  Has there been any discussion among
11  colleagues about who threw it?
12  **A.  Not me.  I don't discuss -- I don't do**
13  **that.**
14  Q.  Okay.
15  **A.  I'm a personal type of person.  I don't get**
16  **into other folks' business.**
17  Q.  All right.  Do you know who was on the
18  entry team?
19  **A.  I know Larry, Bernard, and I think Strain.**
20  **And I can't remember who else.**
21  Q.  Okay.  So that's Larry Clark, Bernard
22  Sheppard, Donnie Strain --
23  **A.  And maybe --**

1  Q.  Is it possible Greg Johnson was on the
2  team?
3  **A.  It's possible.  I don't remember how many**
4  **went in.  Like I say, I can tell you I went**
5  **to the front-door side, to the front of the**
6  **house, and I don't know who went in.  I**
7  **don't know who went in first.  I don't know**
8  **who --**
9  Q.  Are you supposed to be wearing earmuffs and
10  superior ear protection when you use these
11  devices?
12  **A.  It's probably smart to, but you don't have**
13  **to.**
14  Q.  Okay.  Well, right here it says the officer
15  throwing it will wear earmuffs or superior
16  ear protection.  That doesn't sound like a
17  suggestion, does it?
18  **A.  Well, that's just a warning label.**
19  Q.  All right.  After the entry team -- when
20  the entry team went in, what were you
21  doing?  Where were you?
22  **A.  At the front of the house.**
23  Q.  Okay.  And describe the front because this

1  house -- I know -- I think their main
2  entrance was like through a carport --
3  **A.  Through the garage.**
4  Q.  Yeah.  And then there was another door that
5  would have been facing the road.
6  **A.  The door facing the road, I went to that**
7  **side, which was probably over halfway -- it**
8  **wasn't in the middle of the house -- of the**
9  **front of the house.  I think it was more to**
10  **the right side if you're facing it.  There**
11  **was a door there, and that's kind of the**
12  **area I went to.**
13  Q.  Okay.  And so what did you do?  How long
14  were you out there?
15  **A.  Until I heard them say they were clear.**
16  Q.  Okay.  How long do you think that was?
17  **A.  It doesn't take long.**
18  Q.  Couple of minutes?
19  **A.  Maybe, if that long.**
20  Q.  All right.  So tell me what happened next.
21  **A.  I went inside the residence.  Both**
22  **Mr. Almond and Ms. Almond were standing up**
23  **talking.  And we told them why we were**

Page 73

1  there, and then we started searching.  And
2  then folks started finding stuff.  So me
3  and Randy decided that we would just do the
4  inventory because there was guns and money
5  and stuff and it was easier for just two of
6  us to go room to room.
7  Q.  And you and Randy Moore filled out the
8  inventory sheets?
9  A.  Yes.
10  Q.  Okay.  On this inventory sheet on
11  Plaintiffs' Exhibit 4, it appears to be a
12  signature of Randy Moore and the date and
13  it says 5:45 p.m.  Is that what it appears
14  to be to you?
15  A.  5:45 p.m.
16  Q.  And so would that have been when y'all
17  completed --
18  A.  That would have been when we had everything
19  wrote down.
20  Q.  Okay.  And then who loaded everything up?
21  A.  Pretty sure all of us did, had touched
22  something or another.
23  Q.  Would all of us -- is all of us you and

Page 74

1  Randy and Larry or --
2  A.  No.  The whole group.
3  Q.  The whole group.  Okay.
4  A.  Don't quote me on that.  I wasn't just ...
5  Q.  And what vehicle was it loaded into?
6  A.  The one we were riding in.  And I think
7  Strain had a truck.  I think it was loaded
8  into those two vehicles.  I'm trying to
9  remember --
10  Q.  You say Strain.  So Donnie Strain?
11  A.  Yes.
12  Q.  You think he had --
13  A.  I think he had some of the stuff in his
14  vehicle.
15  Q.  Would that have been a sheriff's office
16  truck?
17  A.  Yes.  I hope I'm thinking straight.
18  Q.  Was the inventory sheet completed in the
19  presence of Greg and Teresa Almond?
20  A.  I don't remember.
21  Q.  Was a copy given to them at the time it was
22  completed, or was a copy left at the
23  residence upon completion?

Page 75

1  A.  I want to say it was left at the jail with
2  their belongings.
3  Q.  Would that have been the next day?
4  A.  No.  It would have been that day.
5  Q.  Or that night.
6  A.  That night.
7  Q.  And who would have left it there?
8  A.  It would have been one of us three, and I
9  don't think I did.
10  Q.  Okay.  So --
11  A.  I can't -- I don't know which one of us
12  would have dropped it -- I don't think I
13  did, and I can't answer for --
14  Q.  Okay.  Well, if you don't think you did,
15  then you don't know for certain where it
16  was left?
17  A.  It was supposed to.  Now, whether it did or
18  not, I can't say a hundred percent sure yes
19  or no.
20  Q.  What else do you remember being in the
21  house when y'all left as far as other
22  items?  Did you ever see any jewelry?
23  A.  No.

Page 76

1  Q.  Did you ever see any other items inside the
2  safes?
3  A.  Like what?
4  Q.  Like a coin collection.
5  A.  No.
6  Q.  Okay.  Who was looking into the safes?
7  A.  Everybody that was there pretty much was
8  involved in the search.  Myself and Randy,
9  once they started finding stuff, we just
10  went from room to room and collected.  So I
11  can't tell you who searched what at what
12  time.  Because generally when they find --
13  would find something, they would say, hey,
14  I got something here.  And we would work
15  our way from where we were at to the next
16  part.
17  Q.  Okay.  After everything was loaded up and
18  you think it was in your -- the vehicle you
19  and Randy and Larry were in as well as a
20  truck driven by Donnie Strain, where did
21  y'all take this --
22  A.  To the narcotics office in Wedowee.
23  Q.  Okay.  And who was there to unload it?

Page 77

1   A.   **Myself, Randy, Larry, and I think Strain**
2       **stayed. And I don't remember if anybody**
3       **was with him or not.**
4   Q.   The cash that was taken, I believe, was
5       $4,050. What was done with it?
6   A.   **I put it in the safe until I could get it**
7       **to the bank and deposit it in the seized**
8       **money.**
9   Q.   What safe?
10   A.   **It's a little safe in my former office.**
11   Q.   Okay. Now, in your interrogatories you
12       seemed like you were a little unsure about
13       where it was located between the time it
14       was taken and the time that it was
15       deposited, but you believe it was in the
16       safe the whole time?
17   A.   **I think so.**
18   Q.   Do you remember how long it was before you
19       could deposit it?
20   A.   **It wasn't that day, and I don't -- I can't**
21       **remember how many days it was after the**
22       **fact.**
23   Q.   Okay. If the deposit slip shows that it

Page 78

1       was deposited on Tuesday, February 6th,
2       would you dispute that?
3   A.   **No.**
4   Q.   Okay. How far is the bank from the
5       evidence room?
6   A.   **Right across the street.**
7   Q.   Okay. Is there any reason that this
8       couldn't have been deposited either on
9       Thursday or the Friday when the inventory
10       was returned to the court?
11   A.   **There's always reasons why. It was locked**
12       **up and secure and things come up.**
13   Q.   Okay. Well, is there a standard time that
14       the narcotics unit has or a protocol that
15       is followed in depositing money into an
16       account after it's been seized?
17   A.   **Not that I'm aware.**
18   Q.   Do you remember what the denominations of
19       the currency was that was inventoried?
20   A.   **No.**
21   Q.   Do you remember if it was all hundreds or
22       small bills or --
23   A.   **Don't have a -- I don't remember.**

Page 79

1   Q.   Who counted it?
2   A.   **Probably two or three of us to make sure it**
3       **was correct. I don't trust myself**
4       **sometimes, so usually at least one other**
5       **person will count.**
6   Q.   Okay. Do you remember whether you counted
7       it?
8   A.   **Yeah.**
9   Q.   Do you remember anybody else that would
10       have counted it?
11   A.   **Me and Randy were doing the inventory. So**
12       **if anybody else counted it, it would have**
13       **been him.**
14   Q.   Okay. Do you know if all the money was in
15       one location, or was it in different
16       locations?
17   A.   **The money that we counted was, I believe,**
18       **in one location.**
19   Q.   And what location was that?
20   A.   **One of the safes. I think maybe -- just**
21       **trying to -- living room maybe.**
22   Q.   Okay. How many safes were in the living
23       room?

Page 80

1   A.   **One that I can remember.**
2   Q.   Okay. Can you describe that safe?
3   A.   **Can't remember a color. It was a -- it**
4       **wasn't the thin safes. It was a**
5       **fire-resistant-type safe.**
6   Q.   And do you remember if any money was in any
7       other safes?
8   A.   **I don't remember finding any money in any**
9       **of the other safes.**
10   Q.   Who was present when the safes were open?
11   A.   **The Almonds were sitting on the couch in**
12       **front of the one in the living room, and by**
13       **the time I got to the back bedroom, I**
14       **believe it was already open.**
15   Q.   Okay. Who opened the safes?
16   A.   **I have no idea.**
17   Q.   Did you see the safes when they were
18       opened?
19   A.   **No.**
20   Q.   Do you know if it was Greg or Teresa that
21       opened the safes, or was it an officer?
22   A.   **I have no idea.**
23   Q.   Did you witness any of the safes being

Page 81

1    opened?
2  **A.  No.**
3  Q.  Okay.  So what are you basing your opinion
4    on that you think all the money came out of
5    one safe?
6  **A.  Just them yelling and said they had some**
7    **money.**
8  Q.  Somebody yelled and said --
9  **A.  And that was the only safe in there.  Some**
10   **money in the safe.**
11 Q.  Okay.  Well, if Teresa Almond testified
12   that she had some money in her safe, too,
13   would -- did anybody else yell, hey,
14   there's some money in here, or do you
15   remember --
16 **A.  The only money I remember is the $4,050,**
17   **and I'm pretty sure it was in that green**
18   **safe in the -- or green or black safe in**
19   **the living room.**
20 Q.  Okay.  Do you remember any money being
21   taken out of Greg Almond's wallet?
22 **A.  No.**
23   Can I stand up just a second?

Page 82

1  Q.  Yeah.  We can take a break.
2  **A.  I'm good.  I just --**
3  Q.  Well, actually it --
4    MR. STUBBS:  Watch your mic.
5    MR. SEGREST:  Tell you what, if
6      you don't mind taking a
7      break -- I'm on my second big
8      glass right here.  Let's take
9      a quick break, and this isn't
10     going to last much longer.
11   THE VIDEOGRAPHER:  The time is
12     2:34 p.m., and we are off
13     record.
14   (A brief recess was taken.)
15   THE VIDEOGRAPHER:  The time is
16     2:50 p.m.  We are back on
17     record.
18 Q.  (Mr. Segrest continuing:)  Mr. Walker,
19   before the break we were talking about
20   towards the end of the raid and who was
21   involved in taking property from there to
22   the evidence room.  What is your
23   recollection of how the Almonds' home was

Page 83

1    left as far as securing the home before it
2    was left?
3  **A.  Before we left I actually went to the door**
4    **that was breached.  I put a door -- propped**
5    **a door up under the knob and secured the**
6    **door with a chair.  And then I went out the**
7    **front door.  And I couldn't do the dead**
8    **bolt, but I did the twist bottom lock.**
9  Q.  Okay.  Earlier Randy Moore testified about
10   going upstairs to look in a loft apartment
11   upstairs.  What's your recollection of
12   that?
13 **A.  It was a mess.**
14 Q.  Did you see broken porcelain dolls up
15   there?
16 **A.  I don't remember seeing porcelain dolls.  I**
17   **just know it was a mess.  It was a big**
18   **mess.  I don't know what was broke.  I just**
19   **knew I wasn't fixing to search it.  It was**
20   **messy.**
21 Q.  All right.  Was that before or after you
22   started doing inventory?
23 **A.  That was towards the end.**

Page 84

1  Q.  Okay.  So is it possible somebody else had
2    already been up there?
3  **A.  I guess it's possible.**
4  Q.  Well, you say towards the end.  So it would
5    have been after inventory was done or ...
6  **A.  I don't remember.  It would have been --**
7    **it's towards the end.  I don't know if**
8    **inventory was done, whatever, and we were**
9    **just fixing to load up.  I don't remember.**
10   **I just know it was right there towards the**
11   **end.**
12 Q.  What about the rest of the house and the
13   condition that you remember it being left
14   in?
15 **A.  Other than maybe some clothes on the floor,**
16   **nothing was tore up.**
17 Q.  And is that normal for when y'all do a raid
18   looking for drugs?
19   MR. MORGAN:  Object to the form.
20 **A.  You generally don't put up what you pull**
21   **out, I guess you would say.**
22   MR. MORGAN:  You what?
23 **A.  You don't put up what you've pulled out.**

Page 85

1   So if you pulled out clothes looking for
2   something hid in the drawers, you don't put
3   the clothes back.  They would be piled up
4   in front.
5   Q.   Randy Moore testified that he remembered
6   seeing power tools and other equipment on
7   the stairwell going up to the loft
8   apartment.  Do you remember seeing power
9   tools?
10  A.   I remember like a Weed Eater.  I'm not sure
11  exactly -- they were like -- I want to say
12  it was Husqvarna stuff.  And I don't
13  remember if they were -- what type they
14  were.  But I do remember seeing them on the
15  stairs.
16  Q.   Okay.  And it's your recollection and
17  testimony that that equipment was still
18  there when y'all left?
19  A.   It was there when we left.
20  Q.   Okay.  Were you aware that there was family
21  that lived across the street from the
22  Almonds?
23  A.   Not that night I didn't.

Page 86

1   Q.   So there was no one contacted to say, hey,
2   we're leaving the house, you know, to
3   basically secure the house for anybody
4   else?
5   A.   Say that one more time.
6   Q.   There was nobody from the Almond family
7   that was contacted that said we're leaving
8   the house, you can come over here and
9   secure whatever you need to?
10  A.   No.  Because I secured it before -- as I
11  went out.
12  Q.   Okay.  And --
13  A.   But I didn't know they were family across
14  the street.
15  Q.   Okay.  And your recollection of that is
16  pushing the door to and propping
17  something --
18  A.   Yeah.  And I took the door like you see and
19  then just put it up under the door handle.
20  That way you couldn't push it.  And I want
21  to say it was -- I'd say maybe a louvered
22  door that you could kind of put the chair
23  against.  That way it wouldn't pop out.

Page 87

1   And then, like I say, when I went out the
2   front door, I couldn't lock the dead bolt,
3   but you could lock the handle, the knob
4   part.  You could lock the twist thing.  And
5   I locked that and made sure that it was
6   locked when I left.
7   Q.   Okay.  And so I think we previous said --
8   previously said on this inventory sheet it
9   said 5:45 p.m.  And this would have been
10  January in 2018.  So that time of year it
11  would have been dark outside when y'all
12  left; correct?
13  A.   Pretty sure.  I can't remember if it was
14  dark-dark or just kind of the evening dark.
15  Dusk dark.  You would have had to cut your
16  headlights on driving back?
17  A.   Oh, yeah.
18  Q.   Do you remember if you left the lights on
19  in the house when you left?
20  A.   I don't remember if I did or didn't.  I
21  think I did, but I don't -- I'm not sure.
22  Q.   Okay.  Who made the decision to press
23  charges against Mr. and Ms. Almond?

Page 88

1   A.   I was the case agent.  So basically I guess
2   you could say it was me.
3   Q.   Okay.  In your interrogatories you
4   testified that you learned a couple of days
5   after that Tritt Almond, Greg and Teresa's
6   adult son, was claiming the marijuana to be
7   his.  Is that --
8   A.   That's what I was told.  Not by any of them
9   but by -- I don't remember who told me.
10  Q.   Okay.  You don't have any idea who told you
11  that?
12  A.   No.
13  Q.   Did you make a note of that anywhere in the
14  case file?
15  A.   No.
16  Q.   Did you make anybody at the DA's office
17  aware that there was someone claiming that
18  the marijuana was theirs?
19  A.   No.
20  Q.   Do you think you have a responsibility to
21  disclose that?
22       MR. MORGAN:  Object to the form.
23  A.   If it were told to me by one of the

Page 89

1    Almonds, yes, but not by three or four
2    parties down the road and I don't know if
3    it's true or not.  If it was like -- if it
4    had come from Tritt, Teresa, or Greg, yes,
5    I would have went to the DA's office, but
6    not coming through third party, fourth
7    party.
8  Q.   Would that third or fourth party have been
9    somebody with the sheriff's office?
10 A.   It's possible.  Like I say, I just remember
11    hearing it.  I can't remember who exactly
12    it is.  It could have -- you know, I talked
13    to -- I don't dislike any of them, so it
14    ain't like I don't -- we don't -- I don't
15    talk to everybody.  I just don't remember
16    who it was.
17 Q.   Do you remember being present when Greg
18    Almond came to meet with Larry Clark a
19    couple of days after the raid?
20 A.   Yes.
21 Q.   And do you remember Greg Almond in that
22    conversation saying that the marijuana
23    belonged to Tritt and wasn't his?

Page 90

1  A.   I do not.
2  Q.   When did you first learn that the pill that
3    was used to charge them for a controlled
4    substance -- that they had a prescription
5    for that pill?
6  A.   It may have been right before the prelim, I
7    think.
8  Q.   Okay.
9  A.   Because I think Mandy Baker represented
10    her, and I think -- I thought they got
11    dismissed because she did have a
12    prescription.
13 Q.   Okay.  Do you know whether or not they got
14    indicted?
15 A.   Ain't got a clue.  Never was told.
16 Q.   Were you present in court -- in the circuit
17    court hearing when these charges were
18    ultimately dismissed?
19 A.   No.
20 Q.   Did you do anything as the case officer to
21    try and dismiss the possession of a
22    controlled substance after you learned that
23    they had a prescription for it?

Page 91

1  A.   Did I or would I?
2  Q.   Did you?
3  A.   As far as I know, I told the ADA that was
4    there that day, which I think was Anna
5    Parker.
6       (Brief interruption by the court
7        reporter.)
8  Q.   Okay.  So it's your recollection that you
9    informed the ADA --
10 A.   That I was good with her dismissing her or
11    whatever.
12 Q.   Okay.  In Exhibit Number 5 regarding the
13    forfeiture, it says that money was
14    seized -- the money seized was seized
15    because it was used to buy and sell drugs.
16    Do you have any direct evidence that the
17    money seized was used to buy or sell drugs?
18 A.   It was bought -- they had marijuana
19    fertilizer, stuff to fertilize it and other
20    things.  And the guns are usually to
21    protect this, that, and the other.  But as
22    far as the money, they did have -- had
23    bought materials to --

Page 92

1  Q.   Did you have any evidence that they had
2    bought materials?
3  A.   Like receipts, no.  It was in their house.
4  Q.   Okay.  So you don't know whether they
5    bought it or not?
6  A.   I have no idea who bought it.
7  Q.   And do you have any evidence that any of
8    the money that was actually seized was ever
9    used to buy and sell drugs?
10 A.   Try that one more time.
11 Q.   Do you have any evidence that any of the
12    money seized was ever used to buy or sell
13    drugs?
14 A.   Other than the stuff there that was bought
15    for fertilizer -- I don't know that exact
16    money.  No, I don't know.
17 Q.   Do you have any evidence at all that Greg
18    and Teresa Almond have ever bought and sold
19    drugs?
20 A.   Personally, no.
21 Q.   Or otherwise.
22 A.   Just hearsay.  Hearsay don't go far.
23 Q.   Yeah.  Do you have a gun collection?

Page 93

1   A.  I do.
2   Q.  How many guns do you own?
3   A.  Little less than 20 probably, pistols,
4       rifles, and shotguns.
5   Q.  In looking at the gun collection that
6       Mr. Almond had, what would lead you to
7       believe that these guns were being used to
8       protect an illegal activity?
9   A.  I use all my guns to protect what I got at
10      my house just like you do.
11  Q.  Fair enough.
12          MR. SEGREST:  Y'all give me about
13          five minutes right here.  Let
14          me pull out his
15          interrogatories and look at
16          them.  We can go off the
17          record.
18          MR. MORGAN:  You need five
19          minutes?
20          MR. SEGREST:  Yeah.  I'm going to
21          look at his interrogatories
22          real quick -- I don't know
23          where I placed them -- and see

Page 94

1       if I've got any follow-ups.
2       But other than that, I think
3       I'm done.
4           THE VIDEOGRAPHER:  3:12 p.m.  Off
5           the record.
6           (A brief recess was taken.)
7           THE VIDEOGRAPHER:  The time is
8           3:07 p.m.  Back on record.
9   Q.  (Mr. Segrest continuing:)  Mr. Moore, I
10      have -- I mean, Mr. Walker, I have just a
11      few more follow-up questions.
12          Mr. Moore testified that he thought
13      that NCIC checks were run on the guns that
14      were seized at the Almonds', but he said we
15      didn't do it.  Do you have any knowledge of
16      NCIC checks being run on these weapons?
17  A.  I didn't.  And I didn't suspect any of them
18      being stolen weapons.  So that's why I
19      didn't.  Now, if somebody else run them, I
20      don't know.
21  Q.  Okay.  When you say you didn't suspect any
22      of them being stolen, why didn't you
23      suspect that?

Page 95

1   A.  I've never known Mr. Almond to be a thief.
2       Never heard anything about that.
3   Q.  Do you know if a civil forfeiture case was
4       ever filed by the district attorney's
5       office regarding the currency and guns
6       seized at the Almonds'?
7   A.  I turned it into the DA's office, and what
8       happened to it after that I have no idea.
9   Q.  Okay.  When you say you turned it in, what
10      did you --
11  A.  In the case file there's an affidavit --
12      forfeiture affidavit and all in the --
13  Q.  And in the copy I've got there -- it isn't
14      signed, but I see where one was prepared.
15  A.  I just -- yeah.  And that's the reason I do
16      that.  It was just for case file purposes.
17  Q.  Okay.
18  A.  But it was turned into the DA's office.
19      Then, like I say, what happened to it from
20      there I ain't got a clue.
21  Q.  Have you seen the screenshot from the jail
22      where it was initially reported that the
23      Almonds were charged with manufacturing a

Page 96

1       controlled substance?
2   A.  I didn't see it.  I heard about it.  That
3       page pisses me off sometimes, so I don't
4       look at it.
5   Q.  You talking about the jail page?
6   A.  No.  The "Transparency" page.
7   Q.  Okay.  Do you know why it would have been
8       posted on the jail website?
9   A.  I don't know why it got posted on the jail
10      website, but we did discuss charging them
11      that and --
12  Q.  And what was the basis of that?
13  A.  Because they were growing/manufacturing.
14      But after talking to the clerk, he said we
15      couldn't do it.  But it was never -- they
16      were never told they were charged with
17      that.  That was just a discussion between
18      us.  But I have nothing to do with putting
19      anything on the jail's website.  I have no
20      access to it or whatever.
21  Q.  Is there anything else regarding any of the
22      questions or any of your testimony that
23      after having time to reflect that you'd

Page 97

1     like to change or clarify on any of your

2     answers?

3   **A.   I can't think of anything.**

4         MR. SEGREST: Okay. Nothing

5        further.

6         THE VIDEOGRAPHER: The time is

7        3:10 p.m. Deposition is

8        concluded.

9

10

11

12

13

14     (Deposition concluded at

15      approximately 3:10 p.m.)

16

17

18

19

20

21

22

23

Page 98

1      REPORTER'S CERTIFICATE

2

3     I, Tracye S. Blackwell, a Certified Court

4 Reporter in and for the State of Alabama, do hereby

5 certify:

6     That the foregoing witness was by me duly

7 sworn;

8     That the deposition was then taken before me

9 at the time and place herein set forth;

10     That the foregoing is a complete and correct

11 transcript of the said proceedings;

12     That the reading and signing of this

13 transcript is hereby waived;

14     I further certify that I am neither of kin nor

15 counsel for any of the parties set out herein and

16 in no way interested in the results thereof.

17     Done this 9th day of November 2021.

18

19

20     *Tracye Blackwell*
    Tracye S. Blackwell, CCR, RPR

21     ACCR No. 294
    Expiration date: 9-30-2022

22     Certified Court Reporter
    and Commissioner for the State

23     of Alabama at Large