IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| GREGORY JACK ALMOND and<br>TERESA ROBERTS ALMOND, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No. 3:19-cv-175-RAH<br>)          [WO] |
| RANDOLPH COUNTY, ALABAMA;<br>ET AL., | )<br>)<br>) |
| Defendants. | ) |

## **MEMORANDUM OPINION AND ORDER**

The home is not only a shelter from storms, but also a shelter from unwarranted governmental intrusion.    Under the Fourth Amendment, the government may not execute a warrantless search of a person's home without either consent or probable cause and exigency.   And yet, that is exactly what is alleged to have happened in this case.   The home here belonged to Greg and Teresa Almond, grandparents and lifelong residents of Randolph County, Alabama.   Their home had sheltered them from rain or shine for over thirty years.   But on January 31, 2018, the Almonds allege that their home failed to shelter them from the unconstitutional conduct of law enforcement.

According to the Almonds, on that wintry Alabama day, a joint law-enforcement task force, acting without a search warrant, kicked in the door to their

home, burst in, tossed a flashbang device into their living room, forcefully restrained them, and then proceeded to search the Almonds' home finding money, guns, and jewelry along the way.   During the search, law enforcement also found and confiscated approximately $50 worth of marijuana—including a small marijuana plant—and a single Lunesta pill that was not in its prescription bottle.   Based on the marijuana and the pill, the Almonds were arrested and charged with possession of marijuana and of a controlled substance (the lone Lunesta pill), and their guns and cash were seized.   The criminal charges were later dismissed when the Almonds' son admitted the marijuana was his and when it was revealed that the pill was properly prescribed.   Once the charges were dismissed, the inventoried and seized property was returned.   But the Almonds say that there was other property that was taken but never returned, including $4,000 in cash, a coin collection, diamond jewelry, antique guitars, tools, and several guns.

Of course, law enforcement contends they had a search warrant, that the execution of the warrant was above-board and without issue, and that everything seized was ultimately returned once the criminal charges had been dismissed.   As to the missing items, law enforcement contends that someone else must have stolen any missing property during a subsequent break-in that day or evening—if the missing property existed at all.

Based on these events, the Almonds now bring federal claims for illegal search, excessive force, and malicious prosecution, and state law claims for conversion and outrage.  This matter comes before the Court on cross-motions for summary judgment.  These motions have been fully briefed and are ripe for decision. For the following reasons, the summary judgment motions of Defendants Randolph County, Alabama (County) and the Randolph County Commission (Commission) are due to be granted in whole, the Almonds' motion denied in whole, and the individual Defendants' (Randolph County Deputy Sheriff Larry Clark, Jr., City of Roanoke Police Officer Kevin Walker, and City of Roanoke Police Officer Randy Moore) motions are granted in part and denied in part.

## BACKGROUND[1]

Most of the relevant events occurred within a three-day span from January 31, 2018, to February 2, 2018.  During this timeframe, three interweaving events occurred: an initial visit to the Almond residence by law enforcement on January 31, 2018, the search of the residence later in the day, and the pursuit of a search warrant at some point between January 31, 2018, and February 2, 2018.

### A. The Initial Visit and Investigation

---

[1] While there are pending cross-motions for summary judgment, these facts are either undisputed or presented in the light most favorable to the Almonds. This is so because the Court concludes that the Almonds' partial motion for summary judgment is due to be denied in whole while some of the Defendants' motions for summary judgment are due to be granted. When the facts need to be construed in the individual Defendants' favor to rule on the Almonds' partial cross-motion, the Court says and does so.

On January 31, 2018, Deputy Sheriff Nathanial Morrow of the Randolph County Sheriff's Department paid a visit to the Almond residence to serve Greg Almond with civil papers. Teresa Almond, Greg's wife, answered and told Morrow to return later that day since Greg was not there at that moment. Morrow claims to have smelled the odor of *unburnt* marijuana coming from inside the residence, an observation he did not mention to Teresa. Morrow left, telling her that he would return later in the day.

After leaving the residence, Morrow called the Randolph County Narcotics Unit ("RCNU"), a multi-jurisdictional drug task force, and reported the marijuana odor. Based on Morrow's claimed observation, the RCNU pursued a search warrant. RCNU member Officer Kevin Walker claims that he called Randolph County District Court Judge Amy Newsome to obtain the warrant.

At this point, the story as to the search warrant becomes a mess, but mess aside, the RCNU decided to search the Almond residence that afternoon.

## B. The Search of the Almond Residence[2]

The RCNU team and personnel from other law enforcement agencies met at a nearby church to gear-up and put together a game-plan. One witness said the officers "had on so much equipment" that "they looked like Transformers." Of

---

[2] Despite wearing body cameras at the time, law enforcement has no body-camera footage of the search of the Almond residence.

importance, the plan did not call for the use of a flashbang device.  Once the plan was solidified, the taskforce traveled to the Almond residence and entered the residence at 2:04 p.m., January 31, 2018.

In the moments before law enforcement breached the residence, Greg was in the kitchen and Teresa was in the bedroom.  Greg testified that he heard a knock at the door.  While Greg was making his way out of the kitchen, law enforcement kicked open the door and entered.

Then, a flashbang device, thrown by Deputy Sheriff Larry Clark, Jr., sailed through the door and onto the floor within inches of another officer and Greg.  The device exploded upon impact, breaking floor tiles and kicking pieces of tile into Greg's leg and face.  The explosion also injured Greg's eyes and ears, causing impaired vision and sustained ringing in his ears.

The flashbang device's user manual advises users to never throw the device directly at a person because the overpressure and flash can be lethal.  According to the officer who was within inches of the explosion, the flashbang device was not a part of the operational plan, and he was not wearing the appropriate protective gear for its use.  According to another official, the use of the flashbang device was "not a standard operating procedure" for this type of entry.

According to Greg, Deputy Clark then entered the home and ordered Greg to get on his stomach, telling him that if "you don't cooperate, mother fucker, I'll put

a bullet in your goddamn skull." (Doc. 144-1 at 83.) Greg rolled over as instructed, and then one of the officers pressed the barrel of a gun to Greg's head, handcuffed him, and took him to the living room.

Meanwhile, the other law enforcement officials worked to clear the rest of the residence.  They found Teresa in the bedroom, and an officer, believed by Teresa to be Greg Johnson, yanked her to the ground, bruising her arm.  She was then cuffed and brought into the living room.  At some point, Greg asked the officials to show him their search warrant, but they did not honor the request.

Law enforcement then began an extensive search of the residence.  They found approximately $50 worth of marijuana in various places throughout the residence, including a small marijuana plant, a few marijuana leaves in a cooler and in the outside grill, a glass pipe, plastic baggies, marijuana fertilizer, and a partially smoked joint.

What law enforcement ultimately removed from the Almond residence is heavily contested.  While the officials claim that, per their written inventory report, they only removed $4,050 in cash, a considerable number of guns, the single Lunesta pill, the marijuana and the related drug paraphernalia, the Almonds claim they actually took over $8,000 in cash (including cash from Greg's personal wallet), jewelry including a diamond wedding ring, guns, a coin collection, power-equipment, and a guitar collection.  Because they had already been arrested and taken

to jail, the Almonds did not observe the entire inventory process or law enforcement's removal of their belongings from the residence.

### C. The Subsequent Events

The Almonds spent the night in jail and were bonded out the next morning with criminal charges for possession of marijuana in the second degree and possession of a controlled substance (the single Lunesta pill for which Greg had a prescription).   When they arrived back home, their front-door was open, the residence was in disarray, their belongings scattered across the floors, and their cabinets, drawers, and gun-safes were left wide-open.  Everything of value was gone. The Almonds assumed law enforcement had seized it all, but when Greg saw the inventory report several days later, he realized that it did not identify all of their missing property.  Greg immediately complained to the RCNU and the Commission about the discrepancy between the inventoried property and the missing property. The Commission turned the matter over to its insurance company.

Because of the seized money, the Almonds were unable to pay their mortgage and lost their home due to repossession, forcing them to live in a shed on their family's nearby property.  Over a year later, the criminal cases against the Almonds were dismissed, and the inventoried property was returned to them.  The missing property was not.

### D. The Warrant Timeline

Aside from the parties' dispute concerning the property that was allegedly taken but never returned, another significant contested issue concerns the search warrant itself.

Sometime before the raid of the Almond residence on January 31, 2018, Officer Walker says he called Randolph County District Court Judge Amy Newsome to request a "telephonic warrant." According to Walker, Judge Newsome answered the phone, and after telling her about the smell of marijuana at the Almond residence, Judge Newsome told Walker that he had "enough for a search warrant basically." (Doc. 146-1 at 16.) Walker does not recall if Judge Newsome explicitly told him he had a search warrant, but he believed Judge Newsome had given him a search warrant based on the conversation. (*Id*.) According to other members of the RCNU, Walker told them that they had obtained a verbal search warrant from Judge Newsome during Walker's phone call with her. According to Walker, after the call, the RCNU then entered the Almond residence and conducted the search.

Judge Newsome, however, has a different version of these events. In her deposition, she testified that she did not remember if any such phone call took place but denied issuing a telephonic warrant of any kind even if a call had been made. (Doc. 146-10 at 5-6.) According to Judge Newsome, "there was no search warrant issued on the phone," and that she certainly did not place anybody under oath over the phone. (*Id*. at 5.) Instead, as she recalled it, Walker and the RCNU came to her

8

office on January 31 before the search, and while there, Walker signed a probable cause affidavit, and Judge Newsome then issued the search warrant. (Doc. 146-10 at 15.)

According to the court file, Judge Newsome issued a written search warrant at 2:04 p.m. on January 31, 2018. (Doc. 146-13 at 2.) But Walker's probable cause affidavit in support of the warrant was signed by Judge Newsome and Walker on February 2, 2018—two days after the warrant was supposedly signed and the search executed. (Doc. 146-11.)   Judge Newsome testified that she did not "have an explanation for why [the] dates don't match" but she remained unequivocal that she would have signed the search warrant on the same day as the affidavit. (Doc. 146-10 at 11.)

Complicating matters further is the timeline of the warrant and the search itself.  According to Walker, he and the RCNU entered the Almond residence at 2:04 p.m., January 31, 2018.  But according to Judge Newsome, Walker was at her office, twenty minutes away, also at 2:04 p.m. as noted on the warrant.

When questioned about these discrepancies in her deposition, Judge Newsome acknowledged that the conflicting dates and times raised issues of fact as to whether a search warrant had been issued at the time the RCNU entered the Almond residence and conducted its search.

**THE LITIGATION**

9

The Almonds filed suit on March 11, 2019, and included the following state and federal claims that remain from the operative complaint:[3]

- Count I – Conversion Against the County and the Commission

- Count II – Negligent and Wanton Hiring, Training, and Supervision Against Larry Clark, Jr.

- Count III – Conversion Against Larry Clark, Jr., Kevin Walker, and Randy Moore in Their Individual Capacities

- Count IV – Malicious Prosecution Against Larry Clark, Jr., Kevin Walker, and Randy Moore in Their Individual Capacities

- Count V – § 1983 Excessive Force Against Larry Clark, Jr. in his Individual Capacity

- Count VI – § 1983 Illegal Search and Seizure Against Larry Clark, Jr., Kevin Walker, and Randy Moore in Their Individual Capacities

- Count VII – Outrage/Intentional Infliction of Emotional Distress Against Larry Clark, Jr., Kevin Walker, and Randy Moore in Their Individual Capacities

- Count VIII – Facial and As Applied Challenges to the Alabama Civil Forfeiture Statute, Code of Alabama § 20-2-93

## JURISDICTION AND VENUE

Subject matter jurisdiction is conferred by 28 U.S.C. § 1331 as to the Almonds' federal causes of action, and the Court exercises supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  The parties do not contest

---

[3] Via order dated January 4, 2022, the Court previously dismissed certain claims against certain defendants.

personal jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

## STANDARD OF REVIEW

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a), (c).  No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of her case as to which he would have the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Just as important, the "mere existence of a scintilla of evidence in support of the [non-moving party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).  In making this assessment, the Court must "view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc*., 117 F.3d 1278, 1285 (11th Cir. 1997), and "resolve all reasonable doubts about the facts in favor of the non-movant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am*., 894 F.2d 1555, 1558 (11th Cir. 1990).

"Cross-motions . . . will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (per curiam) (citation omitted). When both parties move for summary judgment, the Court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d, 1328, 1331 (11th Cir. 2005).

## DISCUSSION

The Defendants move for summary judgment on all remaining claims in this case. The Court will address the federal claims first, and then the state law claims.

### A. § 1983 Illegal Search (Count VI)[4]

In Count VI, the Almonds contend the search of their residence violated their Fourth Amendment rights because the search was warrantless and without exception. In response, the individual Defendants assert the search was legal because (1) the search was based on both a written and telephonic warrant, (2) even

---

[4] To the extent the Almonds bring a § 1983 claim alleging there was an unlawful *seizure* as well an unlawful search, the Almonds have abandoned the seizure claim by failing to respond to any of the Defendants' arguments as it relates to the seizure of the inventoried property. (Doc. 174 at 27–28 (responding only to the search arguments)); (Doc. 180 at 20–21.); *see Resol. Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995)*; see also Hooper v. City of Montgomery,* 482 F. Supp. 2d 1330, 1334 (M.D. Ala. 2007).

if there was not a warrant, an exception to the warrant requirement applied, and (3) in any event, they are entitled to qualified immunity.  Both the Almonds and the individual Defendants have moved for summary judgment on these contradictory bases.

After extensively reviewing the record, the Court finds that genuine issues of material fact preclude the entry of summary judgment on this claim against Walker; however, summary judgment is due in Clark and Moore's favor on qualified immunity grounds.

### i.  Was there a warrant?[5]

It is a "'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez,* 540 U.S. 551, 559 (2004) (quoting *Payton v. New York,* 445 U.S. 573, 586 (1980)); *see also United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002) ("The Fourth Amendment . . . sets forth a general proscription on warrantless searches of

---

[5] The Defendants urge the Court not to entertain the Almonds' assertion that the search was not supported by a warrant because (1) the operative complaint states that a "search warrant was obtained via telephone," and (2) this Court wrote at the motion to dismiss stage that a search warrant was obtained prior to the search. The Defendants argue that due to these statements, the Almonds are precluded from asserting, as they have, that the search was warrantless.  But the Almonds have not changed the nature of their § 1983 claim—they have always contended that the search was unconstitutional. And with the benefit of expansive discovery since this Court's motion to dismiss opinion, the Almonds have brought a material fact into clear dispute. The Court will not now overlook the evidence in the record or the merit of the Almonds' claim based on single-sighted literalism. And in any event, the Defendants have briefed and argued that there was a warrant in existence, curing any unfair surprise or prejudice that there may have been.

a person's home.").  As such, in general, searches and seizures without a warrant give rise to a § 1983 claim for a violation of the Fourth Amendment. *See Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021).

Typically, warrants are written and are based on a probable cause affidavit submitted in the presence of the issuing judge, but the Alabama Rules of Criminal Procedure, in certain limited circumstances, authorizes warrants based on sworn testimony communicated by telephone. *See* Ala. R. Crim. P. 3.8(b)(1); *see also United States v. Noriega*, No. 09-00240, 2010 WL 348350, at *2 (S.D. Ala. Jan. 22, 2010) ("Ala. R. Crim. P. 3.8(b)(1) provides that a telephonic warrant is permissible if circumstances make it reasonable to dispense with a written affidavit.").  But the warrant cannot be issued without a sworn statement of probable cause. U.S. Const. amend. IV ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."); *see Kalina v. Fletcher*, 522 U.S. 118, 129 (1997) (holding that the "oath or affirmation" requirement is not satisfied by the use of unsworn testimony).

Before the Court is conflicting evidence as to whether there was a warrant at the time of the search of the Almond residence.  The individual Defendants argue that either a telephonic or written warrant existed before the search.  The Almonds contend there was neither.

As to the existence of a telephonic warrant, Judge Newsome says she did not issue a telephonic warrant, nor would she issue one as a general practice. Walker, on the other hand, testified that he believed Judge Newsome issued a telephonic warrant over the phone during their call. Of importance, Walker did not testify that Judge Newsome actually told him that he had warrant. Rather, Walker testified that Judge Newsome told him that he "basically" had "enough" for a warrant. Being told that there is basically enough probable cause for a warrant is not the same as actually having a warrant, especially in the absence of the other requirements for a telephonic warrant under the Alabama Rules of Criminal Procedure.[6] And every reasonable officer should know of not only the requirements for a warrant but also that they should not rely on casual, off-hand comments before entering and searching an occupied residence. *See Groh*, 540 U.S. at 558 (explaining that an "obviously deficient" warrant is no warrant at all). Accordingly, any argument that the search was constitutional because it was based on a valid telephonic warrant, or on Walker's

---

[6] Rule 3.8 of the Alabama Rules of Criminal Procedure permits telephonic warrants; that is, a warrant based upon sworn testimony communicated by telephone. But the same rule requires that the applicant prepare a duplicate original warrant that the applicant then must read verbatim to the issuing judge. Ala. R. Crim. P. 3.8(b)(2). The issuing judge, if satisfied, may direct the applicant to sign the judge's name on the duplicate original warrant. Ala. R. Crim. P. 3.8(b)(3). No such duplicate original warrant exists here. From all that appears, Walker's position is that he had a warrant because he told Judge Newsome on the phone about the marijuana and in response Judge Newsome told him that he had enough for a warrant.

belief that there was enough probable cause for a telephonic warrant, is not supported by the record.

In contrast to the telephonic warrant issue, there is an issue of fact as to whether there was a written warrant issued by Judge Newsome before the search. The written warrant that exists in the court file is dated January 31, 2018, but Walker's supporting probable cause affidavit is dated February 2, 2018—two days after the search.  While the warrant and affidavit show two different dates, Judge Newsome testified that she would have signed both documents at the same time, which creates a fact question as to whether the written warrant was issued by Judge Newsome on January 31 (pre-search) or February 2 (post-search).  Additionally, the individual Defendants argue that Judge Newsome, in Walker's presence, signed the warrant on January 31, 2018, at 2:04 p.m., but that also happens to be the exact same time that Walker was entering the Almond residence—twenty minutes away from Judge Newsome's office.  This is yet another discrepancy in the timeline that creates a fact question as to whether a written warrant existed when Walker and the RCNU entered the Almond residence.

Based on the discrepancies in the testimony and the documents themselves, the Court cannot conclude at this stage that a written warrant to search the Almond residence existed at the time of the search.  Accordingly, there being genuine issues of material fact, no party is entitled to summary judgment on this particular issue.

### ii. Was there an exception to the warrant requirement?

As an alternative argument, the individual Defendants assert the good-faith reliance and exigent circumstances exceptions to the valid warrant requirement. The Almonds argue that neither exception applies. The Court agrees with the Almonds.

The good-faith reliance exception applies when officers "act[] in reasonable reliance *upon a search warrant* that is ultimately found to be unsupported by probable cause." *United States v. Cruse*, 343 F. App'x 462, 464 (11th Cir. 2009) (emphasis added) (quoting *United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002). That is, "[s]o long as an officer could reasonably have thought that the warrant was valid, the specific nature of the warrant's invalidity is immaterial." *United States v. Taylor*, 935 F.3d 1279, 1290 (11th Cir. 2019), *as corrected* (Sept. 4, 2019). Put differently, "[t]he good faith exception requires the court to consider whether a reasonably well-trained officer would know that the warrant was illegal despite the magistrate's authorization. *Martin,* 297 F.3d at 1318 (quoting *United States v. Leon,* 468 U.S. 897, 922 n. 23 (1984)).

But the issues here do not concern whether the individual Defendants relied upon an invalid warrant. Rather, the issues here concern whether a warrant existed at all. The good faith exception does not exist to give protection to searches based on the mistaken belief that a warrant existed when in fact it did not. As the Supreme Court has explained, the exception exists to give protection to searches based on

existent warrants that should not have been issued in the first place due to some
infirmity such as lack of probable cause or particularity:

> [It] is incumbent on the officer executing a search warrant to ensure the
> search is lawfully authorized and lawfully conducted . . . Because [the
> officers] did not have in [their] possession a warrant particularly
> describing the things [they] intended to seize, proceeding with the
> search was clearly 'unreasonable' under the Fourth Amendment.

*Groh*, 540 U.S. at 563; *see also United States v. Gordon*, 686 F. App'x 702, 704
(11th Cir. 2017) (per curiam) (explaining that the good faith reliance exception does
not apply when a "warrant is so facially deficient that the officer cannot reasonably
presume its validity").

Even if the Court assumed that Walker's mistaken belief that he had a warrant
satisfied the good-faith requirement, Walker's reliance on that belief is
unreasonable. Walker testified that Judge Newsome told him that he had enough for
a warrant, *not* that a warrant had been issued. And further, nothing within the
Alabama Rules of Criminal Procedure could support any reasonable inference that
a warrant over the telephone was permissible in the manner that Walker described.

Accordingly, the Court finds the individual Defendants' assertion of the good-
faith reliance exception is unavailing.

The individual Defendants' secondarily assert the exigent circumstances
exception to the warrant requirement. This exception is equally inapplicable under
the facts in this case. The exigent circumstances exception applies when "the

18

inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *United States v. Burgos*, 720 F.2d 1520, 1526 (11th Cir. 1983). To justify an exigent-circumstances search, the government bears the burden of "demonstrat[ing] both exigency and probable cause." *Holloway*, 290 F.3d at 1334.

 "The exigency umbrella 'encompasses several common situations where resort to a magistrate for a search warrant is not feasible or advisable, including: danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit." *United States v. Cooks*, 920 F.3d 735, 741–42 (quoting *Holloway*, 290 F.3d at 1334). "[T]he exception must be applied carefully to each factual scenario." *United States v. Lynch*, 934 F.2d 1226, 1232 (11th Cir. 1991). "The test of whether exigent circumstances exist is an objective one," asking whether the facts would "lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured." *United States v. Santa*, 236 F.3d 662, 669 (11th Cir. 2000) (quoting *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991)).

The individual Defendants assert that the risk of loss and potential destruction of evidence created the exigency that gave them the authority to initiate a search of the Almond residence. Specifically, the individual Defendants argue that because Deputy Morrow told Teresa that he would return later that day, Teresa could destroy or hide the marijuana in the interim, thereby entitling the individual Defendants to

conduct a warrantless search of the Almond residence to collect and preserve that evidence.

This argument fails for many reasons, at least for summary judgment purposes. First and foremost, it ignores the fact that the RCNU delayed in searching the residence for several hours as it allegedly pursued a telephonic warrant with Judge Newsome, convened at a nearby church, geared up, and devised the operational search plan. Accordingly, by the individual Defendants' own testimony and actions, there was not an immediate need to search the residence. *See Roaden v. Kentucky*, 413 U.S. 496, 505 (1973) (holding that to fit within the destruction of evidence exigent circumstance exception, "police action literally must be [taken] 'now or never' to preserve the evidence of the crime"). Similarly, the individual Defendants' argument that exigent circumstances supported a warrantless entry and search is belied by the fact that the RCNU incorrectly believed they had a telephonic warrant in hand. That is, they entered because they thought they held a warrant, not because they needed to hurriedly enter without a warrant in hand to preserve and collect evidence.

Second, there is no evidence that Morrow told Teresa that he smelled marijuana, thereby putting her on notice that there was a need to destroy or hide evidence or that she was being criminally investigated. In fact, she invited him to return to the residence later that day, and Morrow left, only to return several hours

later.  "It is well settled that '[c]ircumstances are not normally considered exigent where the suspects are unaware of police surveillance.'" *Santa*, 236 F.3d at 669 (alteration in original) (quoting *Tobin*, 923 F.2d at 1511); *see also Hardigree v. Lofton*, 992 F.3d 1216, 1228–29 (11th Cir. 2021) (finding no exigent circumstances where a man calmly closed the door on officers, retreated into the residence, and told them that he was calling his sister to ask if she would give the officers permission to search her home).  While the facts here may give rise to probable cause for a warrant as the individual Defendants claim, no reasonable officer would consider the circumstances to be so exigent as to "give way to an urgent need for immediate action," *Burgos*, 720 F.2d at 1526, that authorizes the government to cross the "firm line at the entry of the house," *Payton*, 445 U.S. at 590.

Simply put, the facts do not support the entry of summary judgment based on the good-faith reliance or exigent circumstances exceptions to the valid warrant requirement.

### iii. Are the individual Defendants entitled to qualified immunity?

Finally, the individual Defendants argue that, assuming the search was warrantless, they are nonetheless entitled to qualified immunity.

Qualified immunity allows law enforcement officials to carry out the discretionary duties of their positions "without the fear of personal liability or harassing litigation, protecting from suit 'all but the plainly incompetent or one who

21

is knowingly violating federal law.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citations omitted) (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001)).  Law enforcement officials are entitled to qualified immunity when sued in their individual capacities as long as "their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

To determine whether the individual Defendants are entitled to qualified immunity, the individual Defendants bear the initial burden of proving that they "acted within the scope of discretionary authority when the allegedly wrongful acts occurred." *Hardigree*, 992 F.3d at 1223 (quoting *Sims v. Metro. Dade Cnty.*, 972 F.2d 1230, 1236 (11th Cir. 1992)).  Once this is established, the burden then shifts to the Almonds to show that the individual Defendants' conduct violated a constitutional right that was "clearly established" at that time. *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021); *Hardigree*, 992 F.3d at 1223–24.

A right is "clearly established" when it puts all reasonable officials on fair notice that the alleged conduct is unlawful. *See Crocker*, 995 F.3d at 1240.  The Eleventh Circuit has recognized three specific paths to "clearly establish" a right: (1) binding case-law from either the United States Supreme Court, Eleventh Circuit, or the state's highest court "with indistinguishable facts," (2) "a broad statement of

principle within the Constitution, statute, or case law" that applies with "*obvious clarity* to the circumstances," or (3) "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Id.* (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009).  The first path is favored while the second two paths are "rarely trod" because the Supreme Court has admonished lower courts to not "define clearly established law at a high level of generality." *Id.* (citations omitted).

There being no real contention here that the individual Defendants were not acting within the scope of their discretionary authority when searching the Almond residence, the Court proceeds to examine whether their conduct violated a clearly established constitutional right.

At the time of the search in this case, it was well-established as "a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton,* 445 U.S. at 586 (citation and footnote omitted); *see also United States v. Burgos,* 720 F.2d 1520, 1525 (11th Cir.1983) (quoting *Payton*); *United States v. Satterfield,* 743 F.2d 827, 843 (11th Cir. 1984) ("Although a warrantless search and seizure in a home is presumed to be unreasonable . . . courts will uphold searches of homes based on both probable cause and exigent circumstances.") (citation omitted)).  However, "[a]n accidental search or seizure does not violate the Fourth Amendment if the officer

reasonably attempted to avoid the error." *Shepard v. Hallandale Beach Police Dept*, 398 F. App'x 480, 483 (11th Cir. 2010) (per curiam) (citing *Hartsfield v. Lemacks*, 50 F.3d 950, 954–55 (11th Cir. 1995)).   "The objective reasonableness of [a law enforcement official's] actions in conducting a search or seizure will often require an examination of the information possessed by the [official] at the time of the search and seizure." *Id.* (citing *Anderson v. Creighton,* 483 U.S. 635, 641 (1987)).

At the time of the individual Defendants' entry into the Almond residence, "it was thus clearly established law that, absent [consent or] probable cause and exigent circumstances, a warrantless search of a residence violates the Fourth Amendment, unless the officers engage in reasonable efforts to avoid error." *Hartsfield*, 50 F.3d at 955.  Here, there was no consent and no exigent circumstances, either in belief by law enforcement or in the events of that day.   More importantly, there was no telephonic warrant—even an invalid one.   For Walker, it was not reasonable to believe that Judge Newsome gave him a valid telephonic search warrant because even he conceded that Judge Newsome only told him that he "basically" had "enough" probable cause to support a warrant—she did not tell him that he actually had a warrant.   And when considering what constitutes a proper telephonic warrant under the Alabama Rules of Criminal Procedure, much more is required than a simple verbal statement from a judge that law enforcement had a warrant. *See* Ala. R. Crim. P. 3.8(b). And as it relates to the existence of a written warrant, there are

questions of fact as to whether one existed at the time of the search. All told, the Almonds have shown that Walker is not entitled to qualified immunity as it was clearly established that a warrantless search absent an exception violates the Fourth Amendment, and it was unreasonable for Walker to believe he had a telephonic warrant.

The outcome for Officers Clark and Moore is different. Clark and Moore did not participate in the phone call between Walker and Judge Newsome and played no active role in the attempted procurement of a warrant, telephonic or otherwise. But they were present when Walker spoke with Judge Newsome about obtaining the warrant and overheard Walker's end of the phone call. They acknowledge that they overhead Walker tell Judge Newsome about the marijuana odor in the residence, and they state, as does Walker, that Walker told them that Judge Newsome had granted a search warrant of the Almond residence. The record shows that Clark and Moore were not the leaders of the expedition and were not responsible for procuring a valid warrant. Considering the facts in a light favorable to the Almonds, it cannot be said that Clark and Moore acted unreasonably in relying upon Walker's statements about the existence of the search warrant. Nothing in the record indicates that Clark or Moore knew or should have known that relying upon Walker's statements might result in a violation of the Almonds' Fourth Amendment rights. *Cf. Hartsfield*, 50 F.3d at 956 ("As for the other Group Two Defendants, nothing in the record indicates

that these officers acted unreasonably in following Newton's lead, or that they knew or should have known that their conduct might result in a violation of the Hartsfields' Fourth Amendment rights. Consequently, the district court did not err in granting summary judgment on the basis of qualified immunity in their favor on the Hartsfields' Fourth Amendment claim."); *Shepard*, 398 F. App'x at 483 ("This Court has concluded that assisting officers during a search are entitled to qualified immunity when there is no indication that they acted unreasonably in following the lead of a primary officer or that they knew or should have known that their conduct might result in a Fourth Amendment violation, even when the primary officer is not entitled to qualified immunity."). Accordingly, the Court concludes that Clark and Moore are entitled to qualified immunity.

### b. **Excessive Force (Count V)**

In Count V, the Almonds bring a § 1983 excessive force claim solely against Officer Clark.[7] The Almonds contend that Clark used excessive force by throwing a flashbang device that injured Greg and by throwing both Greg and Teresa to the floor. Both parties have cross-moved for summary judgment on this claim.

The alleged actions in throwing the Almonds to the floor is easy to resolve. Despite this allegation in the Complaint, neither Greg nor Teresa testified in their

---

[7] The operative complaint also brings excessive force claims against Donnie Strain, Bernard Shepherd, and Greg Johnson but those defendants were previously dismissed. (*See* Doc. 143.)

depositions to that effect.  Rather, Greg testified that someone who he thought was Clark rolled him over while on the floor, and Teresa testified that she believed another officer, Greg Johnson, threw her to the floor.  Accordingly, there being no evidence that Clark threw either Greg or Teresa to the floor, summary judgment is due in Clark's favor on that aspect of the excessive force claim.

The conduct associated with the flashbang device is a different matter, as Clark has admitted to throwing it but asserts that he is entitled to qualified immunity for using it.  For this analysis, the Court will presume that Clark was acting within his discretionary authority.  Accordingly, the Court will determine (1) if Clark violated Greg Almond's constitutional right to be free from excessive force, and if so, (2) if that right had been clearly established at the time of the alleged violation. Each analysis will be taken in turn.  For the reasons that follow, the Court concludes that the use of the flashbang device on these facts when viewed in the light most favorable to Greg, could establish that Clark violated a clearly established constitutional right, thereby depriving Clark of qualified immunity at this stage.

"[Officer] action constitutes excessive force [in violation of the Fourth Amendment] when it is objectively unreasonable." *Dukes v. Deaton*, 852 F.3d 1035, 1042 (11th Cir. 2017).  "To measure the objective reasonableness of officer action, [courts] weigh 'the quantum of force employed' against 'the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or

others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight.'" *Id.* (quoting *Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015). "Whether an officer's actions are 'objectively reasonable' is a function of 'the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).

The facts construed in the light most favorable to Greg establish that Clark threw the flashbang device—a device that its own user manual describes as potentially lethal—into the living room of occupied residence where it exploded within inches of Greg and at least one other officer.  According to Greg, the explosion caused injury, including constant ringing in his ears, sustained vision impairment, and a knot on his leg.  The evidence also shows that Clark did not plan or discuss the use of the device with the other law enforcement officials, and it was not used in response to any perceived risk of eminent danger.  After all, Teresa had previously invited Walker to return to the home, and the only crime under suspicion was the existence of unburnt marijuana in the residence.

Clark contends that the use of the flashbang device was reasonable because it was merely a non-incendiary "distraction device" and because the Almonds posed a "high risk" to the law enforcement officials' safety due to the number of guns later found and seized from the residence.  Clark also claims to have looked inside the living room and did not see anyone in the area before throwing the device.  None of

these reasons are availing, at least for purposes of granting summary judgment in Clark's favor.

First, contrary to Clark's assertion, the record clearly demonstrates the risk of harm posed by the device as the device's user manual warns of the potential lethality and harm associated with using the device in close vicinity of others.  In fact, according to Greg, the device detonated with such force that it not only caused injury to him, but also burst open several kitchen tiles and flung them out like shrapnel.

Second, the record does not support the assertion that the Almonds posed a high safety risk to the breaching officials.  Excessive force is determined based on the objective reasonability of the force based on what the officials knew at the time the force was employed, not what they learned afterwards. *See Dukes*, 852 F.3d at 1042.  While it is true that law enforcement found numerous guns during the subsequent search of the residence, this was not known to Clark at the time he threw the device, nor had there been any assertion or act of violence or concern by the Almonds.  After all, the evidence shows that the RCNU task force did not discuss the possible need for a flashbang device in their preplanning meeting.  To the contrary, Teresa had invited law enforcement to return to the home later that day,

and the only pre-search suspicion of criminal conduct was the presence of marijuana based on a single door-step odor.[8]

Third and finally, Clark's assertion that he looked into the living room before deploying the device and did not see anybody is belied by the actual facts because the evidence shows that the room was in fact occupied and that the device landed within inches of not only Greg, but also within feet of another law enforcement official who was in the room. *See Dukes*, 852 F.3d at 1043 (holding that an "officer's failure to perform a visual inspection before throwing a flashing into an area" and that "the use of a flashbang in an area occupied by bystanders" weighs against reasonableness); *see also Boyd v. Benton Cnty.* 374 F.3d 773, 779 (9th Cir. 2004) ("[G]iven the inherently dangerous nature of the flash-bang device, it cannot be a reasonable use of force under the Fourth Amendment to throw it 'blind' into a room occupied by innocent bystanders absent a strong governmental interest, careful consideration of alternatives and appropriate measures to reduce the risk of injury."). And further, in his deposition, Clark testified that he could not recall what he saw

---

[8] Clark testified that he had heard a rumor that the Almonds were armed and that they were drug dealers, but he could not recall who told him this, when he was told this, or what exactly he was told. (Doc. 144-3 at 111–14.) Construing this testimony in the light most favorable to the Almonds, as the Court must, based on the uncertainty and ambiguity of this testimony, the Court concludes that there is an issue of fact as to whether Clark had information that the Almonds were either armed or drug-dealers *prior* to his use of force.

when he looked into the room.  Clark did not testify that he looked and saw no one in the room.[9]

Viewing the facts in the light most favorable to Greg, a reasonable juror could conclude that Clark blindly and without pre-planning or the knowledge of his fellow law enforcement officials threw a potentially lethal and injurious flashbang device into an occupied room in a situation where there was no active threat of harm, resistance, or evasion.   In doing so, he would have violated Greg's Fourth Amendment rights against excessive force.   *Dukes*, 852 F.3d at 1043; *see also Z.J. by & through Jones v. Kan. City Bd. of Police Comm'rs,* 931 F.3d 672, 685 (8th Cir. 2019); *Estate of Escobedo v. Bender*, 600 F.3d 770, 785 (7th Cir. 2010); *Boyd*, 374 F.3d at 779.

The Court now turns to the issue of whether it was clearly established at the time that the flashbang device could not be used under these circumstances.

Greg primarily contends that binding case law from the Eleventh Circuit clearly established that Clark's use of a flashbang device constituted excessive force. Specifically, the parties argue that whether the law was clearly established turns on the Eleventh Circuit's decision in *Dukes v. Deaton*, 852 F.3d 1035 (11th Cir. 2017),

---

[9] Clark testified that he must have not seen anyone in the room *because* he used the flashbang device, and he would not have used it had he seen anyone. This conclusory testimony is insufficient to establish that Clark did in fact look into the room.

a case in which the Eleventh Circuit examined the use of a flashbang device. Greg contends that *Dukes* clearly established that Clark's use of force under these circumstances constituted excessive force, while Clark contends that *Dukes* is not sufficiently similar to the instant case to have clearly established the law beyond debate. After carefully reviewing the facts of this case and the *Dukes* opinion, the Court concludes that it was clearly established when Clark deployed the flashbang device that such a use of force under these circumstances violated Greg Almond's right to be free from excessive force.

*Dukes*, like this case, deals with a flashbang device used inside an occupied home. 852 F.3d at 1039. And there, the Eleventh Circuit found that the use of the flashbang device on its facts constituted excessive force. *Id.* at 1043. But the court also concluded that the law had not been clearly established in 2017. *Id.* at 1044. Here however, the use of the flashbang device occurred in 2018, thereby making *Dukes* a potential source for clearly established law.

While the facts in *Dukes* are not identical to the facts in this case in all aspects—as no two sets of facts are[10]—they are materially indistinguishable to those

---

[10] For example, *Dukes* dealt with an apartment while this case deals with a house. *Cf. Dukes*, 852 F.3d at 1039. The search in *Dukes* was conducted in the morning, while the search here occurred in the afternoon. *Cf. id.* at 1040. The *Dukes* flashbang device went off in the bedroom, while in this case the flashbang device went off in the kitchen. *Cf. id.* The list of minor distinctions goes on. But the goal is to not be so narrow and specific so as to guarantee that "government actors will invariably receive qualified immunity." *Golodner v. Berliner*, 770 F.3d 196, 206 (2d Cir. 2014). Similarly, courts should not look so generally at the law as to guarantee that "immunity will be available, rarely, if ever" when a violation has been found. *Id.* (citation omitted). "In a sense,

here as required to clearly establish the law.  In fact, if anything, the use of the flashbang device was more reasonable in *Dukes* than it was here.  In *Dukes*, the officers were executing a search of a home on suspicion of possession and the sale of marijuana, like the suspected possession of marijuana here.  *Cf. id.* at 1039.  In *Dukes*, the officer blindly threw a flashbang device into an occupied room.  *Id.* at 1042.  Here, Clark blindly threw a flashbang device into an occupied living room, although it is disputed as to whether Clark actually looked into the room beforehand.  And in *Dukes*, the flashbang device was capable of causing significant harm, like the one that Clark used, although the *Dukes* device could produce extreme heat.[11]  *Cf. id.* at 1040.  Further, in *Dukes*, "there existed minimal need" for the flashbang device even though the "warrant stated that an informant advised law enforcement that [a resident] kept a handgun on his person," 852 F.3d at 1042–43, whereas here, none of the officials had been informed that either of the Almonds kept a firearm on their person, further reducing the need for a flashbang.  Finally, in *Dukes,* there was no evidence that the residents were evading or resisting, *id.* at 1040, as was the case

---

[courts] must apply the Goldilocks principle," *Id.*, and view the facts and specifics of a case "just right."  And "just right," according to the Supreme Court, is to not "define clearly established law at a high level of generality." *Crocker*, 995 F.3d at 1240 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 799 (2014)).  That is what the Court has done here.

[11] Again, the flashbang manual describes the device as potentially being "lethal" when in direct proximity to someone.  Meanwhile, the user manual for the flashbang device used in *Dukes* only noted that it had "the potential to cause serious bodily injury." 852 F.3d at 1040.

here, where not only was there no evidence of evading or resisting, but also there was evidence that Teresa had invited law enforcement to return to the residence and that Greg Almond was peacefully sitting on the floor talking to another officer when the device was thrown. Finally, in *Dukes*, the operational plan of the raid had authorized the use of a flashbang device, *id.*, but here, the operational plan did not contemplate the use of a flashbang device, reducing the reasonability of its use.

In all relevant ways, the facts in this case, construed in the Almonds' favor, are sufficiently similar to *Dukes* to constitute clearly established law on Clark's use of the flashbang device. The Eleventh Circuit held in *Dukes* that the use of a dangerous flashbang device, thrown blindly into a room of an occupied home, during a search for suspected marijuana possession, constituted excessive force. *Id.* at 1042–43. Those are the facts here. *See also Kansas City Bd. of Police Comm'rs,* 931 F.3d 672, 685 (8th Cir. 2019) (citing *Dukes* and holding that by 2010 in the Eighth Circuit "it was clearly established that the use of flash-bang grenade is unreasonable *where officers have no basis to believe they will face the threat of violence* and they unreasonably fail to ascertain whether there are any innocent bystanders in the area it is deployed.").

The Court finds that *Dukes* is a materially and factually indistinguishable case that clearly establishes that Clark's use of force was excessive. *Dukes* is sufficient to put every reasonable officer on notice that blindly throwing a potentially lethal

device into an occupied residence during a residential search with little-to-no threat to officer safety is unconstitutional.  But even if *Dukes* alone was not sufficiently similar to clearly establish the law, *Dukes,* in conjunction with broad excessive force principles,[12] applies with obvious clarity to the totality of the circumstances in this case, also barring qualified immunity under the second pathway to clearly establishing law. *See Long v. Slaton*, 508 F.3d 576, 585 (11th Cir. 2007) (explaining that prior case law applies with "obvious clarity" where the circumstances are such that "only an incompetent officer or one intending to violate the law could possibly fail to know what the police did here violated the . . . law") (citations omitted)).

Genuine disputes of fact preclude Clark's entitlement to qualified immunity, and because of those same general disputes of fact, Greg is not entitled to summary judgment either.  As to Teresa, since she was nowhere in the vicinity of the flashbang device when it detonated and claims no injury because of it, her excessive force claim fails for substantive evidentiary reasons and therefore summary judgment is due to be granted in Clark's favor on Teresa's excessive force claims.

### c. <u>Malicious Prosecution (Count IV)</u>

---

[12]  Here are some of those broad statements: "To measure the objective reasonableness of official action, [courts] weigh 'the quantum of force employed' against 'the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight.'" *Dukes*, 852 F.3d at 1042 (quoting *Salvato v. Miley*, 790 F.3d 1286, 1292 (11th Cir. 2015)).

In Count IV, the Almonds bring a malicious prosecution claim against the individual Defendants (Walker, Clark, and Moore).[13] They argue that summary judgment is due because the Almonds' arrests were supported by probable cause, regardless of whether the search itself was legal. In response, the Almonds contend that the individual Defendants did not have probable cause to arrest them because (1) the search of the residence was illegal, and (2) the charges were ultimately dismissed. On this claim, the individual Defendants are correct.

The Eleventh Circuit "has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983." *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003) (citations and footnote omitted). "To establish a § 1983 malicious prosecution claim, the plaintiff must prove two things: (1) the elements of the common law tort of malicious prosecution; *and* (2) a violation of his Fourth Amendment right to be free from unreasonable seizures." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1256 (11th Cir. 2010) (citation omitted). The malicious prosecution common law tort requires: (1) a judicial proceeding or prosecution instituted or continued by the defendant, (2) lack of probable cause, (3) malice, (4) termination in the plaintiff's favor, and (5) injury or damage. *Dolgencorp, LLC v. Spence*, 224 So. 3d 173, 183 (Ala. 2016) (citation

---

[13] The Almonds also brought a malicious prosecution claim against Billy Lane but have since dismissed that claim. (*See* Doc. 143.)

omitted); *see also Wood*, 323 F.3d at 881–82 (11th Cir. 2003) (noting that the elements of common-law malicious prosecution are the same elements required under Alabama law for the tort of malicious prosecution).

Of these elements, the Court focuses on the second: whether the individual Defendants had probable cause to arrest the Almonds.    The answer is straightforward: yes, these Defendants had probable cause, including arguable probable cause, to arrest the Almonds, regardless of whether the initial search of the residence was legal.

Relevant to this discussion is the principle that an officer who is sued civilly can rely on evidence obtained during an allegedly illegal search for purposes of showing probable cause for an arrest. *Black v. Wigington*, 811 F.3d 1259, 1267–69 (11th Cir. 2016) (holding evidence obtained during illegal search of trailer provided probable cause for plaintiffs' arrest on drug and theft charges).  This principle means that evidence obtained during an illegal search may be suppressed in a criminal prosecution pursuant to the exclusionary rule thereby resulting in dismissal of the criminal charges, while the same evidence when used in a civil case may be used to support a probable cause finding to defeat a § 1983 claim related to the arrest. Accordingly, because this is a civil malicious prosecution action, the Court can look

to the evidence found in the Almond residence—even if the search was illegal—to determine if the individual Defendants had probable cause to arrest the Almonds.[14]

The dispositive question here is whether a reasonable officer in the individual Defendants' positions would have had probable cause to believe that the Almonds were in unlawful possession of marijuana and the Lunesta pill found in their residence. Ala. Code §§ 13A-12-212, 214 (requiring "possession" as a necessary element to the charges brought against the Almonds).

> Possession of contraband may be actual or constructive, and individual or joint.  Constructive possession generally is defined as the knowing ability to exercise dominion and control over an item. Mere presence where contraband is found, without more, will not support a conviction for constructive possession of the contraband.

*Haggard v. Dorsett,* No. 20-cv-00030, 2021 WL 5085953, at *4 (N.D. Ala. Nov. 2, 2021) (internal citations omitted).

But here, there is more than the simple presence of marijuana within the residence.  Not only was the marijuana found in the Almonds' residence and in their physical presence, but it was found in their bedroom, in their safes, in a cooler, and in their grill.  And as to the Lunesta pill, a controlled substance, the officers did not

---

[14] In their briefing, as it relates to the civil malicious prosecution claims, the Almonds confuse probable cause for the search itself with probable cause for the Almonds' arrests.  The Almonds argue that the individual Defendants lacked probable cause to arrest them because their arrests were based on Morrow's disputed testimony that he smelled unburnt marijuana.  But that is not so. Morrow's testimony goes to whether there was probable cause to search the residence.  Once inside, the officers acquired separate probable cause to arrest when they discovered marijuana, regardless of whether the search itself was illegal.

realize it was properly prescribed until after the search. Further, the Almonds were the only two people in the residence at the time of the search. Based on these facts, the individual Defendants had probable cause to believe that the Almonds were in constructive and unlawful possession of marijuana and the pill when they arrested the Almonds and criminally charged them. Neither the fact that the Almonds' son later claimed the marijuana nor that the charges were later dismissed alters this conclusion because it is the facts known to the officers at the moment of an arrest that matter when assessing probable cause for an arrest, not facts that may later come to light. *See Haggard*, 2021 WL 5085953, at *4.

Because the individual Defendants had probable cause to arrest and criminally charge the Almonds, the claims for malicious prosecution against them fail and summary judgment is due to be granted in their favor.

### d. Conversion (Counts I and III)

The Almonds bring state-law conversion claims against all of the Defendants associated with the seizure of their personal property. The conversion claims deal with two categories of property: (1) the property that was inventoried, seized, and ultimately returned when the criminal charges were dismissed, and (2) the property that was allegedly taken but never returned to the Almonds.

The contents of the first category (the returned property) are not disputed. This property included $4,050 and over forty guns. The Almonds contend that this

property was wrongfully converted because "[t]here is no plausible explanation for the taking of this property based on the crimes the Almonds were charged with. The only explanation is that they were taking the property for their own use and benefit." (Doc. 174 at 29.)  In response, the Defendants argue that this property was not wrongfully taken but rather was temporarily seized as the fruits and instruments of criminal activity, which was then returned after the criminal charges were dismissed.[15]

The elements of the tort of conversion have been long established, and these elements are relatively simple in their application to any given set of circumstances. To sustain a claim of conversion, there must be (1) a wrongful taking; (2) an illegal assertion of ownership; (3) an illegal use or misuse of another's property; or (4) a wrongful detention or interference with another's property. *Drennen Land & Timber Co. v. Privett*, 643 So. 2d 1347, 1349 (Ala. 1994) (citations omitted).  The first conversion avenue is the pertinent one under the facts here.

Here, the Defendants not only had a reason to seize the inventoried property (cash and guns) but based on their search of the residence, the officers had probable cause and the authority to seize the inventoried property after the discovery of

---

[15] The Court pretermits extensive discussion of the Defendants' assertion of sovereign and state-agent immunity since the conversion claims fail for factual reasons. But fundamentally, the Defendants would be entitled to state-agent immunity for the taking and return of the inventoried property that was seized after the marijuana was discovered.  They would not, however, be entitled to any immunity if they stole any of the Almonds' missing property for their personal gain because malicious conversion is not within the line and scope of law enforcement duty.

marijuana.  Alabama law provides that "[s]eizure without process may be made" if the law enforcement agency "has probable cause to believe that the property was used or is intended to be used in violation of this chapter." Ala. Code § 20-2-93(d)(4).  Probable cause existed here because law enforcement found marijuana, including a marijuana plant, bags containing marijuana leaves, plastic baggies, marijuana seeds, and marijuana fertilizer in the Almonds' residence, thereby evidencing the manufacture, possession, and distribution of marijuana.

Because the seizure of this property was not "wrongful" under Alabama law, the Almonds' conversion claim fails as to the cash and guns that were later returned.  Therefore, summary judgment is due to be granted in the Defendants' favor for the Almonds' conversion claim based on the property that was returned.

The missing property is somewhat of a different matter.  This category of property includes approximately $4,000 cash, guns, tools, jewelry, and antique guitars.  The Almonds claim that the individual Defendants converted this property when they seized it but never returned it.

If a defendant makes prima facie showing that he did not take the property in question, the burden then shifts to the plaintiff "to produce substantial evidence creating . . . a [genuine] dispute as to whether [the defendant] took or carried away the [property]." *Wint v. Ala. Eye & Tissue Bank*, 675 So. 2d 383, 385 (Ala. 1996) (first alteration in original) (internal quotations omitted).

Here, the Defendants have made a prima facie case showing that they did not take the missing property. They all deny taking anything from the residence that was not inventoried and later returned. Further, they highlight that the Almonds, nor anyone else, never actually witnessed any law enforcement officers take their property. Accordingly, the burden shifts to the Almonds to produce substantial evidence to create an issue of fact as to whether any of these Defendants took the property that remains missing and unreturned.

To do this, the Almonds generally point to the circumstances of the search and seizure: law enforcement searched every nook and cranny of their residence and seized and removed property, the Almonds were removed and taken to jail while law enforcement remained at the residence, and their property was gone when they returned the next day.

Unfortunately for the Almonds, those facts are not enough. A defendant's mere access to money or property, coupled with the disappearance thereof, is not by itself sufficient evidence of conversion when there are other possible explanations for the disappearance of the property. *See Heathcock v. Hadley*, 380 So. 2d 915, 917 (Ala. Civ. App. 1980) ("The evidence, at best, showed that the defendant lived in the home prior to the decedent's death and that some items, according to the plaintiff, were missing from the home after the death of decedent. Clearly, this evidence does not meet the plaintiff's burden of proof in showing wrongful possession by the

defendant."). And here, the Defendants have provided a possible explanation for the disappearance of the property: thieves in the night. The Almond residence is in an area prone to thefts and break-ins. In fact, there were three break-ins of the Almond residence in 2017 alone, and one break-in just ten days before the RCNU search. Further, Walker testified that he locked and secured the residence when he left on January 31, 2018. When the Almonds returned the following day, the front-door was open, indicating that someone may have entered the residence after Walker's departure.

The Almonds on the other hand have not provided evidence that any law enforcement officers, including these Defendants, were seen removing the property at issue, nor were any of them observed with the property. Rather, the Almonds simply assert that law enforcement was in the residence on one day and that the property was discovered missing the next day. At best, this evidences an opportunity to take, but it does not show an actual taking that occurred by any specific Defendant.[16] This alone cannot form the basis of a conversion claim.

---

[16] While the Court must take the facts in the light favorable to the Almonds, the Almonds' conversion claim has another problem in that, other than their own vague and blanket assertions, the Almonds provide no other proof as to the actual existence of this property. As to the missing guns and guitars, Greg Almond can only guess at how many are gone or what they were, and he has no appraisals, bills of sale, pictures, or insurance for any of them. The same goes with the money and much of the other missing property. Unlike for the three prior thefts of personal property in 2017, the Almonds interestingly did not file a homeowners' insurance claim for this alleged theft.

In short, despite the circumstances surrounding the allegedly missing property, the Almonds have not presented sufficient evidence to establish that any of the Defendants actually took, or are responsible for, the property.[17]   Accordingly, summary judgment is due to be granted in all the Defendants' favor on the Almonds' conversion claim as it relates to the missing property.

### e.  Abandoned Claims (Counts II, VII, and VIII)

The Almonds' Complaint brings claims for negligent supervision against Clark (Count II); outrage against Clark, Walker, and Moore (Count VII), and a facial and as applied constitutional challenge to Alabama's Civil Forfeiture Statute, Alabama Code § 20-2-93 (Count VIII).  The Almonds have not responded to the Defendants' summary judgment motions as to these claims.  Accordingly, these claims have been waived and abandoned, and therefore these claims will be dismissed. *See Resol. Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *see also Hooper v. City of Montgomery*, 482 F. Supp. 2d 1330, 1334 (M.D. Ala. 2007).

### CONCLUSION

Accordingly, it is hereby ORDERED as follows:

---

[17] The Court notes that the dearth of evidence related to the conversion claims is largely a function of law enforcement's arrest and removal of the Almonds from the residence, thereby preventing the Almonds from witnessing the removal of property from the residence.

1.   The Partial Motion for Summary Judgment (Doc. 158) filed by Plaintiffs Gregory Jack Almond and Teresa Roberts Almond is DENIED.

2.   The Motion for Summary Judgment filed by Defendants Randolph County and the Randolph County Commission (Doc. 152) is GRANTED. The Clerk is DIRECTED to dismiss Randolph County and the Randolph County Commission as defendants in this action.

3.   The Motion for Summary Judgment filed by Defendant Larry Clark, Jr. (Doc. 144) is granted in part and denied in part. It is GRANTED as to Count II, Count III, Count IV, Count VI, and Count VII. It is DENIED as to Count V.

4.   The Motion for Summary Judgment (Doc. 147) filed by Defendant Kevin Walker is granted in part and denied in part. It is GRANTED as to Count III, Count IV, and Count VII. It is DENIED as to Count VI.

5.   The Motion for Summary Judgment filed by Defendant Randy Moore (Doc. 149) is GRANTED. The Clerk is DIRECTED to dismiss Randy Moore as a Defendant in this action.

6.   The claim for an illegal search in violation of the Fourth Amendment contained in Count VI shall proceed against Defendant Kevin Walker in his individual capacity.

7.     The claim for excessive force contained in Count V related to the use of the flashbang device shall proceed against Defendant Larry Clark, Jr. in his individual capacity.

8.     All other claims are dismissed.

DONE, this the 7th day of September 2022.

_____/s/ R. Austin Huffaker, Jr._____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE