IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

GREGORY JACK ALMOND, *et al.*,           )
                                          )
        Plaintiffs,                       )
                                          )
        v.                                )        Case No. 3:19-cv-175-RAH
                                          )
LARRY CLARK, JR., *et al.*,               )
                                          )
        Defendants.                       )

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

The facts here are a mess, particularly law enforcement's actions in violently entering and searching an occupied residence without consent, exigent circumstances, or a warrant, and based solely on a state court judge's statement that they "had enough" for a warrant. That entry and search was only made worse when a law enforcement officer threw a flashbang device within inches of the homeowner during the entry without a real reason to do so. At summary judgment, Defendants Kevin Walker and Larry Clark sought qualified immunity for their respective actions, but that was denied.

The case then went to trial against Kevin Walker who was responsible for obtaining the search warrant and against Larry Clark who threw the flashbang device. After a three-day trial, the jury issued a combined verdict for the homeowners, Greg and Teresa Almond, for $1 million. That verdict consisted of a $450,000 compensatory award for Greg Almond and a $300,000 compensatory award for Teresa Almond against Kevin Walker based on a Fourth Amendment unlawful entry and search claim. The verdict also included a $250,000 award against

Larry Clark based on a Fourth Amendment excessive force claim, of which $50,000 was for compensatory damages and $200,000 for punitive damages.

Pending before the Court are the Defendants' post-trial motions which assert various errors and an excessive verdict. The Court has received significant briefing on the trial issues and has conducted oral argument. For the reasons below, Defendant Kevin Walker's requested relief will be granted in part and Defendant Larry Clark's relief will be denied in total.

**LEGAL STANDARD**

The Defendants' motions come via Rules 50 and 59 of the Federal Rules of Civil Procedure.

**A.    Renewed Motion for Judgment as a Matter of Law**

Under Rule 50, the court may enter judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). "No later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." *Id.*

On a motion for judgment as a matter of law, the court must "review all of the evidence in the record." *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000). "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.* (citations omitted). The court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id*. at 151.

2

"District courts seldom enter a judgment as a matter of law, for it is appropriate only when there can be but one reasonable conclusion as to the verdict." *Thomas v. Broward Cnty. Sheriff's Off.*, 71 F.4th 1305, 1312 (11th Cir. 2023) (quotation marks omitted) (quoting *Pelletier v. Stuart-James Co.*, 863 F.2d 1550, 1554 (11th Cir. 1989)). That is, "[j]udgment as a matter of law is appropriate only if the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." *Luxottica Grp., S.P.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1310 (11th Cir. 2019) (quoting *Equal Emp't Opportunity Comm'n v. Exel, Inc.*, 884 F.3d 1326, 1329 (11th Cir. 2018)). The court may "not second-guess the jury or substitute [its] judgment for [the jury's] judgment if [the jury's] verdict is supported by sufficient evidence." *Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 811 (11th Cir. 2020) (quoting *Exel*, 884 F.3d at 1329).

## B.   Motion for a New Trial

Under Rule 59(a), the court may grant a motion for "a new trial on all or some of the issues . . . for any reason for which a new trial has . . . been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "New trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1312–13 (11th Cir. 2013) (alteration adopted) (quoting *St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1200 n.16 (11th Cir. 2009)).

## C.   Motion for a Remittitur

Under Rule 59(e), the court can alter or amend a judgment. When the jury's award "is for an identifiable amount that is not permitted by law, the court may simply modify the jury's verdict to that extent and enter judgment for the correct amount." *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1330 (11th Cir. 1999) (citing *New York, L.E. & W.R. Co. v. Estill*, 147 U.S. 591 (1893)). The court

may also reduce the jury's award where "the jury's damage award exceeds the amount established by the evidence." *Rodriguez v. Farm Stores Grocery, Inc*., 518 F.3d 1259, 1266 (11th Cir. 2008) (quoting *Goldstein v. Manhattan Indus., Inc.,* 758 F.2d 1435, 1448 (11th Cir. 1985)).

## BACKGROUND

The testimony at trial largely mirrored the testimony presented at the summary judgment stage. Again, most of the relevant events occurred within a three-day span from January 31, 2018, to February 2, 2018, during which three interweaving events occurred: an initial visit to the Almond residence by law enforcement on January 31, 2018, the entry and search of the residence later in the day, and the claimed pursuit of a search warrant at some point between January 31, 2018, and February 2, 2018.

On January 31, 2018, Deputy Sheriff Nathanial Morrow of the Randolph County Sheriff's Department visited the Almond residence to serve Greg Almond with civil papers. Teresa Almond, Greg's wife, answered and told Morrow to return later that day because Greg was not there at that moment. According to Deputy Morrow, he smelled the odor of *unburnt* marijuana coming from inside the residence, an observation he did not mention to Teresa. Morrow told Teresa that he would return later in the day and left. After leaving the residence, Morrow called the Randolph County Narcotics Unit ("RCNU"), a multi-jurisdictional drug task force, and reported the marijuana odor.

Based on Morrow's statements that he had smelled unburnt marijuana, Deputy Sheriff Kevin Walker, a member of the RCNU, claims that he contacted Randolph County District Court Judge Amy Newsome about a telephonic warrant. According to Walker, he discussed the situation with Judge Newsome on the telephone.

At trial, Judge Newsome testified about their conversation. She stated that she did speak with Walker at some point but that she never issued a telephonic warrant to anyone, including Walker. (Doc. 299 at 51–54.) She also made clear that

there was no telephonic warrant issued to enter and search the Almond home. (*Id.* at 55.)

In his version of the conversation with Judge Newsome, Walker testified that Judge Newsome told him that he had "enough for a search warrant, maybe." (Doc. 300 at 198.) Importantly, he admitted "I was not sworn in, and I don't recall her saying, you have a search warrant in those exact words." (*Id.*) Walker also admitted he did not go through the steps needed to obtain a telephonic search warrant. (*Id.* at 199.) And he also conceded that he did not have a search warrant when the raid team invaded the Almond home. (*Id.* at 199, 222.)

Following this phone call, Walker reported to the RCNU that he had a warrant. Based on Walker's statements, the RCNU proceeded with their preparations to raid the Almond residence based on Deputy Morrow's claim that he smelled unburnt marijuana. The RCNU team and personnel from other law enforcement agencies met at a nearby church to gear-up and formulate a game-plan.

Relevant to the issues at trial, the plan did not call for the use of a flashbang or distraction device. It was never discussed although proper procedure was to notify team members that one was to be used. (Doc. 299 at 96; Doc. 300 at 96–97.) At trial, RCNU team member Larry Clark testified that, even though it was not discussed to his recollection, he intended to deploy one when the RCNU entered the Almond home. (Doc. 299 at 117.) The device he intended to use contained a warning not to throw it within five feet of any person because it could be lethal. (Pls.' Ex. 5; Doc. 299 at 113; Doc. 300 at 79.)

At 2:04 p.m., the task force arrived at the Almond residence where it breached the door and entered the home. The Almonds were present inside. Deputy Donnie Strain was the first to enter. Shortly after he entered, Clark threw his flashbang device through the door, over Strain's shoulder, and into the front room where both Strain and Greg Almond were present. (Doc. 300 at 94–95.) The flashbang device

landed within inches of Greg's feet and detonated. (Doc. 301 at 72, 74.)  The detonation blew a hole in the floor, sent broken tile into Greg Almond's leg and face causing him injuries, and impaired his hearing and vision. (*Id.* at 73–74.)  According to Strain, the flashbang device was a shock to him and made his ears ring.  (Doc. 300 at 95.)  He acknowledged the device possibly posed a risk of harm to him and Greg Almond. (*Id.* at 95–96.)

About his use of the flashbang, Clark testified that he did not remember whether the lights were on or off in the residence when he threw the device, and he could not see the corners on either side of the door. (Doc. 299 at 116.)   He acknowledged throwing the device into the room but that he had no idea where it landed. (*Id.* at 114.) Proper procedure when using the device is to open the door and place the device in the room before any officers enter. (Doc. 300 at 96–97.)

Greg testified that upon entry, Clark put a gun to Greg's head, said, "if you don't get on the floor, I'll blow your goddamn fucking brains out," and then picked Greg up and threw him face first on the floor. (Doc. 301 at 74–75.)  Greg was handcuffed, and the residence was searched.  At some point, Greg asked Strain to show him their search warrant.  Strain did not say they had one; instead, he said, "we got one coming."  (*Id.* at 75.)

The Almonds were taken to jail where they spent the night.   Upon return to their residence the next day, they found it in a state of disarray.  The front door and doorframe were broken, there was a hole in the floor from the flashbang detonation, their personal effects were strewn on the floor, and there was broken and turned over furniture with their contents dumped on the floor.   (*Id.* at 72–73, 80–81.)

On February 2, 2018 – three days after the entry and search – Walker apparently met with Judge Newsome about a warrant.  The court records are confusing and inconsistent.  According to the court file (Pls.' Ex. 13), Walker executed an "Affidavit for Search Warrant" on February 2, 2018, that was sworn to

and subscribed before Judge Newsome that day.  The file also contained a document titled "Search Warrant," which stated that Judge Newsome had issued a search warrant to Walker at 2:04 p.m. on January 31, 2018—the exact same time that the RCNU team entered the Almond home.

## DISCUSSION

**A.    Kevin Walker (warrant)**

**1.    Judgment As A Matter Of Law**

At trial, after the Almonds rested and after Judge Newsome and Walker testified about the circumstances surrounding the search warrant, including Walker's admission that he did not have a warrant, the Almonds moved for a judgment as a matter of law on the issue of the legality of the entry and search.  At that point, the testimony established that no consent, no exigent circumstances, and no warrant existed to enter and search the Almond home on January 31, 2018.  The Court granted the motion and concluded that the entry and search were warrantless and without exception or consent, and therefore, the entry and search violated the Fourth Amendment.

In his Rule 59 post-trial motion, Walker first argues the Court should vacate its judgment on the legality of the entry and search and should order a new trial.  In particular, Walker argues that "[t]he Court disregarded compelling objective evidence that Officer Walker received a verbal search warrant before he conducted the search." (Doc. 306 at 18 (emphasis omitted).)

Under Rule 59(e), a district court may "alter or amend a judgment." Fed. R. Civ. P. 59(e). There are no specific grounds for relief listed in Rule 59(e).  But the Eleventh Circuit has said that a district court may alter or amend a judgment based on manifest errors of law or fact. *Metlife Life & Annuity Co. of Conn. v. Akpele*, 886 F.3d 998, 1008 (11th Cir. 2018) (citing *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007)). "A Rule 59(e) motion cannot be used to relitigate old matters, raise

argument or present evidence that could have been raised prior to the entry of judgment." *Arthur*, 500 F.3d at 1343 (cleaned up) (quoting *Michael Linet, Inc. v. Village of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005)).  A manifest error does not mean that one does not like the outcome of a case, or that one believes the court did not properly weigh the evidence.  It is not just any error—it is one that is plain and indisputable, and that amounts to a complete disregard of the controlling law or the credible evidence in the record.  *Error*, Black's Law Dictionary (12th ed. 2024); *see Shuler v. Garrison*, 718 F. App'x 825, 828 (11th Cir. 2017) ("A manifest error is one that amounts to a 'wholesale disregard, misapplication, or failure to recognize controlling precedent.'" (quoting *Oto v. Metro. Life Ins.*, 224 F.3d 601, 606 (7th Cir. 2000))).  The Eleventh Circuit has "reject[ed] any argument that to err legally always equates to a 'manifest disregard of the law.'" *Montes v. Shearson Lehman Bros.*, 128 F.3d 1456, 1461 (11th Cir. 1997).

Thus, to succeed on his Rule 59(e) motion, Walker must show there were manifest errors of law or fact.  Given Judge Newsome's testimony that she did not issue a telephonic search warrant, Walker's testimony that he neither had nor was told that he had a search warrant before conducting the entry and search of the Almond residence, the requirements of the Fourth Amendment, Alabama law, and the Alabama Rules of Criminal Procedure for search warrants, Walker has not met this very high burden.

First, the Court begins with the Fourth Amendment and then the state law as it concerns telephonic warrants in Alabama.  The Fourth Amendment to the Constitution of the United States sets forth a general proscription on warrantless searches of residential homes:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause,

> supported by Oath or affirmation, and particularly describing the place
> to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  In short, a warrant cannot be issued without a sworn statement of probable cause.  U.S. Const. amend. IV; *see Kalina v. Fletcher*, 522 U.S. 118, 129–31 (1997) (holding that the "oath or affirmation" requirement is not satisfied by the use of unsworn testimony).  Whether in light of or despite that language, Fourth Amendment cases are governed by the principle that warrantless searches are presumptively unreasonable and are "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967).  Nowhere is this truer and more important than in the context of the search of a "home"—the "first among equals" in Fourth Amendment land. *Florida v. Jardines,* 569 U.S. 1, 6 (2013).  Given this privileged status, warrantless searches of homes "bear heightened scrutiny." *Kentucky v. King*, 563 U.S. 452, 474 (2011) (Ginsburg, J., dissenting) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)); *see Payton*, 445 U.S. at 585–86 ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (quoting *United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972))).

The Fourth Amendment's prohibition of warrantless searches, however, is not absolute.  Although there is a strong preference for entries and searches conducted under the judicial auspices of a warrant, the United States Supreme Court has crafted a few carefully drawn exceptions to the warrant requirement. These exceptions are intended to cover situations where "the public interest require[s] some flexibility in the application of the general rule that a valid warrant is a prerequisite for a search." *Arkansas v. Sanders*, 442 U.S. 753, 759 (1979).  One such exception is that law enforcement may enter a private premises and conduct a search if "exigent circumstances" mandate immediate action. *See Michigan v. Tyler,* 436 U.S. 499, 509–12 (1978).  The exigent circumstances exception recognizes a "warrantless

entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant." *Id.* at 509. The exception encompasses several common situations where resorting to a magistrate for a search warrant is not feasible or advisable, including: danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit. *See Johnson v. United States,* 333 U.S. 10, 14–15 (1948) (listing situations falling within the exigent circumstances exception); *United States v. Reid,* 69 F.3d 1109, 1113–14 (11th Cir. 1995) (upholding warrantless search of residence based on exigent circumstances arising from risk of losing evidence, risk of flight, and danger of harm to the public or officers).

Expounding upon the Fourth Amendment's requirements, Alabama law requires that any warrant, telephonic or otherwise, be procured only with probable cause and only after sworn testimony has been given. *See* Ala. Code §§ 15-5-3, 15-5-4; Ala. R. Crim. P. 3.8 (2018), 3.9(b) (2024).[1] Typically, written search warrants are obtained, but Ala. R. Crim. P. 3.8(b) created a detailed process to obtain a warrant telephonically under the appropriate circumstances. Under the Alabama Rules of Criminal Procedure, to issue a telephonic warrant, the issuing judge must hear "sworn testimony communicated by telephone or other appropriate means" and should record the call, if possible, or make "a stenographic or longhand verbatim record" of the call. Ala. R. Crim. P. 3.8(b) (2018). The warrant applicant also must "prepare a document to be known as a duplicate original warrant" and must "read such duplicate original warrant verbatim to the issuing judge or magistrate." Ala. R. Crim. P. 3.8(b)(2) (2018). The judge then must enter "the original warrant." Ala. R.

---

[1] The rules for telephonic warrants are currently found in Ala. R. Crim. P. 3.9(b). In 2018, they were found in Rule 3.8(b).

Crim. P. 3.8(b)(3) (2018). Provided that the judge is satisfied that circumstances[2] exist to dispense with a written affidavit, the judge would then "direct[] the person requesting the warrant to sign the judge's . . . name on the duplicate original warrant," and the judge would also "immediately sign the original warrant and enter on the face of the original warrant the exact time the warrant was ordered to be issued." *Id.*

At trial, Judge Newsome and Walker made clear in their testimony that the requirements for a telephonic warrant were not invoked or met. Walker did not provide sworn testimony to Judge Newsome. Walker did not draft or provide a "duplicate original warrant" or "original warrant" and did not read one to Judge Newsome. *See* Ala. R. Crim. P. 3.8(b). Walker made no recording or notes. The trial testimony only showed there was some sort of discussion over the telephone between Judge Newsome and Walker about Deputy Morrow's visit to the Almond residence. But no warrant was issued, and Walker was not told that he had a warrant; he was simply told that he had enough for a warrant. Much more was required in order to make the entry and search lawful. The inquiry at trial was a legal one based on what the Fourth Amendment and Alabama law required. It was on that basis that the Court ruled.

Walker argues the Court made a mistake in its Fourth Amendment analysis by basing its ruling on Walker's after-the-fact subjective belief rather than applying the Fourth Amendment's standard of objective reasonableness "at the moment" of the search. (Doc. 306 at 31.) The Court disagrees. The Court's ruling was based

---

[2] Rule 3.8(b) also provided a contingency concerning telephonic search warrants in that the circumstances had to make it reasonable to dispense with the written affidavit requirement. No evidence or explanation was provided by Walker as to why the circumstances allowed him to dispense with the written affidavit requirement. The evidence did show, however, that the Randolph County Courthouse was only minutes away from the Almond residence, and there were no exigent or pressing circumstances that made a visit to the courthouse impracticable.

on the Fourth Amendment, Alabama law, the Alabama Rules of Criminal Procedure, and Judge Newsome's testimony, which Walker's trial testimony only confirmed. The Court did not disregard the law, nor did it make its decision solely upon Walker's testimony. Given the clear requirements of the Constitution, Alabama law, the rules of criminal procedure, the lack of any exigent circumstances and consent, and the testimony of the only two individuals who participated in the call—Judge Newsome and Walker—the only issue was whether the legal requirements for a telephonic warrant had been met. They were not. This was a question of law for the Court, not the jury.

Walker also argues that "[t]he Court disregarded compelling objective evidence that Officer Walker received a verbal search warrant before he conducted the search." (Doc. 306 at 18 (emphasis omitted).) The record does not support this assertion. Walker testified that Judge Newsome told him that he had "enough for a search warrant, maybe" (doc. 300 at 198) and that he did not "recall her saying, you have a search warrant in those exact words" (*id.* at 198). And Judge Newsome testified that there was no telephonic warrant issued to enter and search the Almond home. (Doc. 299 at 55.) In short, even by his own testimonial admission, Walker did not receive a telephonic search warrant.

There are indeed limited exceptions to the need for a warrant before entering a residence. Those generally are consent and exigent circumstances. At trial, Walker did not claim that he had consent or that exigent circumstances existed. He only claimed that he discussed a search warrant with Judge Newsome, and because he had been told that he had enough for a warrant, he proceeded with the entry and search of the Almond residence. Being told that he had enough for a warrant is far different from being told that he had a warrant.

At trial and yet again, Walker suggests there is another exception to the warrant requirement — a "good faith exception to the exclusionary rule." Both

12

before and at trial, Walker sought to invoke the *Leon* good-faith exception as a defense to the civil damages claim against him. *See generally United States v. Leon*, 468 U.S. 897 (1984) (discussion the good-faith exception). The Court refuses to recognize such an exception in this context. The exclusionary rule prohibits the use of evidence seized during an unlawful search in a subsequent criminal prosecution. *See United States v. Martin*, 297 F.3d 1308, 1312 (11th Cir. 2002). Unlike the consent and exigent circumstance exceptions, it is not a rule that affords law enforcement a right to engage in a warrantless search. But even if it did, the exception still would suffer from an insurmountable infirmity here — the *Leon* exception applies when there is a warrant, but the warrant is defective for some reason. *See id.* at 1313. Here, there was no warrant, thus *Leon* would not apply even under Walker's theory.

Finally, Walker places significance with Judge Newsome's warrant file. That file contained a probable cause affidavit signed and dated February 2, 2018, which was three days after the search of the Almond residence. The file also contained a document titled Search Warrant issued to Walker on January 31, 2018. That file does not show that a telephonic warrant was issued on January 31, 2018, let alone a valid one.[3] That Walker may have obtained a written search warrant three days after the entry and search did not remedy or cure the Fourth Amendment violation that had already occurred. Strict conformity with the law was required.

The warrant issue was a mess. The Fourth Amendment was not followed. Alabama law was not followed. The Alabama Rules of Criminal Procedure were not followed. Judge Newsome, nor any other judge, told Walker that he had a

---

[3] A reasonable inference could be drawn that this was a post-hoc effort to validate the earlier entry and search on January 31, 2018. Walker also testified that he had engaged in other searches of homes when proper telephonic warrants had not been secured, thereby suggesting this was a common practice by the RCNU. (*See* doc. 300 at 197–98.)

warrant to enter and search the Almond residence.  And there was no consent or exigent circumstances. Yet the entry (a violent one) and search proceeded anyway. There was no issue of reasonableness for a jury to consider on this basis.  Thus, to the extent Walker seeks an order vacating the Court's finding that a Fourth Amendment violation occurred, Walker's request is denied.  And to the extent Walker seeks a new trial—based on the claim that the jury should have decided whether a reasonable officer could have believed that Judge Newsome issued a search warrant at the time of the phone call—that too is denied.

### 2.    Qualified Immunity

Walker also argues for qualified immunity.  This is the fourth time he has sought it.[4]  And for the fourth time, it will be denied.

Law enforcement officials are entitled to qualified immunity when sued in their individual capacities as long as "their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To determine whether Walker is entitled to qualified immunity, Walker bears the initial burden of showing that he "acted within the scope of discretionary authority when the allegedly wrongful acts occurred." *Hardigree v. Lofton*, 992 F.3d 1216, 1223 (11th Cir. 2021) (quoting *Sims v. Metro. Dade Cnty.*, 972 F.2d 1230, 1236 (11th Cir. 1992)).  Once this is established, the burden then shifts to the Almonds to show that Walker's conduct violated a constitutional right that was "clearly established" at that time.  *See Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021) (discussing how to show a constitutional right is clearly established); *Hardigree*, 992 F.3d at 1223–24.  A right

---

[4] Walker previously sought qualified immunity via a motion to dismiss, a motion for summary judgment, and then during an appeal to the Eleventh Circuit.

is "clearly established" when it puts all reasonable officials on fair notice that the alleged conduct is unlawful. *Crocker*, 995 F.3d at 1239–40.

There being no real contention here as to whether Walker acted within the scope of his discretionary authority during the entry and search of the Almond residence, the Court proceeds to examine whether Walker's conduct violated a clearly established constitutional right. Walker submits that it did not.

At the time of the search here, it was well-established as "a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton,* 445 U.S. at 586 (footnote omitted); *accord United States v. Burgos,* 720 F.2d 1520, 1525 (11th Cir. 1983) (quoting *Payton*, 445 U.S. at 586); *see also United States v. Satterfield,* 743 F.2d 827, 843 (11th Cir. 1984) ("Although a warrantless search and seizure in a home is presumed to be unreasonable . . . courts will uphold searches of homes based on both probable cause and exigent circumstances." (citation omitted)). The rule that in-home searches violate the Fourth Amendment unless they are accompanied by a warrant or an exception to the warrant requirement applies "even when [the arrest] is accomplished under statutory authority and when probable cause is clearly present." *Payton*, 445 U.S. at 589; *accord Bashir v. Rockdale Cnty.*, 445 F.3d 1323, 1328 (11th Cir. 2006) ("Although the district court ruled the officers had probable cause to arrest Bashir for disorderly conduct, a ruling Bashir has not challenged on appeal, the existence of probable cause does not by itself validate a warrantless home arrest."); *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) ("Thus, 'absent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within.'" (quoting *Payton*, 445 U.S. at 587–88)).

Those exceptions are extremely limited – consent or exigent circumstances.

*See Katz*, 389 U.S. at 357.  As a result, at the time of the entry into the Almond residence, "it was thus clearly established law that, absent [consent or] probable cause and exigent circumstances, a warrantless search of a residence violates the Fourth Amendment, unless the officers engage in reasonable efforts to avoid error." *Hartsfield v. Lemacks*, 50 F.3d 950, 955 (11th Cir. 1995).  Here, law enforcement did not believe, nor did the events of that day support such a belief, that they had consent or that exigent circumstances existed.  More importantly, there was no telephonic warrant—not even a defective one.

Walker argues that he did engage in a reasonable effort to avoid error because he contacted Judge Newsome.  True, "[a]n accidental search or seizure does not violate the Fourth Amendment if the officer reasonably attempted to avoid the error." *Shepard v. Hallandale Beach Police Dep't*, 398 F. App'x 480, 483 (11th Cir. 2010) (per curiam) (citing *Hartsfield*, 50 F.3d at 954–55).  "The objective reasonableness of [a law enforcement official's] actions in conducting a search or seizure will often require an examination of the information possessed by the [official] at the time of the search and seizure." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).  For example, the Eleventh Circuit has concluded that assisting officers during a search are entitled to qualified immunity when there is no evidence that they acted unreasonably in following the lead of a primary officer or that they knew or should have known that their conduct might result in a Fourth Amendment violation, even when the primary officer is not entitled to qualified immunity.  *Id.* at 483 (discussing *Brent v. Ashley*, 247 F.3d 1294, 1305–06 (11th Cir. 2001), and *Hartsfield*, 50 F.3d at 956 (both concluding officers who had not seen the search warrant and followed the investigating officer who obtained the search warrant into the wrong house were entitled to qualified immunity)).

But this was not an accidental search or seizure or a mistake in location.  Nor was it an entry and search based on some unknown defect in a warrant. It was an

intentional and planned entry into the Almond residence without consent, without exigent circumstances, without a written warrant, without a telephonic warrant, and without an officer who had been told that he had a warrant. For Walker, it was not reasonable to believe that Judge Newsome had given him a telephonic search warrant because she never gave him one and never told him that he had one. Even by his own admission, he was told only that he "basically" had "enough" for a warrant. And when considering what constitutes a proper telephonic warrant under the Alabama Rules of Criminal Procedure, much more was required than a simple verbal statement from a judge that law enforcement had enough for a warrant. *See* Ala. R. Crim. P. 3.8(b) (2018). It was not objectively reasonable for Walker to claim, let alone believe, that he had a telephonic warrant under those circumstances. *See Groh*, 540 U.S. at 564 ("No reasonable officer could claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional."); *see also Bates v. Harvey*, 518 F.3d 1233, 1243 (11th Cir. 2008) (same, but describing a warrantless search inside a home as "presumptively unreasonable" (citing *Payton*, 445 U.S. at 586)).

Like he has throughout this case, Walker once again argues for application of the "good-faith exception to the exclusionary rule." (Doc. 306 at 36.) He also states that "the *Leon* good faith exception protects officers who act in reasonable reliance on a judge's probable cause determination even when a search warrant is ultimately held invalid." (*Id.*) Then, bootstrapping to that rule, Walker submits that this is the "same objective reasonableness standard" announced by the Supreme Court in *Groh*. (*Id.*) According to Walker, the *Groh* Court held that an "officer conducting a search is entitled to qualified immunity if a 'reasonable officer could have believed' that the search was lawful 'in light of clearly established law and the information the searching officers possessed.'" (*Id.*)

Once again, Walker misconstrues the *Leon* rule. The *Leon* rule is not a rule

that "protects officers."  Indeed, it is not a rule that makes a warrantless entry and search a lawful one.  It is a rule of admissibility of evidence in the criminal context. This case does not concern an attempt to suppress evidence obtained with a defective warrant.  In short, *Leon* good-faith has no application here.  Nor should it.

All told, the Almonds have shown that Walker is not entitled to qualified immunity as it was clearly established that a warrantless search absent an exception (consent or exigent circumstances) violates the Fourth Amendment, and it was unreasonable for Walker to believe he had a telephonic warrant.  For the law to be clearly established, it "does not mean that a court must have previously found the very action in question unlawful, but it does mean that 'in the light of pre-existing law the unlawfulness must be apparent.'"  *Jordan v. Doe*, 38 F.3d at 1559, 1566 (11th Cir. 1994) (quoting *Anderson*, 483 U.S. at 640).  Given the rule against warrantless searches as set forth under the Fourth Amendment and Alabama law, all reasonable law enforcement officers should have known that Walker's actions— entering and searching the Almond residence without a written warrant, without complying with telephonic warrant requirements, without being told by a judge that he had a telephonic warrant, without consent, and without exigent circumstances— violated the law.  Under then-clearly established law, the contours of the Fourth Amendment were clear enough to give a reasonable officer fair and clear notice that Walker could not enter and search the Almond residence.  A reasonable officer, especially a veteran one, should know what the law requires.  (*See* doc. 299 at 50.) Ignorance of the law, or being new to the telephonic warrant process, is not a defense or excuse.  (*See* doc. 300 at 196–97.)  Therefore, once again, Walker's request for qualified immunity will be denied.

### 3.    Probable Cause

Walker also argues for a new trial because, according to Walker, the Court abused its discretion when it allowed the Almonds to challenge Walker's argument

and testimony at trial that probable cause existed to enter and search the Almond residence.

This was an issue addressed by the Court before trial. (*See* doc. 276.) The Court sees no reason to go into this issue in detail except to note that probable cause, or lack thereof, was raised by both the Almonds and Walker in their pretrial contentions (*see* doc. 216), that it was set out in the pre-trial order, and that Walker repeatedly injected the issue into the trial.  Indeed, Walker made probable cause an issue at trial by repeatedly claiming that probable cause existed for the search, that it gave him grounds for entering and searching the Almond residence, and that it supported his good-faith belief that he had a warrant and could enter the residence. By making these contentions – repeatedly – the Almonds certainly had a right to dispute them.[5] That is the purpose of an adversarial system, especially at trial.

And finally, the facts related to the alleged probable cause for the entry and search were relevant to the Almonds' excessive force claim against Clark. For example, if probable cause was based on some sort of violent threat by the Almonds, then that fact may have supported the use of a flashbang device.  But if probable cause was based only on the alleged smell of unburnt marijuana, then that fact may not have supported the use of a flashbang device.

Walker also argues that because the Almonds challenged probable cause, Walker should have been permitted to present evidence that the Almonds previously sued other law enforcement officers and later voluntarily dismissed their claims against them.  (Doc. 306 at 60.)  But allowing such testimony or evidence would

---

[5] And quite frankly, there were issues of concern about probable cause that were raised, such as the claim that Deputy Morrow had smelled *unburnt* marijuana when his k-9 partner did not alert from that same smell, the generally confusing and inconsistent timeline of events such as a probable cause affidavit signed on February 2, 2018, and evidence that the phone records showed no phone call between Walker and Judge Newsome on January 31, 2018.

only have injected confusion, waste, prejudice, and irrelevant issues into the trial. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). The Court finds no persuasive argument on this issue.

From all that appears, Walker argues the Court should not have allowed the Almonds to challenge probable cause in the first place because the Almonds did not satisfactorily rebut it at trial. This Monday-morning quarterbacking finds no footing here. The Almonds were permitted to try their Fourth Amendment unlawful entry and search claim, Walker was permitted to rebut and contest it, and the Almonds were permitted to rebut Walker's arguments and evidence. No error exists under this assertion.

### 4. Damages

Walker attacks the $750,000 compensatory damage award from two angles. First, he argues that a new trial should be awarded because "there is insufficient evidence of causation and damages." (Doc. 306 at 54.) Second, he argues the award should be remitted to $0 or something consistent with the evidence.

To begin, "[f]or damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have occurred and further that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue." *Jackson v. Sauls*, 206 F.3d 1156, 1168 (11th Cir. 2000). While reported decisions on the types of damages available for unlawful entry and searches are limited, courts have recognized that damages for physical injury, property damage, injury to reputation, and mental anguish are recoverable. *See, e.g., Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999) ("Victims of unreasonable searches or

seizures may recover damages directly related to the invasion of their privacy—
including (where appropriate) damages for physical injury, property damage, injury
to reputation, etc.; but such victims cannot be compensated for injuries that result
from the discovery of incriminating evidence and consequent criminal
prosecution."); *Horton v. Notorfrancesco*, Case No. CIV-A. 88-1962, 1990 WL
112087, at *7–8 (E.D. Pa. Aug. 1, 1990) ("Horton may recover for embarrassment
and 'mental anguish' from the illegal intrusion into his closet."). Further, the
Eleventh Circuit has stated: "The injury in civil rights cases may be intangible . . . .
It need not be financial or physical but may include damages for humiliation and
emotional distress." *Stallworth v. Shuler*, 777 F.2d 1431, 1435 (11th Cir. 1985)
(citing *Carey v. Piphus*, 435 U.S. 247, 263–64 & n.20 (1978)).

At trial, the Almonds testified extensively about their damages. They testified
to the sanctity of the privacy of their home, the damage to their front door,
doorframe, floor, entertainment center, and personal belongings, law enforcement's
actions in searching their personal belongings and throwing them onto the floor, as
well as to their emotional suffering, which includes withdrawing from others, new
feelings of fear and the need to carry a gun, crying, anxiety, panic, and feeling the
need and actually vacating their home and staying elsewhere. (Doc. 300 at 228–229,
237; Doc. 301 at 29–30, 76–81.) Their daughter testified also, speaking to the impact
the entry and search had on the Almonds (e.g., being withdrawn, distant, lost, fearful,
and no longer acting like their typical selves). (Doc. 300 at 226–27.)

Walker first states that:

[T]here is no evidence that anything that Officer Walker did or did not
do was the proximate cause of the Almonds' damages. In other words,
the injuries and damages that the Almonds claimed were not caused by,
nor were they the foreseeable consequences of, Officer Walker not
having a written warrant.

(Doc. 306 at 54.)

21

But contrary to this assertion, the Almonds claimed these damages were directly tied to the entry and search of their residence which was conducted without a warrant, consent, or exigent circumstances. Indeed, the lack of a warrant not only made the violent entry into the residence unlawful, but it also made the search of the residence and its contents unlawful as well. The damage caused by the entry into the residence and the damage caused by the search were reasonably foreseeable consequences of that unlawful entry and search.[6] While Walker argues that the Almonds would have experienced and incurred such damages anyway, Walker presented no evidence to support that assertion; that is, that the entry and search would have occurred in the identical manner with a warrant in hand. As a result, Walker's assertion rests on a foundation that was not proven.

Walker's argument also seems to ignore the role that the jury played here. Causation is usually a jury issue, and it was here. *See, e.g.*, *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015) ("[T]he causal link . . . [is a] question[] of fact, a jury resolves [it] unless the evidence is undisputed." (citing *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 760 (11th Cir. 2006))); *Rodgers v. AWB Indus., Inc.*, 762 F. App'x 1015, 1023 (11th Cir. 2019) ("[I]t is well established that the question of proximate cause is almost always a question of fact to be determined by the jury . . . ." (quoting *Lemond Constr. Co. v. Wheeler*, 669 So. 2d 855, 862 (Ala. 1995))); *Fair Hous. Ctr. of the Greater Palm Beaches, Inc. v. Sonoma Bay Cmty. Homeowners Ass'n, Inc.*, 682 F. App'x 768, 787 (11th Cir. 2017) ("In short, causation is an intensely factual question that was presented to, and decided by, the jury."); *Jacob v. Korean Air Lines Co.*, 606 F. App'x 478, 481 (11th Cir. 2015) ("[C]ausation is an issue generally left to a jury . . . ."). In fact, Walker's counsel

---

[6] At trial, Walker's counsel spent considerable time examining the Almonds on their emotional state and mental and physical conditions, their medical records and medical and psychiatric visits, and the tidiness with which they kept their residence.

spent an extraordinary amount of time in their examination of the witnesses on causation, including a deep dive into Teresa Almond's medical records and the Almond family's personal issues.   Given the Almonds' assertion of a causal connection and Walker's contest of it, the jury was free to accept or reject it.  But it is not for this Court to interject itself into this key jury role.  As a result, Walker's causation argument is rejected.

But that is not the end of the issue.  Walker also challenges the amount of the compensatory awards and seeks a remittitur of the awards to $0 or some other amount reflective of the evidence at trial.  This assertion stands on stronger footings.

The Supreme Court long ago recognized that excessive damages is one of the grounds under Fed. R. Civ. P. 59 on which a party may seek a new trial.  *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940) ("The motion for a new trial may invoke the discretion of the court in so far as it is bottomed on . . . the damages are excessive . . . .").   Whether to grant a new trial or remittitur on the ground of excessive damages is a matter within the sound discretion of the district court.  *See, e.g.*, *Simon v. Shearson Lehman Bros.*, 895 F.2d 1310 (11th Cir. 1990) ("[W]hen [a] district court grants a new trial because it finds the jury award 'excessive,' we employ the general abuse of discretion standard."); *Goldstein*, 758 F.2d at 1447 ("[A] new trial should be ordered only where the verdict is so excessive as to shock the conscience of the court.  Whether a new trial is required is within the sound discretion of the district court . . . ." (citations omitted).)  If a court determines that the damages award is excessive, it can either grant a new trial or enter a remittitur order and reduce the damages, which the plaintiff can accept or seek a new trial. *Johansen*, 170 F.3d at 1328 ("A court which believes the jury's verdict is excessive may order a new trial unless the plaintiff agrees to remit a portion of the jury's award. (citing *Dimick v. Schiedt*, 293 U.S. 474, 486–87 (1935))).  When ordering remittitur, a court is to reduce the jury's award to the "outer limit of the proof" established by

23

the evidence. *Rodriguez*, 518 F.3d at 1266  (quoting *Goldstein*, 758 F.2d at 1448). "[N]o judgment for a remittitur may be entered without the plaintiff's consent because the Seventh Amendment prohibits the court from substituting its judgment for that of the jury's regarding any issue of fact." *Johansen*, 170 F.3d at 1329 (citing *Hetzel v. Prince Williams Cnty.*, 523 U.S. 208, 209–12 (1998) (per curiam)).

Courts should order a remittitur if the damages award "exceeds the maximum amount that could have been awarded based on the evidence and the instructions." *Rodriguez*, 518 F.3d at 1266. "[A] remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence." *Goldstein*, 758 F.2d at 1448.  The Eleventh Circuit has set a high standard for granting a new trial for excessive damages. The challenged award must be "grossly excessive," indicating that the "jury's verdict was swayed by passion and prejudice," and also "so excessive as to shock the conscience of the court." *Id.* at 1447.

Importantly, the Eleventh Circuit has stated that compensatory damages "need not be proven with a high degree of specificity." *Akouri v. State of Fla. Dept. of Transp.*, 408 F.3d 1338, 1345 (11th Cir. 2005). "Compensatory damages may be inferred from the circumstances as well as proved by the testimony." *Ferrill v. The Parker Grp., Inc.*, 168 F.3d 468, 476 (11th Cir. 1999) (citations and internal quotation marks omitted).  A plaintiff's own testimony may suffice toward that end. *See id.*  "Any evidentiary shortcomings go more to the amount, rather than the fact, of damage." *Id.* (internal quotation marks omitted) (quoting *Marable v. Walker*, 704 F.2d 1219, 1220 (11th Cir. 1983)).  In general, courts must grant deference to a jury's award of compensatory damages for emotional harm because "the harm is subjective and evaluating it depends considerably on the demeanor of the witness." *Akouri*, 408 F.2d at 1344 (quoting *Ferrill*, 168 F.3d at 476).

Here, the jury and the Court were faced with a complex timeline of events from a damages standpoint.  The Almonds could not obtain damages based on their subsequent arrest and prosecution or the seizure of their belongings after that arrest, as those claims had been dismissed at the summary judgment stage.  But the Almonds could obtain damages related to the harm reasonably foreseeable from the unlawful entry and search and that were not caused by any intervening events such as their arrest.  While there was some overlap and narrative that had to be put in front of the jury, in line with the narrow aspect of the unlawful entry and search claim, the Court sought to limit any inference that the Almonds should be compensated for their subsequent arrest and prosecution, or missing items from their residence, or damage to their personal contents removed from the residence, or their failed business or foreclosure of the residence. (*See, e.g.*, doc. 301 at 32.)  Indeed, most of these issues were kept from the jury altogether.  (*See* doc. 276.)

But from a damages standpoint, most of the evidence at trial centered upon the violent entry into the residence, the damage caused by that entry, the search of the residence including all of their personal belongings and resulting damage from that search, as well as their mental anguish and emotional distress flowing from those issues.   The Almonds' testimony supported some measure of an award of compensatory damages.  As a result, Walker is not entitled to a new trial based on the assertion that the Almonds failed to show any damage, nor is he entitled to a remittitur of the compensatory damage awards to $0.

Admittedly, the awards were higher than the Court would have awarded had it sat as the factfinder, but that is not the measure by which the jury's award must be analyzed. *See Goldstein*, 758 F.2d at 1448 (holding that the jury's award is measured by "the amount established by the evidence").  The Court, however, does have real concerns.  These were sizeable awards.  In fact, they were $450,000 and $300,000 when compared to a $50,000 compensatory award to Greg based on Clark's use of

the flashbang device that caused physical injury. The unlawful entry and search claim was a claim of limited damages because of the limited nature of the claim. It was not a wrongful arrest claim, wrongful conviction claim, malicious prosecution claim, or an excessive force claim. Nor was there any evidence of physical injury from the intrusion itself, nor any testimony from a medical provider about mental anguish or any other physical or mental injuries. It was a claim largely related to the events occurring during the afternoon of January 31, 2018. Again, the Court has no doubt there was a compensatory component to the mental anguish and emotional distress that the Almonds suffered when their personal privacy was violently invaded in the manner that it happened here.

The Eleventh Circuit has cautioned courts against "divining" the appropriate amount of damages when the party moving for remittitur fails to provide "a dollar amount that would not be excessive." *See Advanced Bodycare Sols., LLC v. Thione Int'l, Inc.,* 615 F.3d 1352, 1363 n.23 (11th Cir. 2010) ("Because [counterclaim defendant] did not indicate the amount of the remittitur or judgment reduction the district court should have ordered—put another way, since [counterclaim defendant] did not point the district court to a dollar amount that would not be excessive—it is unclear how the district court could have divined such amount.").

Walker has not proposed an acceptable amount for the compensatory damage awards that he challenges, so the Court addresses Walker's motion while bearing in mind the Eleventh Circuit's caution against divining an appropriate amount. *See id.* While Walker argues for a remittitur to $0 or a new trial, a partial remittitur is more appropriate. And here, the Court finds, under the totality of the evidence, a remittitur of Greg's award from $450,000 to $150,000 and for Teresa from $300,000 to $100,000 is appropriate. The Court finds that the jury's original award of $450,000 to Greg and $300,000 to Teresa to compensate them for the unlawful entry and search exceeds the maximum amount that could have been awarded based on the

evidence, the Court's instructions, and is excessive beyond the realm of reasonableness. *See Rodriguez*, 518 F.3d at 1266. This is especially true when there was no medical or other objective evidence of the Almonds' damages, only the testimony of the Almonds and their daughter. The Court recognizes that there was a host of events that day, including those that immediately followed, that had a significant emotional and personal impact on the Almonds. But not all of that is compensable, nor is the unlawful entry and search the sole cause. Thus, unless the Almonds accept a remittitur of those awards to $150,000 and $100,000 respectively, the Court will order a new trial concerning the issue of damages.

"The Seventh Amendment requires, however, that the plaintiff be given the option of a new trial in lieu of remitting a portion of the jury's award." *Johansen*, 170 F.3d at 1329 (citing *Hetzel*, 523 U.S. at 209–11). If the Almonds do not consent to the remittitur, the Court will order a new trial solely on the issue of damages. Accordingly, the Court reduces Greg's compensatory damage award to $150,000 on the unlawful entry and search claim and Teresa's compensatory award to $100,000 on the same claim and grants a new trial at their option.

## B.   Deputy Sheriff Larry Clark (excessive force claim)

Against Clark on the excessive force claim, the jury found for Greg Almond and awarded $50,000 in compensatory damages and $200,000 in punitive damages. Clark seeks qualified immunity, or alternatively, a remittitur or a new trial.

### 1.   Qualified Immunity

Like he did at summary judgment, Clark argues for his entitlement to qualified immunity. His argument centers on the type of device and the circumstances in which it was deployed. He states that: "This device, as advertised, simply made a loud noise. There are no cases in the Eleventh Circuit that have held that law enforcement officers making a loud noise as they enter a property violated a suspect's Fourth Amendment rights." (Doc. 295 at 6.) In other words, as Clark

argues, Greg "cannot establish that the existing case law at the time of this incident 'so clearly defined the contours' of the use of distraction devices that it was clear to any officer that the use of this device was unlawful under the circumstances they confronted." (*Id.*)  Greg, of course, contests this assertion, both factually and legally, pointing to the actual evidence at trial.

"Offic[er] action constitutes excessive force [in violation of the Fourth Amendment] when it is objectively unreasonable." *Dukes v. Deaton*, 852 F.3d 1035, 1042 (11th Cir. 2017) (citing *Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015)).  "To measure the objective reasonableness of offic[er] action, [courts] weigh 'the quantum of force employed' against 'the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight.'" *Id.* (quoting *Salvato*, 790 F.3d at 1293).  "Whether an officer's actions are 'objectively reasonable' is a function of 'the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).

Clark contends his use of the device was reasonable because it was merely a non-incendiary "distraction device" and because the Almonds posed a "high risk" threat to the law enforcement officials' safety based on the number of guns later found and seized from the residence.  Clark also claims to have looked inside the living room and saw no one in the area before throwing the device.  This was not the evidence at trial.

At trial, the manufacturer's warning for the device was presented to the jury. That document in bold type was titled WARNING.  Of importance, the Warning did not describe the device as simply a "distraction device" or that the device only made a loud noise or bang.  Instead, the Warning identified the device as a "12 Gauge Flash Bang Cartridge."  In using the word "flash," the Warning itself described the

device as something more than a device that simply goes *bang*. Further and more importantly, the Warning, while stating that it was "not an explosive," also warned users as follows: "DO NOT throw directly at any person. The overpressure and flash in direct contact may be Lethal. Ideally to be thrown no closer than 5 feet from area of desired (sic) effect." (Pls.' Ex. 5, ¶ 4.) Thus, by its plain language, the Warning stated that it did more than just go *bang* and that it could be lethal.

The Warning was not the only testimony about the device's propensities and its use. At trial, Greg also testified about the device's detonation. He testified that the device was thrown within inches of his feet (doc. 301 at 74), and that when it detonated, it did so with such force that it "blew a hole in the floor" (*id*. at 72), caused floor tile to disintegrate and hit his leg and face (*id*. at 73), impacted his hearing and sight (*id*. at 73–74, 77), and caused a knot on his leg (*id*. at 74, 77).

Deputy Donnie Strain also testified about the device at trial. He testified that, during the pre-raid meeting, Clark did not mention his intent to use any sort of device during the raid, but that if a device was discussed, which it should have been, he would have "used ear protection, eye protection, and gloves along with the other protective gear that I wore." (Doc. 300 at 90, 96.) This was because he would have wanted to "protect my ears, my hearing, protect my eyesight." (*Id.* at 90.) He also testified that proper use of the device was to open a door and then to place the device inside before law enforcement entered. (*Id.* at 96–97.) He added that he was the first officer to enter the residence, and after he did, the device flew over his shoulder and landed between him and Greg and immediately detonated. (*Id.* at 94–95.) This came as a "shock" to him and made his ears ring. (*Id.* at 95.)

Clark also testified about the device. He stated that he did not recall telling the team members at the pre-raid meeting that he intended to deploy the device. (Doc. 299 at 95–96.) He also acknowledged that he knew nothing about the Almonds' criminal history, background, or prior experience with law enforcement,

but he knew when he left the pre-raid meeting that he planned to use the device. (*Id.* at 108, 117.)  As to the device itself, he acknowledged that it could kill someone. (*Id.* at 113.)  Finally, he testified that he did not remember seeing Deputy Strain or Greg before he threw it in the front room where they were located and that he had no idea where it landed with respect to Strain or Greg.  (*Id.* at 113–14.)

Thus, the facts construed in the light favorable to Greg establish that Clark blindly threw the flashbang device — a device that its own user manual describes as potentially lethal — into an occupied living room where it landed and detonated within inches of Greg and at least one other officer.  The explosion caused injury, including constant ringing in Greg's ears, sustained vision impairment, and a knot on his leg.  It also damaged the floor by blowing a hole in it.  The evidence also showed that Clark did not discuss using the device with the other law enforcement officials and that it was not deployed in response to any perceived or actual risk of eminent danger or high safety risk concerning the Almonds.  After all, as the evidence at trial showed, Teresa had invited Deputy Morrow to return to the Almond residence, and the only crime under suspicion was the existence of unburnt marijuana in the residence.

Clark states that "[i]f any credence is given to the plaintiffs' assertion that they had over eighty firearms in the house, the danger to the officers is obvious." (Doc. 295 at 8.)  Assuming this factual assertion is true, no evidence was presented that Clark or any officers were aware of any guns, let alone eighty guns, at the time of the raid.  Nor was there any evidence that the Almonds imperiled law enforcement or had any history of violence or using guns against anyone.  Excessive force is determined based on the objective reasonableness of the force based on what the officials knew at the time the force was employed—not what they learned later.  *See Dukes*, 852 F.3d at 1042.

And the actual facts—the room was occupied and the device landed within inches of Greg and within feet of Deputy Strain—contradicts Clark's trial testimony that he looked into the living room, did not see anyone, and then deployed the device. *See Dukes*, 852 F.3d at 1043 (holding that an "officer's failure to perform a visual inspection before throwing a flashbang into an area" and that "the use of a flashbang in an area occupied by bystanders" weighs against reasonableness).

Viewing the facts in the light favorable to the Almonds, which largely mirrored those presented at summary judgment, Clark blindly, without pre-planning or informing his fellow law enforcement officials, threw a potentially lethal and injurious flashbang device into an occupied room despite the fact that the Almonds presented no active threat of harm, resistance, or evasion. In doing so, Clark violated Greg's Fourth Amendment rights against excessive force.[7]  *See Dukes*, 852 F.3d at 1043; *see also Jones ex rel. Z.J. v. Kan. City Bd. of Police Comm'rs,* 931 F.3d 672, 685 (8th Cir. 2019) ("[W]e hold only that it was clearly established in 2010 that the use of flash-bang grenades is unreasonable where officers have no basis to believe they will face the threat of violence and they unreasonably fail to ascertain whether there are any innocent bystanders in the area it is deployed." (emphasis omitted)); *Est. of Escobedo v. Bender*, 600 F.3d 770, 784–86 (7th Cir. 2010) ("[T]he use of a flash bang grenade is reasonable only when there is a dangerous suspect and a dangerous entry point for the police, when the police have checked to see if innocent individuals are around before deploying the device, when the police have visually inspected the area where the device will be used and when the police carry a fire extinguisher."); *Boyd v. Benton Cnty.*, 374 F.3d 773, 777–79 (9th Cir. 2004) (holding that the use of flashbang device was an unconstitutional use of excessive force where

---

[7] Clark also testified that a flashbang is appropriate in all residential entries.

police deployed it without either looking or sounding a warning when there were innocent individuals in a room as well as suspected robbers).

The Court now turns to whether it was clearly established at the time that the flashbang device could not be used under these circumstances or in the manner that it was used. This is Clark's primary argument in his post-trial motion. And it again goes back largely to the Eleventh Circuit's decision in *Dukes v. Deaton*. *See generally Dukes,* 852 F.3d at 1035. Clark tries to distinguish *Dukes* by arguing that the device he used was not an incendiary device like that in *Dukes*, and therefore, it was not clearly established that using this particular type of device under these circumstances constituted excessive force. The Court previously discussed *Dukes* under these facts when it ruled on the parties' summary judgment motions, and it rejected Clark's assertion at that time. Being presented with *Dukes* again, the facts at hand largely remain the same, and in some respects, they are worse.

Like it did previously, the Court concludes that it was clearly established at the time of the entry and search of the Almond residence that the use of a flashbang device under these circumstances and in the manner that Clark used it violated Greg Almond's right to be free from excessive force. *Dukes*, like this case, dealt with a flashbang device deployed inside an occupied home. *Id.* at 1039–41. And there, the Eleventh Circuit found that the use of the flashbang device under those facts constituted excessive force. *Id.* at 1043. While the facts in *Dukes* are not identical to the facts in this case in all aspects — as no two sets of facts are — they are materially indistinguishable to those here as required to clearly establish the law.

In fact, if anything, using the flashbang device was more reasonable in *Dukes* than it was here. In *Dukes*, the officers were executing a search of a home on suspicion of possession and the sale of marijuana, like the suspected possession of unburnt marijuana here. *Id.* at 1039. In *Dukes*, the officer blindly threw a flashbang device into an occupied room. *Id.* at 1042. And here, Clark also blindly threw a

flashbang device into an occupied living room, although Clark claimed that he looked into the room first.  That Clark testified that he was unaware of anyone in the room is belied by the fact that the device landed within inches of both Strain and Greg.[8]

And although the device in *Dukes* could also produce extreme heat, that flashbang device carried the risk to cause significant harm, much like the one that Clark used.[9]  *See id.* at 1040.  That the *Dukes* device was incendiary while the device used here was not is an immaterial distinction.  After all, the Warning on Clark's flashbang device warned of its lethality and the need to avoid throwing it within a five-foot radius of a person, and both Greg and Strain provided testimony about the device's impacts on them and the damage it caused upon detonation.  Indeed, Greg testified that the device detonated with so much force that it blew a hole in the floor, disintegrated the floor tile, and caused personal injury.  This testimony was not contested by any testimony at trial.

Further, in *Dukes*, "there existed minimal need" for the flashbang device even though the "warrant stated that an informant advised law enforcement that [a resident] kept a handgun on his person," whereas here, none of the officials had been informed that the Almonds kept firearms on their person, or were dangerous, or posed any immediate threat to their safety, or that this was a high risk entry, which all mitigated the need for a flashbang. *Id.* at 1042–43.  And in *Dukes,* like this case where Teresa had invited Deputy Morrow to return, there was no evidence that the

---

[8] Clark seems to suggest that his actions were not intentional.  The evidence showed that they were.  After all, Clark had planned to use the device when he participated in the pre-raid meeting with other law enforcement members.

[9] Again, the user manual describes the device as potentially being "lethal" when in close proximity to someone.  Meanwhile, the user manual for the flashbang device used in *Dukes* only noted that it had "the potential to cause serious bodily injury." *Dukes*, 852 F.3d at 1040 (internal quotation marks omitted).

residents were evading or resisting the officers. *Id.* at 1040.  Finally, in *Dukes*, the operational plan of the raid had authorized the use of a flashbang device, but here, the operational plan did not contemplate the use of a flashbang device, which further reduced the reasonableness of its use.  *Id.*

In all relevant ways, the facts when construed in the Almonds' favor are similar enough to *Dukes* to constitute clearly established law on Clark's use of the flashbang device.  The Eleventh Circuit held in *Dukes* that the use of a dangerous flashbang device, thrown blindly into a room of an occupied home, during a search for suspected marijuana possession, constituted excessive force.  *Id.* at 1042–43.  Those are the facts here.

The Court finds that *Dukes* is a materially and factually indistinguishable case that clearly establishes that Clark's use of force was excessive.  *Dukes* is enough to put every reasonable officer on notice that blindly throwing a potentially lethal device into an occupied residence during a residential search with little-to-no threat to officer safety is unconstitutional.  But even if *Dukes* alone was not sufficiently similar to clearly establish the law, *Dukes,* along with broad excessive force principles, applies with obvious clarity to the totality of the circumstances here, which also bars qualified immunity under the second pathway to clearly established law.  *See Long v. Slaton*, 508 F.3d 576, 585 (11th Cir. 2007) (explaining that prior case law applies with "obvious clarity" where the circumstances are such that "only an incompetent officer or one intending to violate the law could possibly fail to know what the police did here violated the . . . law" (quotations omitted)).

Once again, Clark's request for qualified immunity will be denied.

### 2.    Remittitur

The jury awarded Greg $50,000 in compensatory damages and $200,000 in punitive damages against Clark.  Clark attacks both.

First, as to the $50,000 compensatory award, Clark claims the verdict was "flawed" because there was no medical testimony establishing that the flashbang device caused any of the injuries complained of by Greg.  Clark also states that the "undisputed testimony at trial was that the plaintiff did not appear to be injured during the four to five hours that it took to complete the search of his residence and inventory of items, and that during that time the plaintiff never complained of being injured."  (Doc. 295 at 8.)  Clark further argues that "plaintiff himself testified that he did not attempt to seek medical care for any alleged injury for more than three years after the event, and there was no medical testimony that any of the plaintiff's complaints were related to the use of force during entry into his residence." (*Id.* at 8–9.)

Contrary to Clark's assertion, there was no "flaw" in the verdict on the compensatory award.  Greg testified to the personal injuries and effects that the detonation had on him, including the knot it caused on his leg, his impaired vision and hearing, and the damage caused to his floor.  These effects were easily quantifiable by a lay person and did not need any medical testimony to quantify. That Greg did not immediately seek medical attention or notify law enforcement of his injuries, does not render the verdict flawed or unsupported by any evidence of injury or damage.  These certainly were good counterpoints for Clark to make with the jury to mitigate any assertion of significant or permanent injury – and his counsel did so at trial – but they do not foreclose his claim of injuries.  *See, e.g.*, *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) ("It is the jury's task—not the court's—to weigh conflicting evidence and inferences, and determine the credibility of witnesses." (cleaned up) (quoting *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2002)); *Moss*, 782 F.3d at 618 ("[T]he causal link . . . [is a] question[] of fact, a jury resolves [it] unless the evidence is undisputed." (citing *Battle*, 468 F.3d at 760)); *Jacob*, 606 F. App'x at 481

("[C]ausation is an issue generally left to a jury . . . ."); *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) ("It is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." (brackets omitted) (quoting *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 309–10 (11th Cir. 1988) (per curiam))).

And when considered in the context of the amount of the compensatory award – $50,000 – there was nothing shocking or exorbitant about the amount. No remittitur or new trial is warranted on account of the $50,000 compensatory damage award.

Clark also challenges the $200,000 punitive damages award. Clark argues the award is excessive because, as a deputy sheriff, he was only paid $12.50 per hour, and there is no conceivable way he can pay for this verdict from his current salary. He also argues that, because of a question posed by the jury during deliberations, the jury must have assumed that insurance would pay any award.

First, the jury question issue. In response to a jury question about insurance, the Court instructed the jury that such a consideration was not appropriate. Clark takes from this question that the jury therefore improperly considered insurance coverage in deciding to award damages. That is not the appropriate inference to be drawn, especially in the absence of any supporting evidence. *See Jones v. Campbell*, 436 F.3d 1285, 1303 (11th Cir. 2006) ("[T]he customary presumption that jurors follow instructions . . . ." (citing *Yates v. Evatt,* 500 U.S. 391, 403–05 (1991))); *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions. . . . Similarly, a jury is presumed to understand a judge's answer to its question." (citing *Richardson v. Marsh,* 481 U.S. 200, 211 (1987))). No evidence has been provided showing that the jury assumed there was insurance and issued a

damages award based on that belief.  Accordingly, Clark can find no relief under this argument.

The Court notes that Clark makes no allegation that the punitive damage award violates any of the due process principles discussed in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), or that the punitive damage award is not in line with the degree of reprehensibility of his wrongdoing, or is unconstitutionally disparate when compared with the penalties imposed in comparable cases.  Nor does Clark raise issues such as (1) whether Greg's harm was physical rather than economic; (2) whether Clark's conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the Almonds were financially vulnerable; (4) whether Clark's conduct involved repeated actions or was an isolated incident; and (5) whether the harm resulted from intentional malice, trickery, or deceit, or mere accident.

Instead, Clark merely attacks the award based on his claimed inability to pay it.  He argues that he only made $12.50 per hour as a deputy sheriff at the time and only makes $65,000 in salary in his current position.  The problem is, however, that Clark offered no evidence to either to the jury or the record that establishes either assertion.  Further, and more importantly, Clark has presented no evidence that Clark lacks other means, such as assets or insurance, of satisfying the award.  While net worth and financial ability to pay can be a factor for consideration, on this record, Clark's argument is merely unsubstantiated conjecture, hollow assertions, and an incomplete showing of poverty, wealth, or the financial inability to pay.

So, the Court finds no grounds for remitting the punitive damage award or granting a new trial based on the amount of the award.  The award of punitive damages is therefore appropriate under the facts and evidence.  Clark's request for remittitur therefore will be denied.

## CONCLUSION

Accordingly, it is **ORDERED** as follows:

(1)     Defendant Larry Clark's *Renewed Motion For Judgment As a Matter of Law, Or In the Alternative, Motion For Remittitur, Or In the Alternative, Motion for New Trial* (Doc. 295) is DENIED;

(2)     Defendant Kevin Walker's *Renewed Motion For Judgment As A Matter of Law In His Favor, To Vacate Judgment As A Matter of Law In The Plaintiff's Favor, Motion to Vacate, Alter Or Amend Judgment, And In The Alternative, Motion For A New Trial Or For A Remittitur* (Doc. 296) is GRANTED in part.  It is granted to the extent Defendant Kevin Walker seeks a remittitur of the compensatory damage awards against him.  It is denied in all other respects.

(3)     The compensatory damage award of $450,000 against Kevin Walker in favor of Plaintiff Greg Almond is hereby REMITTITED to $150,000.  Plaintiff Greg Almond is provided ten (10) days from the date of this Order to file a notice of remittitur in accordance with these terms, if he accepts the Court's remittitur. If Plaintiff Greg Almond fails to accept the Court's remittitur within ten (10) days, a new trial will be ordered limited to the issue of damages.

(4)     The compensatory damage award of $300,000 against Kevin Walker in favor of Teresa Almond is hereby REMITTED to $100,000. Plaintiff Teresa Almond is provided ten (10) days from the date of this Order to file a notice of remittitur in accordance with these terms, if she accepts the Court's remittitur. If Plaintiff Teresa Almond fails to accept the Court's remittitur within ten (10) days, a new trial will be ordered limited to the issue of damages.

**DONE**, on this the 12th day of November, 2024.

R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE